# *In the United States Court of Federal Claims*

| | | |
|---|---|---|
| **Palafox Street Associates, LP, et. al.** **Plaintiffs,** | ) | |
| **v.** | ) | **No. 99-898C** **Judge C. Miller** |
| **The United States,** **Defendant** | ) | |

## AMENDED COMPLAINT

**COME NOW** the Plaintiffs, the Keating Development Company ("KDC") and Palafox Street Associates, L.P., for this Complaint against Defendant, United States of America (hereinafter "the Government" or "GSA"), and for their Amended Complaint respectfully allege as follows:

## PARTIES AND JURISDICTION

1. Plaintiff KDC is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

2. Plaintiff Palafox Street Associates, L.P. ("Palafox") is a Pennsylvania Limited Partnership, the General Partner of which is KPscD, Inc., a Delaware corporation.

3. KDC was the Owner and Lessor to the Government of the premises for the United States District Courthouse at 1 Palafox Street, Escambia County, Pensacola, Florida ("Premises").

4. Palafox is the assignee of KDC with respect to the ownership and lease of the Premises, as more fully set forth below.

5. This Court has jurisdiction pursuant to 28 U.S.C. §1491 and the Contract Disputes Act of 1978, as amended, 41 U.S.C. §601 *et seq.*, and applicable regulations.

## FACTUAL BACKGROUND

6. On or about October 3, 1995, KDC and the Government entered into a Lease for Real Property, Lease No. GS-04B-35055, (hereinafter "Lease Agreement") under which KDC was to construct a Courthouse at 1 Palafox Street, Escambia County, Pensacola, Florida, and upon completion of the construction, lease the building to the Government for use as a United States District Courthouse and other Federal governmental offices (hereinafter "Premises"). A copy of the Lease Agreement, without attachments, is attached as **Exhibit A** to Plaintiffs' original Complaint**.**

7. The initial term of the Lease Agreement was for twenty (20) years, beginning on June 1, 1997 and ending on May 31, 2017, at an annual rental rate of $1,653,299.06. The date of the term was subject to change based upon the date that the Government accepted the construction of the Premises as substantially complete.

8. The Government accepted the Premises as substantially complete and began paying rent on August 1, 1997. The 20-year base term of the Lease Agreement expires on July 31, 2017.

9. The Lease Agreement also contains renewal options for two additional five year terms. The annual rate for the first option period was $708,704.00 and for the second option period was $822,138.40.

10. During the course of performance, the annual rental rate for the initial term of the Lease Agreement was increased to $1,663,724.17 (or $138,643.68 per month) pursuant to

Supplemental Lease Agreement ("SLA") No. 21, a copy of which is attached to the original Complaint as **Exhibit B**.

11. As part of the Lease Agreement, KDC was required to**,** and in fact did, enter into a Lease for Real Property (hereinafter "Ground Lease") with the City of Pensacola, Florida, the owner of the real property on which the Courthouse was to be constructed. A copy of the Ground Lease is attached to the original Complaint as **Exhibit C**.

12. KDC assigned the Lease Agreement to Palafox pursuant to Assignment and Assumption of Lease dated December 10, 1996, which was accepted by the Government pursuant to Novation Agreement dated December 10, 1996 (both of which are collectively attached as **Exhibit D** to the original Complaint), and KDC assigned the Ground Lease to Palafox pursuant to Assignment and Assumption of Lease dated December 10, 1996, which was accepted by the City pursuant to Amendment No. 1 to Lease of Real Property dated December 12, 1996 (both of which are collectively attached as **Exhibit E** to the original Complaint).

13. On June 30, 1998, the Plaintiffs submitted nine (9) certified claims to the Contracting Officer. Claim No. 1, the claim for the present value of the renewal option period rents, is set forth in Counts I-III below. Claim Nos. 2-9 are set forth in Count IV below.

