5. GSA and Court System, and any third parties of any work performed and respect to time period of performance, delays, instructions to vendors, instructions given relating to efforts to conceal/obfuscate conditions at site, in particular during January 1998.
6. GSA and Court System contentions of actions or inactions by KDC to render building unusable for their intended purpose. Rendering level of performance impossible resulting that courtrooms were untenantable, as well U.S.M.S.; as set forth in K. Johnson's letter 10/23/97.
7. GSA and Court System related to damages sustained by the GSA as set forth in K. Johnson's letter 10/23/97.

2/05/98 **GSA (K. Johnson) to KDC (D. Martin); Keating Paint is unacceptable, Keating has chosen to default; GSA installing vinyl:** Ms. Johnson notifies Mr. Martin that Keating is in default with lease. Paint is unacceptable. remediation of moisture problem.. VWC or its equivalent is required within Judges Chambers Suites. GSA has taken action to install vinyl which will become a claim of the government against Keating.

2/10/98 **Pensacola News Journal Article; "Courthouse Faults Fixed; Opening set for March":** Problem plagued courthouse to open seven months late. Air conditioning that caused mildew is fixed; vinyl deemed as cause, will still be used. Roof leaks and inadequate lighting in courtrooms are addressed. GSA's Mr. Mote quoted that Keating has paid for repairs, but may sue Government to recover some costs. Hopefully, it can be resolved in mediation. CH2MHill blames unbalanced air conditioning system. CH2MHill initially recommended paint finish in remediation, now after additional testing, CH2MHill's convinced system is in place for vinyl wallcovering. Mossing stated that "first floor lobby "bakes", due to untinted windows; now seeking proposals to remedy problem. Other problems are low lighting levels and non-recessed fire extinguishers. We want to deal with everything before we move-in."

2/10/98 **GSA (D. Koenig) to KDC (D. Bitterlich); Issuance of final CH2MHill Report:**

*Findings:* Building Operations will be at positive pressures or essentially neutral at all modes except night shutdown. Slight negative conditions measured during night shutdown.

*Conclusions:*

- Fungal growth at most exterior walls with vinyl.

- Infiltration of most outside air caused by operating building at a negative pressure.
- Intrusion is often a problem during HVAC start-up mode because of pressure in balances.
- Convinced that moisture source was outside air infiltration.
- Not able to duplicate negative pressure conditions that created this moisture intrusion.
- Outside air quantities much greater than exhaust, the building is under strong positive pressurization with HVAC operating.
- Reviewed sequence of operations and test and balances reports, do not indicate problem; suspect that moisture intrusion occurred before test and balance.
- Believe building pressurization was likely inadequate prior to test and balance (approximately early August), namely:
  - Wet wallboard in early October, moisture intrusion and accumulation, mildew growth through *wallpaper* typically occurs over several month period, except under most extreme conditions.
  - Historically, in hot/humid climate, buildings are more likely to have pressure imbalances and moisture intrusion problems, resulting from inadequate pressurization; CH2MHill believes it is more reasonable to conclude the condition occurred before system was fully balanced than after balancing.

*Recommendations:*

- Do not exhaust when HVAC system shutdown.
- Operate HVAC systems continually, to maintain positive pressurization.
- Cover exterior walls with a permeable finish (i.e. latex paint or fabric wallcovering). However, vinyl can be used if building maintains positive pressurization under all operating conditions.

2/13/98 Cozen & O'Connor (F.W. Jacoby, Esq.) to GSA (R.W. Schlattman, Esq); Final CH2MHILL Report issuance/delay, F.O.I.A. Request: Mr. Jacoby acknowledge's receipt of the final CH2MHILL report 2/10/98, respective to tests and investigation allegedly on site 1/15 and 16/98. Noteworthy points:

- Length of time to release report of twenty-five days
- No preliminary information provided to KDC or test notes/data.

