INTERROGATORY NO. 42:

State with specificity, including a description and breakdown of the cost categories and amount of each category, the basis of your request for $S7,604 in paragraph 120 of your complaint, and substantiate your answer.

ANSWER: All relevant information, to the extent not privileged, in response to Interrogatory No. 42 is set forth in the Claims submitted by Plaintiffs to the GSA. Moreover, Plaintiffs have previously, on two separate occasions, provided auditors for the GSA with the opportunity to examine and inspect Plaintiffs' books and records with respect to its Claims which are the subject of this litigation. Finally, Plaintiffs will make available to the Defendant its relevant books, records and other documents in its custody, control or possession relating to the project and/or the lease pursuant to the Defendant's First Requests for Production of Documents, to the extent relevant and responsive to the Discovery Requests, and not privileged.

RESPECTFULLY SUBMITTED AS TO OBJECTIONS

Herman M. Braude, Esquire
Braude & Margulies, P.C.
888 Seventeenth Street, N.W.
Washington, D.C. 20006
Tel: 202-293-2993
Fax: 202-331-7916
Attorney of Record for Plaintiffs,
Keating Development Company and
Palafox Street Associates, L.P.

Of counsel:
Gerson B. Kramer, Esquire
Stuart A. Sakwa, Esquire
Braude & Margulies, P.C.

F. Warren Jacoby, Esquire
Cozen and O'Connor

CERTIFICATE OF SERVICE

I certify that the foregoing Responses and Objections of Plaintiffs to Defendant's First Set of Interrogatories Directed to the Plaintiffs was sent via U.S. Mail, postage prepaid, this ~~15th~~ 12th day of January, 2001, to the Defendant addressed as follows:

John S. Groat, Esquire
Comm'l Litig. Branch
Civil Division, Department of Justice
Classification Unit, 8th Floor
Washington, D.C. 20530

PHILA1\1364440\1 066645.000

CERTIFICATION

I have read the foregoing Responses and Objections to Defendant's First Set of Interrogatories Directed to the Plaintiffs and do swear and affirm that they are true and correct to the best of my knowledge, information and belief.

KEATING DEVELOPMENT COMPANY

By: ______________________
Michael Sencindiver, Vice President

COMMONWEALTH OF PENNSYLVANIA:
: ss
COUNTY OF Montgomery :

The foregoing instrument was sworn to and subscribed before me this 10th day of January, 2001 by MICHAEL SENCINDIVER, Vice President of Keating Development Company, on behalf of that corporation, who is personally known to me.

______________________
NOTARY PUBLIC

Printed Name: Marcia S. Kelly

My commission expires: 11.27.03

Notarial Seal
Marcia S. Kelly, Notary Public
Lower Merion Twp., Montgomery County
My Commission Expires Nov. 27, 2003
Member, Pennsylvania Association of Notaries

CERTIFICATE OF SERVICE

I certify that the foregoing Responses and Objections of Plaintiffs to Defendant's First Set of Interrogatories Directed to the Plaintiffs was sent via U.S. Mail, postage prepaid, this ~~15th~~ 17th day of January, 2001, to the Defendant addressed as follows:

John S. Groat, Esquire
Comm'l Litig. Branch
Civil Division, Department of Justice
Classification Unit, 8th Floor
Washington, D.C. 20530

[signature]

PHILA1\1364440\1 066645.000

COPY
05

JSGROAT
DJ No. 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

U.S. Department of Justice

Civil Division
Telephone: (202) 514-4325
Facsimile: (202) 514-7965

Washington, DC 20530

May 22, 2001

FACSIMILE AND FIRST CLASS MAIL

Gerson B. Kramer, Esq.
Herman M. Braude, Esq.
Braude & Margulies, P.C.
The Brawner Building
888 Seventeenth Street, N.W.
Suite 500
Washington, D.C. 20006

Re: Palafox Street Associates, L.P., v. United States, Court of Federal Claim No. 99-898

Dear Messrs. Kramer and Braude:

Based upon the Government's inspection of the documents Palafox produced on May 2-3, 2001,[1] Palafox's January 17, 2001 responses to defendant's interrogatories are insufficient. For the reasons set forth below, the Government seeks Palafox's agreement to supplement its responses.

Palafox's answers rely in large part upon Palafox's reference to documents produced, without specifying the particular documents upon which Palafox relies. Such responses are generally not acceptable.

> Subdivision (c). The Committee is advised that parties upon whom interrogatories are served have occasionally responded by directing the interrogating party to a mass of business records or by offering to make all of their records available, justifying

[1] Boxes labeled 27PA, 833P, 2651, 2652, 2653, 2654, 2660, 2661, 2662, 2663, 2665, 2656, 2666, 2657, 2664, 2665, 2669, 2670, 2671, 2689, 2690, 2797, 2798, 2800, 2801, 2802, 2999, 3004, 3176, and 3043, and a loose leaf binder.