14. On October 30, 1998, the Contracting Officer denied all of the claims in their entirety, but included offers of settlement for five of the nine claims. The Plaintiffs did not agree to the aforementioned settlement amounts offered by the Government, although the Government did remit to the Plaintiffs a payment in the sum of $28,000 on account of the Plaintiffs' claims, the acceptance of which the Government specifically agreed was not a release or waiver of any of the Plaintiffs' claims.

**COUNT I (FRAUD IN THE INDUCEMENT)**

15. Plaintiff re-alleges Paragraphs 1 - 14 as if fully set forth herein.

16. As part of the Solicitation for Offers (SFO), the Amendments thereto, and in negotiations with KDC, the Government represented to KDC that its price proposal was to be based upon the entire term of the lease, including the two option periods, and that the price proposal for all of such periods was a material term of the offers to be considered by the Government for the subject lease. The Government specifically indicated that the prices offered for the two option periods would be included in and considered in evaluating such offers.

17. Prior to the issuance of the SFO, the Government and the City of Pensacola ("City") negotiated and agreed upon, and the City executed and issued to the Government a Declaration of Donation ("Initial Donation Agreement"), which did not require execution by the Government and whereby the City of Pensacola donated to the Government, the property, including all improvements thereon, which was to take effect at the end of a twenty year lease.

18. Notwithstanding the foregoing Initial Donation Agreement, at the pre-proposal conference for said lease on February 22, 1995, the Government stated, "at the end of the lease term, the building and site will revert to the City."

19. In written questions submitted to the Government before the pre-proposal conference, but only answered later, an offeror asked whether the offerors could "receive a copy of the 'donation agreement' between the City of Pensacola and GSA." In written response to the question about the Donation Agreement issued after the pre-proposal conference, the Government responded to the question by stating, "[t]he above referenced agreement has been proposed by the City of Pensacola, but has not been executed by either GSA or the City of Pensacola. Since the agreement is not final, copies of the donation agreement will not be

released at this time. If the document is signed by GSA and City, it will be recorded in the public record and will be public information available to all interested parties." This statement was materially false in several ways: First, the terms of the Donation Agreement had already been finalized and agreed to between the City and the GSA, and executed by the City and delivered to the GSA, several months earlier, in the summer of 1994, so that the statement that it was "not final" as of February 1995 was not true. Second, the GSA was never to be signatory to the Donation document, which was drafted as a unilateral "Declaration of Offer of Donation" to be issued by the City which conveyed to the Government the irrevocable right to take title to the land and improvements after the expiration of the initial lease term of 20 years, with no requirement or need for the Government to exercise either of the two five year option periods that were part of the ground lease and the parties' contract. Finally, GSA's implication that the Donation document could not be "released" was also false, as no regulation or procedure existed that would have prevented the GSA from sharing the document, whether in writing or as a proposed document, with interested offerors as was done with the ground lease and renewable option agreement.

20. KDC was not the offeror who submitted the written the question about the Donation Agreement, and KDC also had no way of knowing what the Donation Agreement applied to or its potential effect on the likelihood by the Government of either or both of the renewal options under the lease to be executed by KDC and the Government. KDC in any event relied on the written information conveyed by the GSA about the Donation Agreement being "not final" and not available, and thus to its detriment KDC did not pursue the issue itself in preparing its proposal, even though the issue of the options in the contract became a matter of pre-award discussions and proposal revisions between KDC and the GSA, as discussed below.

At no point in these discussions prior to the award of the lease to KDC on October 3, 1995 and the subsequent execution of the lease agreement did the Government reveal to KDC that the lease extension options under discussion between KDC and the Government were, for all intents and purpose, actually of no value to the Government, since under the terms of the then-existing Donation Agreement issued by the City to the GSA City, the Government could unilaterally obtain title to the site and the buildings building free and clear of any obligation to Plaintiffs under the Lease Agreement with respect to either of the renewal option periods, and without paying rent or other consideration to KDC for either of such periods. As opposed to other relevant and proposed documents that were furnished to bidders, such the forms of ground lease and assignable options, the existence and/or form of which were presented to proposed bidders in the SFO and/or at other times during the period prior to the submissions of Best and Final Offers ("BAFOs"), the Government never mentioned the Donation Agreement or its effect on the transaction under following the award and execution of the lease.