*#468 U.S. Federal Courthouse, Pensacola, Fl*
*CE #358 to Mold/Mildew at Exterior Walls with*
*Vinyl Wallcovering*
*Page 24*

- GSA/consultants had no time to speak to KDC (Owner) regarding tests/finds, but had time to speak to the press.
- KDC was very surprised to see article. Moreover, the comments are not consistent to Final Report.
- At closure of 1/15/98 meeting of tests/observances, GSA/CH2MHILL advised all tests investigations were concluded. KDC consultant and representative advised parties we would return to New York. However, GSA then conducted further tests and investigations on 1/16/98 without notice.

Therefore, pursuant to F.O.I.A., please provide the following negotiations, communications and/or agreements (written/oral) by:

1. GSA, Court Systems, related consultants of and tests, investigations, work performed, services relating to alleged moisture problems subject to Final CH2MHILL Report 2/10/98, prior to or subsequent to 1/15/-16/98.
2. Any preliminary or draft reports, communications, excerpts memoranda or other documents of work/services during the period of January 1, 1998 to the present.
3. GSA, Court System, related consultants/vendors regarding and wallcovering to be installed whether prior to or subsequent to January 15 and 16, 1998.
4. GSA, Court System, related Consultants/vendors of drafts, reports, reports, communications, excerpts of the November 1996 report, both prior to or subsequent.
5. GSA, Court System, related consultant/vendors of drafts, reports, communications, excerpts from October 1, 1997 to the present time; connection to moisture problems referenced in the November report.
6. GSA and Court System, regarding wallcovering to be installed or otherwise applied to prior to and/or subsequent to November tests/investigation report.

Please respond in writing, as soon as possible.

2/25/98 Reynolds (R. Frazier) to KDC (D. Bitterlich); All painted Wallboard covered with vinyl by GSA: Richard Frazier confirmed to Don Bitterlich that GSA subcontractor installed vinyl wallcovering on all remediated wallboard.

2/26/98 Thompson Engineering Report/Remembrances of 10/13/97 and 10/10/97 Observations:

*#468 U.S. Federal Courthouse, Pensacola, Fl*
*CE #358 to Mold/Mildew at Exterior Walls with Vinyl Wallcovering*
*Page 25*

Remembrances:

- Met with C. Vann approximately at noon on 10/03/97 at the new courthouse.
- Inspected impacted vinyl wallcover, V.W.C. peeled back, dry wallboard with black mold spots exhibited, sums V.W.C. with pink spots. Also, observed block construction above ceiling, sketched wall system; did not observe dampproofing between brick and concrete block.
- Return to site 10/10/97 for testing; witnessed by C.Vann, Jim Marrs, Mike Youngster. Conclusive to all present, moisture readings at exterior walls with vinyl wallcover. No moisture readings at painting or fabric walls. Random interior walls tested, no moisture present.
- Meeting at 2:10 P.M. with Judge Vinson. Attendees affirmed findings that moisture conditions only occurred at vinyl wallcovering. Probability of vapor drive and dew point discussed. Judge Vinson did not concern himself with cause, stated he wanted vinyl wallcovering installed and it was up to Keating to do it, somehow.
- Existing courthouse exhibited several areas of moisture intrusion, water stains, and mildew.

2/26/98 — **Thompson Engineering Report/Site Testing on 2/19/98:** All walls recorded dry except within three feet of balcony doors. Delmhorst at level 10 on the surface, slight moisture, but dry enough for painting.

- Room by room report log attached of Delmhorst readings.
- Installation of vinylwall covering was beginning.
- Note: Tests performed in winter season; moisture drive would be from inside building to building exterior, subsequently at drying effect.
- Conclusion: Although conditions are dry, vinyl wallcovering with low/zero permeability remains a high probability of mold redevelopment in the summer season.

3/04/98 — **GSA Vinyl Wallcovering Exhibits Received:** Mr. Bitterlich received 12" x 6" sample of vinyl installed by GSA.

3/04/98 — **KDC (D. Bitterlich) to Thompson (L. Newlan)/Reynolds (R. Frazier); Thompson Engr. to test exterior walls for moisture:** Bitterlich Notice-to-Proceed to Thompson/Reynolds for site test of all walls for moisture.