> the response by the option provided by this subdivision. Such practices are an abuse of the option. A party who is permitted by the terms of this subdivision to offer records for inspection in lieu of answering an interrogatory should offer them in a manner than permits the same direct and economical access that is available to the party. If the information sought exists in the form of compilations, abstracts or summaries then available to the responding party, those should be made available to the interrogating party. The final sentence is added to make it clear that a responding party has the duty to specify, by category and location, the records from which answers to interrogatories can be derived.

Advisory Committee Notes, 1980 Amendment, Fed. R. Civ. P. 33; Govas v. Chalmers, 965 F.2d 298, 302 (7th Cir. 1992) (discussing application of the rule).

Based upon our inability to locate specifically responsive documents among those produced, Palafox should supplement at a minimum its answers to Interrogatories Nos. 3, 4, 5, 6, 7, 12, 13, 14, 15, 17, 18, 20, 21, 22, 23, 24, 25, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, either with specific responses or references to specific documents. None of the documents Palafox produced appeared to respond to the Government's document request nos. 4 & 5, which requested bid preparation documents, which raises a question as to whether the production was complete and responsive.

Our specific comments and objections to Palafox's answers to particular interrogatories follow:

Interrogatory No. 4

The Government inquired as to the duties and responsibilities of all of Palafox's supervisory and managerial personnel involved in obtaining and performing the lease and the project. Palafox objected to the interrogatory, suggested that the Government should be aware of these facts, and referenced the fact that documents were made available. This response is not satisfactory and Palafox should respond to the inquiry in detail.

Interrogatory No. 7

The Government inquired as to any statement or statements regarding the allegations contained in the complaint. Palafox objected to the interrogatory but recognized the possibility of "statements which may have been submitted in conjunction with insurance claims by or on behalf of any of the Plaintiffs with respect to any casualty losses which occurred at the project." Palafox should identify and produce those statement and a privilege log identifying any such statements that are withheld upon the basis of privilege.

INTERROGATORIES Nos. 8 & 9

The Government inquired as to whether Palafox has some form of an electronic mail system and electronic internal or external databases related to both this lease and/or project and Palafox's proposal for and performance of the lease and/or project. Palafox resounded affirmatively, but did not produce any such communications or databases. Palafox should produce all such communications and databases and should provide copies to the Government.

INTERROGATORY No. 13

The Government inquired as to "any published or written documents, forms, generally recognized methods, assumptions, industry practices, computer programs, formulas, or other aids or references used by Palafox or by those consulted by it . . . . ." Palafox objected to this interrogatory, stated that "Defendant is or should be aware of all of the relevant parties whose identities are requested in Interrogatory No. 13 from the negotiation of the lease and the construction of the subject project and/or the Claims submitted by Plaintiffs to the GSA." and referenced prior and pending document production. Palafox's answer is not responsive.

INTERROGATORY No. 16

The Government inquired as to "any documents or other records generated by Palafox or any person or firm acting upon its behalf that state an amount of profit or loss, whether gross or net, whether anticipated or actual, which Palafox experienced or anticipated experiencing on the lease and/or project." Palafox objected and referenced prior and pending document production. The Government did not identify any specific responsive documents. Palafox should specifically identify any responsive documents.

INTERROGATORY No. 22

The Government inquired as to "how [Palafox] . . . learned about the existence of the alleged 'donation agreements,' described in Count I of the complaint, from the City of Pensacola to GSA." Palafox responded that "[a]ll relevant information, to the extent not privileged, in response to Interrogatory No. 20 is set forth in the Claims submitted by Plaintiffs to the GSA." The Government is entitled to a full response to its inquiry. If Palafox claims a privilege as to any responsive document, the Government requests that Palafox provide a privilege log.

INTERROGATORY No. 22

The Government sought substantiation of the alleged increase in price alleged in paragraph 43 of the complaint. Palafox's answer is not responsive.

INTERROGATORY No. 25

The Government inquired as to the specifics of the allegation in paragraph 59 of the complaint, alleging that Palafox offered "the Government the choice of vinyl, wood or cloth covering.", Palafox referenced its claims submitted to the GSA and its document production. Palafox should respond specifically to this inquiry.

INTERROGATORY No. 27

The Government inquired as to "the methods that [Palafox] proposed to solve the mold and mildew problems as alleged in paragraph 62 of your complaint, and [requested that Palafox] substantiate [its] answer." Palafox responded that, based "upon information and belief, that the utilization of a wall treatment other than vinyl would solve the mold and mildew problem." This answer is not responsive.

INTERROGATORY NO. 31

The Government asked Palafox to "identify the 'supplemental lighting,' including the room number in which it was installed and description of the type or amount that you installed, as alleged in paragraph 79 of the your complaint." Palafox's answer referencing the complaint, its claims, and its documents production is not responsive.

Please advise me within 7 days of how Palafox wishes to proceed.

Yours truly,

JOHN S. GROAT
Attorney
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

cc: Kevin Rice, Esq.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - X
PALAFOX STREET :
ASSOCIATES, LLP., et al :
Plaintiffs, :
: NO. 99-898C
v. : (Judge C. Miller)
:
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - X

Oral deposition of DENNIS MARTIN, Witness, on behalf of the Defendant, pursuant to the Federal Rules of Civil Procedure, taken in the law offices of Cozen & O'Connor, 1900 Market Street, Philadelphia, Pennsylvania, December 30, 2005, commencing at or about nine-thirty o'clock a.m., Eastern Standard Time, before Jacqueline A. Geary, Certified Shorthand Reporter - Notary Public.