21. In July, 1995, representatives of KDC met with the Government in order to review KDC's preliminary proposal for the Lease Agreement. During these discussions, the Government representatives expressed their preference for a 180-day notice period prior to exercising the renewal options under the Lease Agreement, whereas Keating had proposed a longer advance notice period. The renewal options were further discussed in the July 1995 meeting because, and at that time, the Government told KDC that KDC should "look hard" at the renewal options under the Lease Agreement, and that the options would be evaluated by the Government as a material part of the pricing of the proposal, which was consistent with the prior representations and assurances given by the Government to KDC.

22. At the July 1995 meeting, the Government further emphasized that the Government would not consider any bid for such lease which was above the prospectus amount of $1,670,000 per annum for net rent, and that there had to be sufficient room in any bid to provide for possible changes to the project by the Government.

23. KDC's preliminary proposal was substantially equal to the prospectus amount, and KDC would not have submitted a final proposal for the Lease Agreement, and further reduced its proposal relating to the initial 20 year term of said lease, in the absence of the assurances and representations (including those in the SFO, as aforesaid) made by the Government regarding the expectation that the renewal options would be evaluated as part of and otherwise considered as a material element of the proposal analysis, and assumed that if the options were to be evaluated the Government had a reasonable expectation of exercising them in good faith, not knowing about the Donation Agreement and its terms. Therefore, in an effort to accommodate the government's claimed financial limitations in an economically viable fashion, KDC adjusted its base period and option period prices in preparing its BAFO (*i.e.*, bringing the base period rate to within the government's preferred "prospectus" range and adjusting the annual rates over the two option periods). In doing so, KDC relied on the reasonable assumption that the option periods would be exercised in good faith if the government wanted to continue to use the courthouse after the 20-year base period ended.

24. Ostensibly as a compromise to the offerors, including KDC, who had expressed concern about the manner and timing of the exercise of the renewal options, the government issued an amendment (Amendment 4) to the solicitation on July 31, 1995. This amendment lengthened (by 30 days) the notice or "warning" time for the government's decision whether to exercise each option, to a minimum of 210 days prior to the commencement of the option period.

25. KDC submitted its BAFO on August 18, 1995. As required by the government, KDC quoted to the two five-year option renewal period.

26. On October 3, 1995, GSA awarded KDC the project based on KDC's BAFO. The award specifically included the two five-year option periods with the adjusted BAFO rental rates for those periods.

27. On or about October 16, 1996, Mr. Dan Koenig, of the General Services Administration, during the course of a telephone conversation with KDC, informed KDC that the GSA would never exercise the renewal options under the Lease Agreement because the GSA can exercise its irrevocable and unilateral right under the Donation Agreement to become the fee simple owner of the Premises upon the expiration of the initial 20 year terms of the Ground Lease.

28. Subsequent to KDC and the Government entering into the Lease Agreement, the City executed and delivered to the Government a irrevocable Second Donation Agreement that was in all material terms identical to the Initial Donation Agreement. The Second Donation Agreement, like the first, effectively permits the Government to obtain title to the Premises after the expiration of the initial twenty year term of the Lease Agreement, thereby confirming likelihood that the Government was unlikely to exercise of renewal options under the Lease Agreement, notwithstanding the provisions of the Lease Agreement.

29. A version of the Donation Agreement was signed by the City Manager in January 1996 and at that time recorded in the public records, approximately three months after the execution of the Lease Agreement by KDC in October of 1995.

30. The Ground Lease provides that the Plaintiffs can only lease the Premises to the United States Government for use as a United States District Courthouse or other Governmental

offices. The Ground Lease also provides for the City's right to terminate the Plaintiffs as lessees under the Ground Lease upon the Government's termination of its Lease Agreement with the Plaintiffs for the Premises.

31. Because the Ground Lease restricts the Plaintiffs' right to lease the Premises solely to the United States, once the Government chooses not to exercise the renewal options under the Lease Agreement, as the Government has already apparently done, Plaintiffs' rights in the Premises for the option years are rendered worthless.