3/04/98 **Cozen & O'Connor (F.W. Jacoby, Esq.) to GSA (R. Schlattman, Esq.); FOIA request for testing report/Drafts:** Mr. Jacoby requests test report inspections that GSA allegedly conducted on-site 1/15-16/98. Also, still no response or acknowledgment from Mr. Schlattman as to Mr. Jacoby FOIA letter of 2/13/98 or prior FOIA request to Ms. Parks-Curran on 2/3/98.

3/18/98 **KDC. (D. Martin) to GSA (D. Koenig): KDC review of CH2MHill Report:** Mr. Martin issued correspondence in summary of CH2MHill Final Report of 1/15-16/98 investigation and testing.

- KDC issued Final Report on 2/10/98, surprised at delay, in particular given that GSA chose not to include building Owner in preliminary review findings/reports. Particularly given results were made available to the press, prior to the issuance.
- Difficulty understanding priorities, given KDC is legal owner, GSA contends KBC has failed to perform, the spirit of cooperation to promptly address concerns on this basis of the data would be shared immediately for action. This was not done.
- FOIA request regarding this matter, hopeful to obtain documents leading up to inspection, event itself, and following the inspection.
- KDC representatives, consultants, and contractor attending 1/15/98 investigation were told that investigation was concluded. The report indicates, further studies/tests were performed and discussed the following day, contrary to KDC stated desire to participate in studies and observances.
- Final report includes that the moisture/mildew condition occurred before the ventilating system was balanced. KDC consultants opinion is that this is jut not correct.
- Balancing work was performed from 5/5/97 to 7/16/97; vinyl wallcovering was installed from 3/15/97 to 5/25/97.
- Ventilating system had been operating 24 hours a day in the entire building for a number of months; from time to time, respective areas were balanced. These conditions could not have caused negative pressurization, which has contended to cause mold/mildew.
- Vinyl wallcovering could not have been applied if wallboard was wet.
- Judge Collier's office and conference room, initially installed with fabric, discovered moisture during readings in early October 1997 behind newly installed vinyl by this Judge's contractors, more than two months after balancing of this system.
- The above noted readings confirm that the application of vinyl on

exterior walls creates moisture and resultant mildew, as set forth in the Thompson Report issued 10/19/97.

- Vapor pressures result from differential between humidity on the exterior versus the interior accumulated at the vinyl and condensating.
- In spite of our concerns, and those of your consultant, GSA still has determined to replace the impacted walls with vinyl.
- Because of our concerns, we have refused to agree to or perform such installation, which we cannot be responsible for any resultant property damage or personal injury.

3/19/98 **Thompson Engineering Report; Review and Comments:** Mr. Lewis Newlan submitted the following comments from his file notes and rememberences:

1) During 10/10/97 visit with Judge Vinson, observed mold and mildew in the lobby of the existing courthouse. Moss and vegetation growth also visible on exterior of the building.
2) In Item No. 7 from Field Observations in our 10/19/97 Report, unidentified room No. 422 and 425, were confirmed to have had vinyl during the 2/19/98 inspection.

3/19/98 **Thompson Engineering Report; Review and Comments:** Mr. Lewis Newlan submitted the following comments:

1) Walls should be covered with a permeable finish.
2) Constant positive pressure on this inside could potentially reduce moisture accumulation in the wall cavity, if pressure can act upon the cavity.
3) The sensible to latent heat loads should be calculated.
4) Vapor barrier for moisture is also a pressure barrier for air. If barrier in place, increased pressure will have no effect on that which occurs behind (V.W.C.) air barrier. Diffusion of vapor necessary to reach equilibrium state will occur without influence of interior pressure, blocked by the barrier.
5) Potential for vapor condensing into water within the wall is controlled by the dew point of the exterior air compared to the dry bulb temperature at the interface of the wall surface (back side) of the vinyl wallcovering and wallboard. When the dew point of the exterior air is greater than the dry bulb temperature of the interior of the building, condensation will occur.
6) Trowel applied dampproofing (designed for intrusion of liquid water)

LAW OFFICES
COZEN AND O'CONNOR
A PROFESSIONAL CORPORATION
THE ATRIUM
1900 MARKET STREET
PHILADELPHIA, PA 19103
(215) 665-2000
(800) 523-2900
FACSIMILE
(215) 665-2013