- - -

Page 2

APPEARANCES:

COZEN & O'CONNOR
BY: F. WARREN JACOBY, ESQ.
1900 Market Street
Philadelphia, PA 19103-3508
215-665-2154
Attorneys for Plaintiffs

U.S. DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
BY: JOHN S. GROAT, JR., ESQ.
1101 L Street, N.W.
Room 11050
Washington, DC 20005
202-514-4325
Attorneys for Defendant

- - -

Page 3

I-N-D-E-X


DENNIS MARTIN PAGE

Mr. Groat............................6

EXHIBITS Documents received and marked for identification

Notice of Deposition received and marked for identification as Defendant's Deposition Exhibit 1.............................Page 5

Order received and marked for identification as Defendant's Deposition Exhibit 2...Page 10

Letter, dated December 20, 2005, received and marked for identification as Defendant's Deposition Exhibit 3..................Page 12

Defendant's Motion to Compel received and marked for identification as Defendant's Deposition Exhibit 4..................Page 12


Page 4

EXHIBITS (Continued)


Memorandum from Don Bitterlich received and marked for identification as Defendant's Deposition Exhibit 5..................Page 36

Conversation Record received and marked for identification as Defendant's Deposition Exhibit 6.............................Page 36

Conversation Record received and marked for identification as Defendant's Deposition Exhibit 7.............................Page 48

Job Cost Ledger received and marked for identification as Defendant's Deposition Exhibit 8.............................Page 55


Page 5

PROCEEDINGS

DENNIS MARTIN, having been duly sworn, was examined and testified as follows:

- - -

(Notice of Deposition received and marked for identification as Defendant's Deposition Exhibit 1)

- - -

MR. JACOBY: Jack, before we get started, the usual stipulations, the only objections not reserved are ones to form of question or do you want me to object to everything?

MR. GROAT: Go ahead and object to everything. This is a 30(b)(6) and we will be able to use it, you know, at trial, so I think we might as well try to get everything cleaned up now.

MR. JACOBY: Number two, as I mentioned to you before the Reporter came, Mr. Martin was at all times relevant to the facts in this matter, general counsel for Keating and for Palafox, thus, while he's prepared to testify as a 30(b)(6), there may be an occasion or questions that might raise issues of privilege

Page 6

and I just want to alert you to those potentials
MR. GROAT: I assume, if they come up, you'll raise them.
MR. JACOBY: I just want to --
MR. GROAT: I have no problem with that at all.
MR. JACOBY: I just want to, hopefully, establish some boundaries.
And number three, he's here solely as a 30(b)(6) witness pursuant to what you've marked as Defense Exhibit 1.
He's not here as a fact witness.
He is not here to testify as to any matters beyond the scope of the 30(b)(6) notice.
MR. GROAT: Very well.
BY MR. GROAT:
Q. Sir, would you examine what's been marked as deposition Exhibit Number 1?
A. I'm done.
Q. Are you familiar with what's been marked as deposition Exhibit 1?
A. Yes.
Q. And, sir, would you state your full name, please?

Page 7

A. It's Dennis Arthur Martin.
Q. And, sir, where do you reside?
A. Apartment 1821, 1600 Arch Street, Philadelphia, PA.
Q. And, sir, could you briefly summarize your formal education?
A. I graduated in 1973 from Colgate University, and in 1976, from the University of Pennsylvania law school.
Q. And, sir, could you state briefly your professional work experience?
A. In 1976, I started as an associate in the law firm of Jacoby, Donner, and Jacoby here in Philadelphia.
And in 1981, joined Daniel J. Keating Construction Company which trades today as Keating Building Corporation as general counsel.
In 1983, I became executive vice president and general counsel.
In 1991, I became president of Keating Development Company. And then about six months ago, we hired a new general counsel and I gave that title up.
Q. And what is your present title then?
A. President of Keating Development Company,

Page 8

executive vice president of Keating Building Corporation, secretary of Keating Building Corporation.
Q. Now, sir, have you or any company, organization, or association to which you belong been found to have engaged in any fraud, deceit, or dishonesty by any court, government, agency, or other board?
MR. JACOBY: I'll object to the form of the question. You can answer it.
BY MR. GROAT:
Q. Please answer as best you can.
A. No, we haven't.
Q. I ask the question because I've gotten very strong responses in some cases and I try to make it as broad as possible.
MR. GROAT: I understand the objection to the form, but I just want to move on as quickly as possible.
MR. JACOBY: Fine.
BY MR. GROAT:
Q. You know, why are you here, why were you designated the 30(b)(6) deponent, to the best of your knowledge?
A. Well, when something like this would come