The Government made material misleading representations: (1) by not revealing the existence of the Initial Donation Agreement; (2) by not revealing the material terms of either of the Donation Agreements prior to the award and execution of the Lease Agreement; (3) by indicating that the renewal options were and would be a material part in the evaluation of the offers; (4) by responding to inquiries from offerors that any Donation Agreement was not final and had to be executed by the Government, and indicating that that had not yet occurred, which was not the case; and (5) that its exercise of the options depended solely on the good faith determination of the Government as to whether it wished to continue to operate the Courthouse, given its unilaterally and irrevocable rights under the Donation Agreement.

32. At the time that the Government made the representations to KDC and the other offerors, as well as at the time the Government entered into the Lease Agreement with KDC, the Government had no present intention to ever exercise the renewal options. The GSA had a price restriction which would not allow it to go forward with the project if the per annum net rent exceeded $1,670,000. In order to induce offerors, including KDC, to make offers below the $1,670,000 cap, the GSA intentionally misrepresented the Government's intentions with respect to the renewal options. These representations (and/or omissions) were meant to be acted upon by

the offerors, including KDC, and were, in fact, acted upon by KDC to its detriment as described below.

33. KDC had the right to rely upon the Government's representations and assurances, as set forth above, that the exercise of the renewal options, although not automatic, would in good faith be honestly considered by the Government, as aforesaid.

34. KDC submitted its price proposal for, and entered into, the Lease Agreement Agreement, based upon the Government's representations and assurances, as set forth above, that it would exercise its options to renew the Lease Agreement if it in good faith chose to continue to operate a United States District Courthouse in Pensacola, Florida, without building another new Courthouse. The only variable, from the standpoint of KDC was whether the Government would elect, in good faith, to continue to operate a Courthouse, which was a risk that KDC was willing to assume.

35. If prior to entering into the Lease Agreement, KDC had known of the existence, execution and material terms of the Initial Donation Agreement, i.e. that the Government will become the fee simple owner of the Premises in twenty years thereunder, KDC would have increased the amount of its proposal for the initial twenty year period, and decreased the amount for the two option periods, and would therefore probably have not obtained and entered into the Lease Agreement.

36. Based upon a present day value assessment of the option terms, which have been rendered worthless by the Donation Agreements, by reason of the aforementioned acts, omissions and other conduct of the Government, Plaintiffs are entitled to either damages in the amount of $857,222.93, or rescission of the Lease Agreement and restitution.

**COUNT II (MISREPRESENTATION)**

37. Plaintiff re-alleges Paragraphs 1-36 as if fully set forth herein.

38. The GSA had a price restriction which would not allow it to go forward with the project if the per annum net rent exceeded $1,670,000. In order to induce offerors, including KDC, to make offers below the $1,670,000 cap, the GSA did not disclose its intentions with respect to the renewal options, and misstated the existence and status of the Donation Agreements.

39. These representations (and/or omissions) were meant to be acted upon by the offerors, including KDC, and were, in fact, acted upon by KDC to its detriment as described below.

40. KDC had the right to rely upon the Government's representations and assurances, as set forth above, that the Government's decisions whether to exercise the renewal options, although not automatic, would nonetheless be made in good faith and that the exercise of the options be honestly considered by the Government.

41. KDC submitted its price proposal for, and entered into, the Lease Agreement, based upon the Government's representations and assurances, as set forth above, that it would exercise its option to renew the Lease Agreement if it in good faith chose to continue to operate a United States District Courthouse in Pensacola, Florida, without building another new Courthouse. The only variable, from the standpoint of KDC was whether the Government would elect, in good faith, to continue to operate a courthouse.

42. If, prior to entering into the Lease Agreement, KDC had known of the existence and material terms of the Initial Donation Agreement, *i.e.*, that the Government will become the fee simple owner of the Premises in twenty years, KDC would have increased the amount of its

proposal for the initial twenty year period, and decreased the amount for the two option periods, and would therefore probably have not obtained and entered into the Lease Agreement.