ATLANTA, GA
CHARLOTTE, NC
COLUMBIA, SC
DALLAS, TX
LOS ANGELES, CA

NEW YORK, NY
NEWARK, NJ
SAN DIEGO, CA
SEATTLE, WA
WESTMONT, NJ

F. WARREN JACOBY
DIRECT DIAL (215) 665-2154

April 13, 1998

VIA TELECOPIER

Don Bitterlich
Keating Building Corporation
One Bala Avenue
Bala Cynwyd, PA 19004

Re: Palafox Street Associates, L.P. -
General Services Administration
(Lease No. GS-04B-35055)

Dear Don:

I received your FAX regarding the letter of April 8, 1998 which you received from KBJ.

In light of the problems which were experienced with the fabric acoustical panels and the moisture and mildew, as well as possibly other areas, under the circumstances I do not believe that your company is in a position to release final payment to the Architect. AGREED!

Although it might make sense to call them and explain the situation, given the tenor of their letter, you might also have to respond in writing for the record. However, I do not want to build a trail of correspondence regarding any consultant or subcontractor or supplier of Keating which might be used by the GSA as evidence of their liability, which might then be imputed to Keating.

I therefore suggest that a careful letter be drafted to the Architect in response to their letter, but protecting the record, so to speak.

RECEIVED
APR 14 1998
KEATING

PENGAD-Bayonne, N.J.
DEFENDANT'S EXHIBIT
D1136

KDC04437

Don Bitterlich
Keating Building Corporation
April 13 1998
Page 2

---

Should you have any questions, please call me.

Very truly yours,

COZEN AND O'CONNOR

BY: F. WARREN JACOBY

FWJ:mts

cc: Dennis A. Martin, Esquire (Via Telecopier)
Michael Sencindiver (Via Telecopier)

M:\66645\BITTERLI.A13

RECEIVED
APR 14 1998
KEATING

KDC04438

# AUDIT OF A CLAIM FOR INCREASED COSTS
PALAFOX STREET ASSOCIATES, L.P.
FEDERAL COURTHOUSE, PENSACOLA, FL
LEASE NUMBER GS-04B-97-35055
REPORT NUMBER A010089/P/4/xxx
JANUARY xx, 2001

## NOTICE

This report contains information the Office of Inspector General has determined is proprietary and predecisional. Persons disclosing this information publicly or to others

not having an official need to know are subject to possible administrative or civil penalties pursuant to the Trade Secret Act (18 U.S.C. Section 1905). Safeguard this report to prevent improper disclosure.

AUDIT OF A CLAIM FOR INCREASED COSTS
PALAFOX STREET ASSOCIATES, L.P.
FEDERAL COURTHOUSE, PENSACOLA, FL
LEASE NUMBER GS-04B-97-35055
REPORT NUMBER A010089/P/4/xxx
JANUARY xx, 2001

TABLE OF CONTENTS


| | Page |
|---|---|
| REPORT LETTER | 1 |
| INTRODUCTION | 3 |
| Background | 3 |
| Objective, Scope and Methodology | 4 |
| RESULTS OF AUDIT | 5 |
| Brief | 5 |
| Findings and Conclusions | 5 |
| Finding 1 -Two Claim Parts Not Valid | 5 |
| Finding 2 - Subcontract Costs Were Overstated | 6 |
| Finding 3 - Labor, Overhead and Profit Costs Were Overstated | 6 |
| Internal Controls | 6 |
| APPENDICES | |
| Summary of Palafox's Claimed Costs and Related Audit Adjustments | A-1 |
| Statement of Palafox's Claimed Costs and Related Audit Adjustments | B-1 |

Report Distribution C-1

Date: January xx, 2001
Reply to
Attn of: Audit Manager (JA-4)

Subject: Audit of a Claim for Increased Costs
Palafox Street Associates, L.P.
Federal Courthouse, Pensacola, FL
Lease Number GS-04B-97-35055
Report Number A010089/P/4/X01xxx

To: Karen Johnson, Contracting Officer
Property Acquisition and Realty Services (4PEA-C)

This report presents the results of our audit of the $1,761,837 claim submitted by Palafox Street Associates, L.P. (Palafox) under the above contract number. Palafox and its parent company Keating Development Company were the lessors for the Federal Courthouse in Pensacola, Florida. The lease was awarded on October 3, 1995 and the building was fully occupied in March 1998. Palafox filed a claim for various matters on June 30, 1998.