Page 9

in, it would come to me, I would pass that on to, at the time of this request -- well, at the time of the original production of documents, not Exhibit 1, but the production was 2001, I would pass that on to Dee Ayala, A-Y-A-L-A, and she would assemble the documents, the files from storage, as well as the people, any of the active employees who were still involved in the project.
Q. And may I ask what her title was, if you would, please?
A. She was just an administrative assistant.
Q. And to whom did she report?
A. She reported to me and to an assistant general counsel, Catherine Koronvokis.
Q. Did she have any special legal training?
A. No, I don't recall.
Q. To the --
A. She has a degree in social work. She was a college graduate. Very, very good, but I don't think she had a paralegal training.
Q. Do you recall specifically what her title was?
A. I think it was administrative assistant.
Q. And did most of her job duties involve a

Page 10

search for and production of documents?
MR. JACOBY: Object to the form. You can answer.
THE WITNESS: That was part of her duties.
BY MR. GROAT:
Q. What did all her duties encompass?
A. Well, she also prepared -- she was an assistant to Kate Koronvokis, so she did some correspondence for Kate.
She also prepared bid packages, what's called the front ends of the bid packages.
When the company -- as a construction manager goes to bid out work to subcontractors, a formal package is prepared taking the general conditions, AIA general conditions, putting modifications to those, there's things called supplementary general conditions and supplementary special conditions, and she was skilled in preparing those and modifying those, too.
- - -
(Order received and marked for identification as Defendant's Deposition Exhibit 2)
- - -
BY MR. GROAT:

Page 11

Q. Let me show you what has been marked deposition Exhibit 2 and ask you if you are familiar with that document?
A. Actually, no, this is the first time I've seen it.
Q. Are you aware of the contents of that document?
MR. JACOBY: When you say aware, Jack, independent of reading it today, was he aware of any of the contents previously?
MR. GROAT: Thank you for phrasing the question much better than I did. Yes.
BY MR. GROAT:
Q. Had you previously been aware of the contents of the document?
A. Some of the things. We were talking with GSA trying to get a settlement going. I was aware that the summary judgment wasn't granted. And the 30(b)(6) I was aware of by December, sometime in December date.
Q. Were you aware that the 30(b)(6) deponent had been ordered to be made available by December 15th?
A. I was told that on December 14th or something.

Page 12

MR. GROAT: Let me have marked as deposition Exhibit Number 3 my letter of December 20, 2005.
- - -
(Letter, dated December 20, 2005, received and marked for identification as Defendant's Deposition Exhibit 3)
- - -
BY MR. GROAT:
Q. Are you aware of the contents of that letter?
A. Yeah, I did see this letter.
Q. Are you aware of the request that the documents that were produced be made available today?
A. Yes, I discussed it with counsel.
Q. And was a determination made not to -- are the documents available today or not?
MR. JACOBY: They're not. They've been produced, we don't believe we have an obligation to reproduce them.
MR. GROAT: Please mark this as next in order.
- - -
(Defendant's Motion to Compel received and marked for identification as Defendant's Deposition Exhibit 4)
- - -
BY MR. GROAT:
Q. Now, let me show you Exhibit 4 and I'll ask you if you're familiar with what's been marked as defendant's Exhibit Number 4?
A. I'm familiar that defendants filed a Motion to Compel.
Q. Had you had an opportunity to review that motion previously?
A. Yes.
Q. And let me invite you to inspect what's been marked as page two of the appendix to that motion. Are you familiar with that document?
A. Yes.
Q. How did that document come to be prepared?
MR. JACOBY: I'll object to the form. I also instruct the witness not to testify as to privileged communications.
THE WITNESS: How it was prepared. It was prepared by counsel after speaking with us.
BY MR. GROAT:
Q. What, if any, role did you have in

Page 13

Page 14

preparing the responses to what is marked as responses and objections of plaintiff to defendant's first requests for production of documents directed to the plaintiffs?
MR. JACOBY: I'll object. I caution the witness to testify only to steps he might have taken, not to communications he had with anyone with respect to this document.
THE WITNESS: I reviewed it with counsel and I would have responded to specific questions.
BY MR. GROAT:
Q. Do you recall if you specifically prepared the responses or were the responses drafted by another person?
A. They were prepared by counsel.
Q. What role, if any, did Ms. Ayala have in the preparation of these responses?
A. What's the date of this? She left a couple of years ago.
MR. JACOBY: It looks like they were '01, Dennis, looking at the certificate of service, January of '01.
MR. GROAT: I believe that to be correct.
THE WITNESS: They would have simply

Page 15

organized and provided the documents for the production.
BY MR. GROAT:
Q. Now, you say they, administrative assistants working for you?
A. No. She would have provided the documents for the project to counsel. That's -- I mean, basically, she would assemble -- there are probably twenty or more file boxes of documents here that she would have assembled, counsel comes in, looks at them, and responds.
Q. How would she have assembled those documents?
MR. JACOBY: Object to the form. You can answer if you understand the question.
THE WITNESS: She would have identified the documents that are in storage from a list of documents that are in storage, box numbers, and she would have also gone to the current employees, Mike Sencindiver, Tracy Greer, and asked for their files.
BY MR. GROAT:
Q. Now, was this pursuant to standing instructions that you gave to your -- are you aware who exactly did the search for the