43. Based upon a present day value assessment of the option terms, which have been rendered worthless by the Donation Agreements, by reason of the aforementioned acts, omissions and other conduct of the Government, KDC and Palafox are entitled to either damages in the amount of $857,222.93, or rescission of the Lease Agreement and restitution.

**COUNT III (EQUITABLE ADJUSTMENT UNDER CHANGES CLAUSE DUE TO GOVERNMENT'S SUPERIOR KNOWLEDGE/FAILURE TO DISCLOSE MATERIAL INFORMATION)**

44. Plaintiff re-alleges Paragraphs 1 - 43 as if fully set forth herein.

45. Prior to the issuance of the SFO, the Government and the City negotiated and agreed upon, and the City executed and issued to the Government, the Initial Donation Agreement, whereby the City irrevocably agreed to donate the Premises to the Government at the end of the initial twenty year term of the Lease Agreement.

46. The Government was aware of the existence and execution and delivery of and all of the material terms of the Initial Donation Agreement Lease Agreement prior to the issuance of the SFO and during Lease Agreement negotiations with KDC and the other offerors.

47. The Government did not disclose the foregoing information and the material terms of the Initial Donation Agreement, or of the Second Donation Agreement, to KDC prior to the award and execution of the Lease Agreement. Specifically, the Government did not disclose that after the expiration of the 20 year initial term of the Lease Agreement, the Government would become the fee simple owner of the Premises, subject to no encumbrances, including the Ground Lease and the Lease Agreement.

48. Prior to submitting its proposal for and entering into the Lease Agreement, KDC was unaware of the existence, execution and delivery of or the terms of the Initial Donation

Agreement, or that the pending Second Donation Agreement, had an effective term of twenty years, after which the Premises would revert to the Government.

49. Notwithstanding that it had previously negotiated and agreed with the City upon, and the City executed and delivered to the Government, the Initial Donation Agreement, and was also in the process of issuing to the Government the Second Donation Agreement during the final bidding process for the Lease Agreement, the Government failed and refused to disclose to KDC the foregoing information and the material terms of any Donation Agreement. Thus, KDC was precluded from learning, and did not learn, of the existence of the Initial Donation Agreement and the material terms of any of the Donation Agreements until after KDC had submitted its final proposal for and been awarded and entered into the Lease Agreement.

50. The Government knew that KDC and all other offerors were ignorant and had no knowledge of the existence of the Initial Donation Agreement and the terms of any of the Donation Agreements. In fact, during the pre-proposal conference held on February 22, 1995, a potential offeror requested a copy of "the Donation Agreement," and the Government refused to provide a copy, indicating that it did not yet exist.

51. Without the Government's superior knowledge regarding the existence of the Initial Donation Agreement and the terms of any of the Donation Agreements, KDC had the right to rely upon the stated terms of the SFO and the other representations and assurances of the Government, as aforesaid, and submit a proposal that was based upon the representations and assurances that the Government would in good faith honestly consider the exercise of its renewal options under the Lease Agreement, the only issue being whether the Government would continue to occupy and operate the Premises after the initial twenty year period.

52. Without the Government's superior knowledge, and based upon the representations and assurances of the Government, as aforesaid, KDC submitted its price proposal for and entered into the Lease Agreement on a reasonable business risk assumption that the Government would exercise its option to renew the Lease Agreement if it chose, in good faith, to continue to operate a United States District Courthouse in Pensacola, Florida, without building another new Courthouse.

53. If KDC had known of the existence, execution and delivery of the Initial Donation Agreement, or the material terms of any of the Donation Agreements, KDC would have: increased the amount of its proposal for the initial twenty year period, and decreased the amount for the two option periods, or not submitted a proposal for and entered into the Lease Agreement, based upon a business risk analysis and all of the material facts available to it.

54. By its failure to reveal its superior information concerning a material fact that would reasonably influence the potential offers, the Government "constructively" changed the solicitation and resulting agreement, thus entitling Plaintiffs to receive an equitable adjustment to the lease payments.