The audit determined that Palafox could not support its proposed labor rates and subcontractor costs. In addition, Palafox proposed direct costs which should be included in its overhead, markup and developer commission costs whose rates are specified in a supplemental lease agreement. Palafox claimed $857,223 for GSA not exercising option years. We adjusted the entire amount because the government is not obligated to exercise these option years. Palafox claimed $250,599 for dealing with mildew on exterior walls. we adjusted $167,349 for subcontract costs, overhead and salary costs, of which $28,057 was unsupported. Also, Palafox claimed $421,385 for the extension of the completion date because of mildew problems which were caused by Palafox's construction problems. Because the extension was caused by Palafox, this claim is invalid. Palafox claimed $79,030 for additional lighting. For purposes of this audit, we assumed GSA is obligated for the remaining 7 parts of the claim. We adjusted $74,745 for subcontract costs, overhead and salary costs, of which $58,850 was unsupported. Palafox claimed $19,515 for backlighting of the glass seal. We adjusted $17,019 for subcontract costs, overhead and salary costs, of which $173 was unsupported. Palafox claimed $10,129 for reconstruction of the witness stand. We adjusted $8,379 for subcontract costs, overhead and salary costs, of which $396 was unsupported. Palafox claimed $31,775 for tenant subcontractor backcharges. We adjusted $26,256 for subcontract costs, overhead and salary costs, of which $15,469 was unsupported. Palafox claimed $20,402 for damages in

obtaining a certificate of occupancy. We adjusted $13,718 for subcontract costs, overhead and salary costs of which $726 was unsupported. Palafox claimed $14,175 for adding an aluminum jacket to the cooling tower insulation. We adjusted $8,169 for overhead and salary costs. Palafox claimed $57,604 for adding plaster ceilings to the holding cells. We adjusted $20,935 for subcontract costs, overhead and salary costs of which $1,056 was unsupported.

Because no technical evaluation was received, this report contains no quantitative or qualitative technical findings related to the claim. The contracting officer should not start contract negotiations without a technical evaluation of Palafox's claim, which combined with this report will assist the government in obtaining a fair and reasonable settlement. The contracting officer should also be certain that this claim does not overlap and duplicate costs recovered under change orders or other claims submitted by Palafox under this contract.

Please address questions regarding this report to Steve Hollander, auditor-in-charge, or me on (404) 331-5125, extension 31 or 21, respectively.

James D. Duerre
Audit Manager
Southeast Sunbelt Audit Office (JA-4)

PREAWARD AUDIT OF A CLAIM
PALAFOX STREET ASSOCIATES, L.P.
FEDERAL COURTHOUSE, PENSACOLA, FL
LEASE NUMBER GS-04B-97-35055
REPORT NUMBER A010089/P/4/xxx

## INTRODUCTION

### Background

The General Services Administration (GSA) awarded a lease to Keating Development Company on October 3, 1995 at $1,653,299 per year for the 20-year term of the lease from June 1, 1997 through May 31, 2017 for a United States Courthouse in Pensacola Florida. The lease document also stated that this lease may be renewed at the option of the government for two additional five-year periods. On December 16, 1996, the lease was assigned to Palafox Street Associates, L.P. (Palafox), which was created specifically for the project. On August 1, 1997 the 20-year term of the lease was changed to August 1, 1997 through July 31, 2017 at $1,663,724 per year.

Palafox is the developer and Keating Building Corporation is the prime contractor. The building was fully occupied in March 1998. Palafox filed a claim for various matters on June 30, 1998. The claim was divided into ten parts and totaled $1,761,837.