Page 16

documents in this case?
A. It would have been Dee Ayala.
Q. Could you spell her name so --
A. It's A-Y-A-L-A.
Q. And her standing instructions were to go both to a repository that would indicate what documents were in storage regarding a particular project?
MR. JACOBY: I'll object to the form. And I'm not sure -- you've come up with this standing instructions concept. If you can rephrase the question, I will have no objection to it.
BY MR. GROAT:
Q. What steps would she have taken to locate responsive documents?
A. There is a -- we have a shop in which we store job records, office records, accounting records, trailers, tools, equipment.
Q. I take it she didn't go to the trailers?
A. No. There's a list of, as documents are boxed up from the project sites, from accounting, from people's offices to be sent to the shop, they're then numbered and identified, and there's an inventory list.

Page 17

And periodically, after seven to ten years, people -- I go out there, chief financial officer, and we just destroy documents that we don't need after seven to ten years.
But -- so Dee would take that list, identify this particular job number as well as the titles of the boxes, and then they would be pulled, our shop foreman would physically take the box off the shelf, put it in a truck, take it to the office, take it to the conference room.
Q. How would she determine what should be pulled for the inspection?
A. She would pull everything.
Q. By pull everything, what do you mean?
A. Every box that says Palafox on it, job, whatever it was, I think it was 427, something like that, whatever the Keating job number was, she would pull every job -- every box with that number on it that had a reference to it.
And she would also go to the individual employees in the office who were connected with the job and ask for their files and put those files physically in the conference room.
Q. Now, are you aware of what was done in

Page 18

this case?
A. Yeah. That's a standard operating procedure. And I went into the conference room which was full of boxes.
Q. And is it your testimony that the boxes in the conference room represented all of the boxes that were identified as having files identified as relating to the Palafox project that were in storage?
A. Yes.
Q. And is it your testimony that your assistant, who you've referred to as Dee, went to individuals in the Keating organization and ascertained whether they had any responsive documents?
A. She would have gotten their complete files.
Q. You've testified she would have gotten, on what basis do you testify to that today?
A. That's a standard operating procedure.
Q. Are you aware, in fact, if it was done in this case?
A. Yes. I've seen the boxes. I've seen the people's -- I've seen Tracy Greer's files in the boxes, I've seen Mike Sencindiver's files in the boxes, Steve Grevlich, Don Bitterlich,

Page 19

Joe Streveri, I've seen all of their files in the boxes that were produced.
Q. In the boxes that have been identified as being produced?
A. Yes.
Q. And that's in the government's -- let me invite you to look at page sixty of the appendix?
A. Yeah. I took that list and went out and looked in the boxes. And you're missing a couple boxes.
Q. By that, we're referring to page sixty?
MR. JACOBY: When you say sixty, that's --
MR. GROAT: The appendix to the government's Motion to Compel.
MR. JACOBY: Mine stops, the copy you gave me, stops at page fifty-eight, but I think I know what you're talking about.
THE WITNESS: I have a copy.
MR. JACOBY: I know the letter you're talking about.
Did you hear what he said, though, that you're missing boxes?
MR. GROAT: Yes.
BY MR. GROAT:
Q. Can you specifically identify the boxes

Page 20

that were missing at this point in time?
A. I didn't, for whatever reason, didn't think that was important. I only wrote one of them down. There's one to possibly four boxes.
Q. One to four boxes not noted. And how do you know those boxes were produced?
A. Because the government marked with pink tabs what needed to be copied, and in these boxes, which are sequential to some of the boxes here, there were pink tabs that had to be marked by your people.
Q. Now, in addition to boxes taken from storage, the personal files of what individuals were represented in those boxes?
MR. JACOBY: Can I object and suggest that you may need some clarification. I'm not trying to testify, I'm just trying to help muddle through this.
MR. GROAT: Please, I want to move along.
MR. JACOBY: Dennis, I think that Jack's confusion might be, because of the timing, there might well be, Tracy or Mike's files might already be in boxes, but it may well be at the time that Dee also took files from their work areas as well, right?

Page 21

THE WITNESS: That's correct. By 2001, this job is -- '97 they started paying rent or '95?
BY MR. GROAT:
Q. I think the whole thing was wrapped up in '98.
MR. JACOBY: So the question, to respond to Jack's question, would be whether, at that point in time, in 2001, whatever files they had, working files or whatever, were already in the boxes or whether they had additional files in the offices. That's the point of clarification.
MR. GROAT: I would have reached it a much longer way --
MR. JACOBY: That's fine.
THE WITNESS: They would all be in storage today other than there's a real estate tax bill that gets paid every year, there's minor correspondence that goes on currently on this, and anything connected with the litigation, but anything other than that is in storage.
BY MR. GROAT:
Q. Do you know whether it would have been in storage at this point in time, in 2001?
A. It should have been.