55. Based upon a present day value assessment of the option terms, which have been rendered worthless by the Donation Agreements by reason of the aforementioned acts, omissions and other conduct of the Government, Plaintiffs are entitled to damages of $857,222.93.

**COUNT IV (OTHER EQUITABLE ADJUSTMENT CLAIMS)**

56. Plaintiffs re-alleges Plaintiffs 1 - 55 as if fully set forth herein.

57. Claim No. 2 was for the additional costs and damages incurred by KDC as a result of furnishing and installing vinyl wall covering on certain exterior walls.

58. The Lease Agreement specified the interior finishes for the entire building, including with respect to such exterior walls. During the development of the pricing for the

Premises, the Plaintiffs offered the Government the choice of vinyl, wood or cloth covering on such exterior walls, and the Government elected to have such walls covered with vinyl wall covering.

59. After installation of the vinyl wall covering, and after the Government accepted the building as substantially complete, mold and mildew were discovered on the exterior walls underneath the vinyl wall covering.

60. The mold and mildew resulted from a lack of permeability of the vinyl wall covering on the exterior walls, thus creating a vapor barrier and trapping moisture which collected on the inside of such walls.

61. Plaintiffs proposed solutions to correct the alleged deficiency, but the GSA rejected the solutions of Plaintiffs, and the Government ordered Plaintiffs to remove the contaminated drywall, and either clean and re-install the drywall or replace the drywall, and then reinstall vinyl wall covering.

62. As a result of the foregoing acts, omissions and other conduct on the part of the Government relating to the vinyl wall covering, the Plaintiffs have incurred additional costs, expenses and damages of $250,599.00.

63. Claim No. 3 is for the Government's improper withholding of rent, and the interest due thereon.

64. The Government accepted the building as substantially complete on August 1, 1997.

65. Under the terms of the Lease Agreement, the Government was required to make its monthly rental payment on the first work day of the month after the month for which the rent was due.

66. The terms of the Lease Agreement provide that an interest penalty is to be paid automatically by the Government, without request from the Plaintiffs, if the payment is not made by the due date.

67. The Government did not make its monthly rental payments for August and September, 1997 on September 1, 1997 and October 1, 1997, respectively, as required.

68. The Government made the monthly rental payments of $138,643.68 each for August and September on November 5, 1997, without interest.

69. The Government subsequently withheld the monthly rental payments for the months of November and December of 1997, as well as for January, February and March of 1998.

70. On May 1, 1998, the Government made two rental payments in the amounts of $408,385.47 and $58,244.98.

71. On or about May 28, 1998, the Government sent a letter and attached spreadsheet, setting forth its accounting of the rental payments paid and payable to the Plaintiffs under the Lease Agreement.

72. Over time, the Government asserted three bases for allegedly withholding rent under the Lease Agreement: sagging acoustical panels, the mold/mildew issued as set forth above, and alleged uncompleted punch list items; however, the Government failed to give the Plaintiffs timely notice of the bases for such alleged withholding as required under the Lease Agreement and applicable regulations.

73. Moreover, the sagging acoustical panels were corrected in a timely manner and, in any event, did not affect the ability of the Government to use the building for its intended function. As set forth above, the mold/mildew issue was the result of the acts, omissions and

other conduct of the Government and, therefore, is not a basis for withholding rent. Furthermore, the Government and the Plaintiffs had developed and concurred on a punch-list in June of 1997, the Government accepted the building as substantially complete on August 1, 1997, and the punch list items were completed by September of 1997. After September of 1997, the Government issued new punch-list items in an attempt to mask, among other things, the Government's tardiness on its tenant fit-up work for which it was responsible.

74. Based upon the foregoing, the Government has improperly withheld $421,385.12 in monthly rental payments, not including interest.

75. Claim No. 4 is for additional work required by the Government due to allegedly insufficient lighting.

76. The Plaintiffs installed the lighting for the building in conformance with the Lease Agreement, and the illumination calculations incorporated into the Lease Agreement.

77. In June of 1997, during preparation of the punch-list, the Government requested additional lighting, which the Plaintiffs installed at their own expense in an effort to appease the unreasonable demands of the Government.