**CONTRACT NUMBER:**
GS-04B-35055

**PURPOSE OF CONTRACT:**
Lease of Federal Courthouse
Pensacola, Florida

**CONTRACTOR'S NAME:**
Palafox Street Associates, L.P.

**LOCATION OF OFFICE VISITED:**
Bala Cynwyd, Pennsylvania

**DATE OF CLAIM**
June 30, 1998

**CLAIM AMOUNT**
$1,761,837

**CONTRACTOR'S CONTACT PERSON:**
Don Bitterlich, Executive Project Manager

**CONTRACTING OFFICER:**
Karen B. Johnson (4PEA-C)

**AUDIT CONTACT:**
Jim Duerre
Steve Hollander

## Objective, Scope and Methodology

The objective of the audit is to determine if the data submitted by Palafox to support the
$1,761,837 claim is reasonable, complete and accurate.

The audit scope consisted of a review of Palafox's $1,761,837 claim which consisted of ten individual claim amounts. The 10 items and amounts are:

| | | |
|---|---|---|
| 1 | Renewal Option Period | $857,223 |
| 2 | Mold/Mildew on Exterior Walls with Vinyl Wallcovering | 250,599 |
| 3 | Improperly Withheld Rental Payments | 421,385 |
| 4 | Additional Lighting to Meet GSA Demands | 79,030 |
| 5 | Provisions and Additions to Backlighting of the Glass Seal and the Special Proceedings Courtroom | 19,515 |
| 6 | Reconstruction of (5) Opposed Witness Stand Platforms | 10,129 |
| 7 | GSA Tenants Subcontractor Backcharges | 31,775 |
| 8 | Damages due to GSA Tenants' Subcontractors' Failure to Perform Work in Order to Obtain a Certificate of Occupancy | 20,402 |
| 9 | Add Aluminum Jacket to Cooling Tower Pipe Insulation | 14,175 |
| 10 | Add Plaster Ceilings at Holding Cells/Adjoining Areas | 57,604 |
| | | $1,761,837 |

To accomplish the audit objective and scope of work, we

1) reviewed the claim and GSA lease documents;
2) verified the mathematical accuracy of the claim;
3) obtained and reviewed invoices and other supporting documents for subcontract costs;
4) traced labor rates to W-2's;
5) reviewed support for labor burden rates;
6) totaled the direct time employees charged to this project and included in the claim after the scheduled completion date to determine if they could have worked the hours proposed; and
7) held discussions with GSA officials to understand the nature of the claim.

We did not discuss specific audit findings with Palafox, however audit matters were

discussed to the extent necessary to understand the claim.

The audit was performed in accordance with generally accepted government auditing standards.

## RESULTS OF AUDIT

### Brief

The audit identified adjustments totaling $1,615,180 including $97,042 classified as unsupported. Audit results are summarized as follows:

| | TOTAL | UNSUPPORTED |
|---|---|---|
| Claimed Cost | $1,761,837 | |
| Less Audit Accepted Cost | 146,657 | |
| Audit Adjustment | $1,615,180 | $97,043 |

The audit accepted cost is qualified because, except for parts one and three of the claim, it assumes government liability, which has not been determined. Details of the claim and explanations of the audit adjustments are presented in **Appendix A** of the report.

### Findings and Conclusions

### Finding 1 – Two Claim Parts Not Valid

Palafox claimed $857,223 in damages against GSA for not exercising two five-year options at the end of the 20-year lease. Palafox alleges fraud on the part of GSA because according to their assessment of lease documents, GSA never intended to exercise these options. This part of the claim is invalid because the government is not obligated to exercise these two five-year options. Standard Form 2, U.S. Government Lease for Real Property, states that "this lease may be renewed at the option of the Government" for these two five-year options. This form was signed by the Vice President of Keating Development Company. Accordingly, we disallowed the entire amount. We acknowledge that this part of the claim is subject to legal interpretation.

Also, Palafox claimed $421,385 in damages against GSA for late payments and the withholding of payments for August 1997 through May 1998. These payments were withheld primarily because of severe mildew problems on the interior of the exterior walls. In some cases the drywall and wall coverings had to be replaced. GSA determined that the problem was caused by the rainwater from the gutters and roof leaking into the wall cavities of the exterior walls. We disallowed the entire amount because construction problems caused by Palafox caused the mildew problem and

prevented tenant occupancy. We acknowledge that this part of the claim is subject to legal and technical interpretation.