Page 22

Q. Now, did the documents Palafox produced include the documents that Palafox had accumulated at the job site?
A. Yes.
Q. And this would have included all the working documents of the people at the job site?
A. Yes.
Q. And this would have included all inspection reports, labor reports, the entire record, the entire documentary record of the work at the job site?
MR. JACOBY: Object to form. You can answer.
THE WITNESS: Any -- the job site doesn't keep payroll records, they would have come from accounting, so those -- there were accounting boxes that were produced, but inspections, correspondence with the GSA, inspection reports, all of that was produced.
BY MR. GROAT:
Q. Now, were there records maintained at the job site that would not be reflected in this production, in other words, would there be a construction trailer and would some of those documents have been destroyed after the project

Page 23

was completed?
A. Generally not. That's why you'll see these documents, the box numbers in groups, but not -- there may be seven in a group, then there will be a gap.
The documents are coming from the trailer. The trailer, when the job ends, the trailer's documents all go into storage.
So the project manager empties them, so he is storing things -- unfortunately, no one, for economy standpoint, sits there and says this is the twelfth copy of this thing because the office is storing it, the job site is storing it, the project exec is storing it.
They each store all their documents, so yes, there is -- all of the trailer documents would go.
Q. Now, let me turn to page two of the appendix and to plaintiff's responses. Now, specifically, I invite your attention to the second response, and would you read that response to the record, please?
A. This is to number two?
Q. Number two.
A. Plaintiffs object to request number two which is overly broad which would cause

Page 24

unreasonable annoyance, embarrassment, oppression, burden, or expense to the plaintiffs and seeks to elicit information which is not relevant to the subject matter of this litigation.
Q. Now, to the best of your knowledge, are there any documents that would fit in that category that are responsive to the request made by the government?
MR. JACOBY: I'll object to the form of the question and I'm going to object to the question, itself. Jack, if you read the entire document, it was indicated that, notwithstanding those issues, that everything was produced. If your question is was something not produced because of that objection, then I'll let him answer; otherwise, he's not here to testify as to these requests for discovery.
BY MR. GROAT:
Q. Was anything not produced pursuant to this objection?
A. Not to my knowledge.
Q. Now, you mentioned the storage shed, what documents are stored at the storage shed?
MR. JACOBY: Is this the shop we're

Page 25

talking about?
MR. GROAT: The shop, I'm sorry.
THE WITNESS: Because it's a lot bigger than a shed.
We'll get fifty boxes from one job site. This wasn't a big job. What is stored there?
BY MR. GROAT:
Q. Yes, what is stored there?
MR. JACOBY: Not just with respect to this project?
MR. GROAT: Well, I'm specifically addressing it to the plaintiffs in this case, and my question goes to all documents related to this job.
BY MR. GROAT:
Q. Are there any other places that documents related to this job are stored?
A. No.
Q. Explain, if you would, the relationship between Keating Development Company, Keating Building, and Palafox Street Associates?
A. Keating Building is a construction company that was formed in, I want to say 1976, yeah, 1976, close enough, owned by Daniel J. Keating the Third, commercial contractor, large

Page 26

commercial construction contractor.
In about 1991, we formed the development company which is Keating Development Company which is also owned by Daniel J. Keating and that company provides development services to clients which means we can do things, for example, finance, hire architects, develop a project, as opposed to just building.
Keating Building Corporation, at times, builds for Keating Development, and other times, other contractors build for Keating Development.
Then the individual projects are set up, once they become a reality, are set up into individual partnerships.
Q. And what was Palafox Street Associates?
A. That was the individual partnership set up for this project.
Q. And who is the partnership between?
A. The partnership, there is a corporate general partner, which has a very small interest, about a one percent, and then there are individual limited partners.
Q. And these were investors in the --
MR. JACOBY: I'm going to instruct him not to answer. I don't think it's responsive

Page 27

to 30(b)(6) or really relevant.
BY MR. GROAT:
Q. Let me direct your attention, then, to Palafox Street Associates, where would the records be stored concerning Palafox Street Associates?
A. In the shop.
Q. Are the corporate records for Palafox Street Associates stored in the shop?
MR. JACOBY: Object to form. You can answer.
THE WITNESS: No. The corporate records, since it's an ongoing company, are in our office.
BY MR. GROAT:
Q. Were those corporate records produced?
MR. JACOBY: That assumes they were requested.
MR. GROAT: That assumes they were requested.
MR. JACOBY: And that we had no objection if they were requested.
MR. GROAT: Fred, we're trying to get through this this morning.
MR. JACOBY: That's why I'm doing this; otherwise, I wouldn't.