78. In December of 1997, the Government requested additional lighting as a "supplement" to its June punch-list requests.

79. The Plaintiffs installed the "supplemental" lighting under protest, and seeks herein the recovery of the additional costs and expenses incurred as a result of the Government's demand to install lighting in excess of the Lease Agreement requirements.

80. As a result of the Government's imposition of additional lighting requirements beyond those required under the Lease Agreement, the Plaintiffs incurred additional costs and expenses of $79,030.00, not including interest.

81. Claim No. 5 is for the costs and expenses incurred by the Plaintiffs to install revised backlighting behind the glass Great Seal in the Special Proceedings Courtroom.

82. During the course of construction of the building, the Government issued SLA's to modify the design of the Special Proceedings Courtroom.

83. During the design review of the changes directed by the Government as part of the SLA's, the Plaintiffs requested additional compensation for design services.

84. The Government refused to pay for such additional design services and directed the Plaintiffs to design and install lighting for a cost not to exceed $544.00. The Government also advised the Plaintiffs that they were to "do their best" in terms of designing the lighting.

85. After installation of the lighting, the Government rejected the lighting, and requested that the Plaintiffs remove the lighting and install a different fixture, without additional compensation.

86. As a result of the Government's requests, which requested that the Plaintiffs perform work and provide services beyond that required under the Lease Agreement, the Plaintiffs have incurred additional costs and expenses of $19,515.00.

87. Claim No. 6 is for the costs and expenses incurred by the Plaintiffs to re-construct raised platforms for five witness stands.

88. During the design review process, Plaintiffs submitted a design for witness stands that were in compliance with the Americans with Disability Act ("ADA").

89. The Government objected to the design, and requested modifications. The Government issued a SLA for Plaintiff to design and construct witness stand platforms that could be removed in the event a handicapped person was using the witness stand.

90. Plaintiffs subsequently provided such design, and the Government did not object to the design submitted by Plaintiffs and the shop drawings for the removable platforms were approved by the Government.

91. The Government was responsible for selecting the chair for the witness stands.

92. The chairs selected by the Government created an alleged safety concern with respect to the witness platforms. The alleged safety concern was a direct result of the chair selection by the Government.

93. The Government directed the Plaintiffs to increase the size of the platforms and include a wheel stop, but has refused to compensate the Plaintiffs for the costs and expenses of the additional work.

94. As a result of the Government's request for additional changes in the platforms, the Plaintiffs incurred additional costs and expenses of $10,129.00.

95. Claim No. 7A is for the costs and expenses incurred by the Plaintiffs to repair work installed and damaged by the Government's tenant fit-up contractors.

96. Throughout 1997, the Plaintiffs advised the Government that its tenant fit-up contractors were damaging the work of the Plaintiffs as they were performing follow on work. The Plaintiffs not only provided written notice, but also supplied photographs of the damaged work.

97. Pursuant to FAR 52.236-11, which was incorporated into the Lease Agreement, the Plaintiffs are entitled to an equitable adjustment for any additional costs and expenses incurred as a result of the Government taking possession and use of any portion of the work.

98. The Final decision of the Contracting Officer recognizes the Government's responsibility, but the Government only offered, as a settlement, $11,719.00.

99. As a result of the Government's tenant fit-up contractors damaging Plaintiffs' work, the Plaintiffs incurred additional costs and expenses of $31,775.00.

100. Claim No. 7B is for the costs incurred by the Plaintiffs to install work not accomplished by the Government's tenant fit-up contractors and for delays caused by the Government's tenant fit-up contractors.

101. Starting in April of 1997, the Plaintiffs advised the Government that its fit-up contractors were not meeting the coordination and scheduling requirements in order for the Plaintiffs to obtain a Certificate of Occupancy from the City.

102. In May of 1997, the Plaintiffs advised that Government that they would seek to recover the costs of delay as a result of the Government's fit-up contractor's lack progress.