Page 28

THE WITNESS: That I don't recall. I don't recall them, frankly, being asked for.
MR. JACOBY: If you want to get back to us on that, we'll check on that. I'm not even sure they're relevant, but let's look at it.
BY MR. GROAT:
Q. Now, in the government's -- let me invite your attention to the government's letter of May 22, 2001 at page sixty of the appendix. Now, were you familiar with that letter when it was prepared --
MR. JACOBY: I'll object --
BY MR. GROAT:
Q. -- or when it was sent to Palafox?
MR. JACOBY: Object to form. You can answer.
Have you seen this letter before?
THE WITNESS: I don't recall seeing it before. I don't recall a lot from 2001.
MR. JACOBY: Is that your answer?
BY MR. GROAT:
Q. Whatever is fine, if you do -- I'm not trying to torture a response out of you.
A. I saw it recently. I can't recall seeing it in 2001. And I know I saw it recently

Page 29

because I took this list of boxes.
Q. Let me invite your attention to page two of the letter, the middle of the letter, and are you aware of the government's contention that the boxed documents Palafox produced were not responsive to the government's document requests numbers four and five which requested bid preparation documents?
A. Yes.
Q. Based upon your examination of the documents produced, were all of the bid preparation documents for this job produced?
A. Yes.
Q. And what did those documents include?
A. They included the records of Steve Grevlich, Mike Sencindiver, Tracy Greer.
Q. Now, are these the individuals who analyzed the proposal?
MR. JACOBY: Object to the form. You can answer.
THE WITNESS: Yes.
BY MR. GROAT:
Q. And you are aware of the analysis they performed?
MR. JACOBY: Same objection. You can

Page 30

answer.
THE WITNESS: Yes.
BY MR. GROAT:
Q. And did the documents produced reflect that analysis?
MR. JACOBY: Objection to form.. If you understand the question, you can answer it, if you can.
THE WITNESS: Their files would have included their analysis to the extent they wrote an analysis down.
BY MR. GROAT:
Q. Now, did the documents produced reflect an analysis of the cash flow that would be generated by the government's exercise of the options in this case?
MR. JACOBY: You're asking Mr. Martin to try to recall what specific documents provided. To the extent you recall, fine; if you don't recall, you don't recall.
THE WITNESS: I don't recall.
BY MR. GROAT:
Q. Are you aware of any documents that reflect a cash flow analysis of -- resulting as the exercise of the options?

Page 31

A. Yeah. In preparation for the claim, yes.
Q. Now, let me invite your attention to page two of the appendix, again, response number three.
MR. JACOBY: Jack, that's the one that says all documents relating to design of the project?
MR. GROAT: That's correct.
BY MR. GROAT:
Q. Now, are you aware of any documents that were withheld in response to this request for production?
A. No.
Q. And are you aware of any documents that were deemed privileged and withheld based upon this request for production?
A. No.
Q. Let me invite your attention to request number four and ask the same question, are you aware of any documents that were withheld in response to this question?
A. No.
Q. And question number five?
MR. JACOBY: Are you asking the same question about privilege for four, too, or should he just assume that each time?

Page 32

BY MR. GROAT:
Q. Let me ask you the same question as to whether any documents have been withheld regarding question number four, and as we go down, I just ask you to review the questions and respond to the same question for each paragraph without my repeating it?
MR. JACOBY: Just say paragraph number and your response, just so the record is clear.
MR. GROAT: Thank you.
THE WITNESS: Five is no.
BY MR. GROAT:
Q. Okay, thank you.
A. Six is no.
Seven is no.
Eight is no.
Nine, I don't believe we provided canceled checks because that would be ridiculous to try to find those.
We don't file canceled checks by jobs. And I don't know from, I mean, 2001, I can't recall seeing a canceled check in the last ten to fifteen years. I think it's all done electronically.
Q. Are ledgers maintained that would reflect

Page 33

the payment?
A. Sure.
Q. Were these included in the production?
A. Yeah. The subcontractor folders were all produced which have, in their folders, the subcontracts, the payment -- the applications for payment, when were the payments made, the final release by each subcontractor.
MR. JACOBY: He's asking a different question.
BY MR. GROAT:
Q. One way of proving actual payment would be a canceled check?
A. Uh-huh.
Q. What, in the documents produced, stands in place of a canceled check as proof of payment?
MR. JACOBY: I'll object to form. You can answer.
BY MR. GROAT:
Q. To the best of your ability, please?
A. You really have to ask accounting. I mean, I look at --
MR. JACOBY: Let me see if I can help you. Does the subcontract file contain a

Page 34

release or some acknowledgment of payment from the subcontractor when the job is concluded?
THE WITNESS: Yes.
MR. JACOBY: Does it state the amount that was received?
THE WITNESS: Yes.
BY MR. GROAT:
Q. Let me invite you to request number ten?
A. No.
Q. And by no, you mean nothing has been withheld?
A. That's correct.
Q. And number eleven?
MR. JACOBY: Let me correct it. His testimony had been he wasn't aware of anything.
MR. GROAT: That is correct.
MR. JACOBY: Is that your testimony when you say no?
THE WITNESS: That's correct.
BY MR. GROAT:
Q. And with regards to number eleven?
A. No.
Q. And with regards to number twelve?
A. No.
Q. And with regards to number thirteen?