103. In September of 1997, the Plaintiffs confirmed to the Government that they would perform work that was the responsibility of the fit-up contractors in order to obtain the Certificate of Occupancy.

104. The Final Decision of the Contracting Officer recognizes the Government's responsibility for Plaintiffs completing the fit-up contractor's work, but does not recognize the full costs and expenses incurred by the Plaintiffs, and does not recognize responsibility for the delays incurred by the Plaintiffs.

105. As a result of the Government's tenant fit-up contractors delaying the Plaintiffs and not completing their work, the Plaintiffs incurred additional costs and expenses of $20,402.00.

106. Claim No. 8 is for the costs incurred by the Plaintiffs to install additional aluminum jackets to the pipe insulation feeding the cooling tower.

107. The Plaintiffs installed provided and installed piping insulation in accordance with the Lease Agreement and the project specifications.

108. The Government reviewed the Plaintiffs' submittals and approved of the installation proposed.

109. After substantial completion, the Government alleged that the piping insulation was not in conformance to the project specifications.

110. The Government demanded that the Plaintiffs install an aluminum jacket or else face a reduction in rental payments.

111. The Plaintiffs agreed to install the aluminum jackets under protest, and advised the Government that they would seek to recover the costs of the additional work, over and above that required by the project specifications, imposed upon them.

112. The Final Decision of the Contracting Officer recognizes the Government's responsibility for the Plaintiffs installing the aluminum jackets, but does not recognize the full costs and expenses incurred by the Plaintiffs.

113. As a result of the Government's demand that the Plaintiffs install the aluminum jackets, the Plaintiffs incurred additional costs and expenses of $14,175.00.

114. Claim No. 9 is for the costs, expenses and impact sustained and incurred by the Plaintiffs to install a plaster ceiling in the holding cells and adjoining areas that were not required by the plans and specifications.

115. During the design submission phase, KDC submitted a design modification to install an additional concrete metal deck over the secured areas so as to allow better access to the mechanical work above without security risks.

116. In the summer of 1996, KDC's submission was reviewed and approved by the Government without requiring a plaster ceiling.

117. Subsequently, in March and April of 1997, notwithstanding the foregoing, the Government directed the Plaintiffs to add a plaster ceiling to the underside of the metal deck.

118. The Plaintiffs advised the Government that they would perform the work under protest, and seek the additional costs and expenses associated with the work. The Plaintiffs advised the Government that had the plaster ceiling been demanded by the Government during the design review process, the Plaintiffs could have performed the work for little extra costs.

119. As a result of the Government's demand that the Plaintiffs install the plaster ceiling, the Plaintiffs incurred additional costs and expenses of $57,604.

120. As a result of Claims 2-9, Plaintiffs have incurred additional costs and expenses of $904,614.12, an account of which the Government has paid the sum of $28,000.00.

WHEREFORE, Plaintiffs, Keating Development Company and Palafox Street Associates, L.P. prays that the Court:

a. Rescind the Lease for Real Property, Lease No. GS-04B-35055, and award to the Plaintiffs as restitution, all of its costs, damages and expenses, as well as a reasonable allowance for overhead and profit; or in the alternative

b. Award to the Plaintiffs as damages, $857,222.93 due to the Government's failure to disclose material facts surrounding the Donation Agreements, plus interest and costs; and

c. Award to the Plaintiffs damages for their Claims Nos. 2-9 in the amount of $876,614.12, plus interest and costs; and

d. Grant such additional relief as the Court may deem just and appropriate.

Respectfully submitted,

.
/s/

Date: September 11, 2006

__________________________

Herman M. Braude, Esq.
Gerson B. Kramer, Esq., of counsel
Michael A. Lewis, Esq., of counsel
Braude & Margulies, P.C.
1200 Potomac Street, N.W.
Washington, D.C. 20007
(202) 471-5400
(202) 471-5404 (fax)
Attorneys for Plaintiffs, Keating Development Company and Palafox Street Associates, L.P.

Also Of counsel:
F. Warren Jacoby, Esq.
Cozen and O'Connor
1900 Market Street
Philadelphia, PA 19103
(215) 665-2154