Page 35

A. No.
Q. And with regards to number fourteen?
A. No.
- - -
(At this point, a short recess was taken, after which time the deposition resumed.)
- - -
BY MR. GROAT:
Q. Fifteen?
A. No.
Q. Sixteen?
A. No.
Q. Seventeen?
MR. JACOBY: Jack, in responding, I assume you're also considering the claims notebook that was submitted as well as part of the response?
MR. GROAT: Yes, I am.
THE WITNESS: No.
BY MR. GROAT:
Q. Now, if you would review eighteen, but before you respond, I wanted to show you something.
MR. GROAT: Mark these as the next in order.
- - -

Page 36

(Memorandum from Don Bitterlich received and marked for identification as Defendant's Deposition Exhibit 5)
- - -
(Conversation Record received and marked for identification as Defendant's Deposition Exhibit 6)
- - -
MR. JACOBY: Right now, he's responded to seventeen. He needs to respond to eighteen.
THE WITNESS: You wanted me to look at this before --
MR. GROAT: I want to avoid any problem because I think these --
MR. JACOBY: Fine. Jack, where did you get this document?
MR. GROAT: This was in the materials produced.
MR. JACOBY: It would appear to be privileged.
MR. GROAT: Well, you know, it came up in the materials and it wasn't identified. I have another document that is marked which I tried to give you, it's marked privileged, and I thought perhaps something had been omitted from

Page 37

the file, but it seems clearly not, so --
MR. JACOBY: The document identified as Exhibit 5 is a privileged document.
MR. GROAT: Well, it's information submitted to an attorney in the form of a draft.
MR. JACOBY: But it's clearly submitted to attorneys and it's clearly submitted for the purpose of submitting a claim. It's work product, it's in anticipation of litigation. I can go on and on and on.
MR. GROAT: May we go off the record?
- - -
(Discussion off the record)
- - -
MR. JACOBY: You have presented to my client and me copies of two separate documents.
The first document, marked as Exhibit 5, appears to be a memorandum from Don Bitterlich to Mr. Martin and myself clearly designating us as attorneys and it talks about attached please find the completed-to-date document summation for the claim.
I don't know how you got this document,

Page 38

where you got this document, I'm not suggesting anything improper, however, I would suggest to you that this document is clearly a privileged document, apparently was produced inadvertently, and we're going to be asking you to return it to us.
MR. GROAT: And for the record, this represents a draft of the claim, as I understand it, prepared by Mr. Bitterlich, and it's your position that drafts he prepared --
MR. JACOBY: Sure. It's a work product, it's in anticipation of litigation, he's directing it to both counsel, inside and outside counsel.
MR. GROAT: So this represents a draft of the claim.
MR. JACOBY: I understand. That would be my position.
And then with respect to Exhibit Number 6, Exhibit Number 6 is, the first page of which is a document entitled conversation record under Keating's logo from Mr. Bitterlich to me, and he has clearly marked on the face of it attorney hyphen client privilege document, and attached to that is another document.

Page 39

I would again suggest that this shouldn't or couldn't be any doubt that this was a privileged document.
I don't know how it was produced, I don't know how the government came into possession of it. We will be asking for this document also to be returned to us as privileged.
BY MR. GROAT:
Q. Now --
MR. JACOBY: One more thing. I'm sorry, Jack.
Again, when Mr. Martin responds to your questions about these various paragraphs in the request for production, I thought the ground rule we agreed upon was that he was not aware of any documents withheld, including documents withheld for privilege, and he can respond as to whether he was aware or not whether these two documents were produced, but if he wasn't aware, then his answer stands for what it says.
MR. GROAT: And please understand, for the record, I'm not suggesting any misfeasance or malfeasance, what I'm trying to do is understand the process by which the production was done, and especially in light of these two

Page 40

documents.
And I guess my question with regards to the documents produced, was any privileged review conducted of these documents.
MR. JACOBY: When you say these documents, any of the documents produced by Keating?
MR. GROAT: All the documents produced.
MR. JACOBY: You can answer then. Do you understand the question?
THE WITNESS: I understand the question.
I didn't do any privilege review of them. Gerson Kramer from Margulies' office, our attorneys, reviewed the documents.
Again, they were assembled in the conference room prior to the --
BY MR. GROAT:
Q. How do you know that to be the case?
A. Because he came to our offices with Don.
MR. JACOBY: Don being Don Bitterlich?
THE WITNESS: Don Bitterlich. Frankly, we produced all of Don Bitterlich's files. These appear to be Don Bitterlich's copies. That doesn't surprise me that something like that -- Don, as you get into the documents, you will see, wrote everything down.

Page 41

BY MR. GROAT:
Q. Mr. Bitterlich wrote everything, I think we can all agree on that.
I guess my question comes to, what, if any, documents may have been removed from the files upon the basis of privilege, to the best of your knowledge?
MR. JACOBY: Object to the form. You can answer.
THE WITNESS: I would believe any drafts of our claim, but beyond that, I'm really not aware of what was removed.
BY MR. GROAT:
Q. So based upon your understanding, upon what authority would any drafts of the claim have been removed from the documents?
A. As preparation for litigation.
MR. JACOBY: Object to form of the question. I don't think Mr. Martin is here in his legal capacity or as an expert witness on the law.
BY MR. GROAT:
Q. Drawing your attention to defendant's Exhibit Number 5, can you state for the record what it is?