Page 42

MR. JACOBY: Object to the form. You can answer.
THE WITNESS: It's a transmittal from Don Bitterlich, our project manager, to F. Warren Jacoby, Esquire, and myself, of a draft of a portion of our claim which was submitted in the claim books to the government.
BY MR. GROAT:
Q. Now, the cc indicates to whom -- the copies of this package would have been sent to whom?
A. Daniel J. Keating the Third, Mike Sencindiver, Mike Bertino, Tim Clippinger, and Dan Dirscherl.
Q. And could you identify who those individuals are, please?
A. Mr. Keating, president of the building company, chairman of the development company.
Mike Sencindiver is a vice president of the development company and the person in charge of developing the Palafox project.
Mike Bertino was vice president of the construction company.
Tim Clippinger was a project executive.
And Dan Dirscherl was head of field operations for Keating Construction.

Page 43

Q. Now, were these individuals' files checked to determine whether there would have been documents responsive to the government's request?
A. Yes, their files were produced.
Q. And would it have been their normal practice to retain the copies of internal memorandum that they received?
A. It would vary by individual.
Dan Keating retains very little. They're all in kind of an executive capacity as opposed to an operational.
I know Mike, just from -- Mike Sencindiver doesn't maintain many copies of things. He doesn't have extensive files.
Mike Bertino ran the construction operation. I doubt he would have kept a copy of something like this.
Tim, as project exec, might have. Dan Dirscherl is running the field people, wouldn't have.
It will vary very much by person.
Q. Well, the question is prompted by the fact that in our review of the files, we found one copy of this and we didn't find, you know,

Page 44

other copies in other individuals' files, and given the distribution, my question is, can you explain that?
A. I can explain it, because the construction company does anywhere from two hundred to three hundred and fifty million dollars worth of volume a year, handles, when added, the CM value handles anywhere from three hundred and fifty to five hundred million dollars worth of construction a year, probably has twenty active projects. Don sent lots of memos around. These people couldn't possibly retain or be inclined to retain everything that came across their desk in a file, particularly when it's not -- when they're just being cc'd on it. They're doing much, much, much more than a mold and mildew claim at the Pensacola Courthouse.
Q. And let me show you what's been marked as defendant's Exhibit 6.
MR. GROAT: And let me go off.
\- - -
(Discussion off the record)
\- - -
BY MR. GROAT:

Page 45

Q. Can you explain what's been marked as deposition Exhibit 6, please?
MR. JACOBY: Object to form. You can answer.
THE WITNESS: It's a transmittal from Don Bitterlich to Fred Jacoby of Cozen and O'Connor, Fred Jacoby, Esquire, of a letter that Don had received from Landis and Staefa.
BY MR. GROAT:
Q. Are you familiar with the contents of the letter?
A. Yes. I would have to reread it. It's a 1997, but I remember us dealing with Landis and Staefa.
Q. Now, were you the individual in overall charge with conducting a privilege review of these documents?
A. No, it would have been Braude and Margulies.
Q. Now, if you would, returning to eighteen, I've tried to identify two documents that I think, you know, arguably might have been responsive to eighteen that were produced. Are you aware of any other documents that might be responsive to request for production number

Page 46

eighteen that were not produced?
MR. JACOBY: Object to form. I also raise the same objection that these are privileged documents, should not have been produced.
THE WITNESS: We wouldn't -- we wouldn't have produced privileged documents that Braude and Margulies pulled as privileged.
BY MR. GROAT:
Q. I guess that goes to, how would I know what was potentially pulled as privileged?
A. You would have to ask Braude and Margulies.
Q. Well, we did and we didn't get one, and the requests requested a privilege list and we never received -- my problem is, I don't know if any documents were removed.
MR. JACOBY: Make a request for a privilege log.
MR. GROAT: Can we go off the record?
- - -
(Discussion off the record)
- - -
BY MR. GROAT:
Q. We're at nineteen.

Page 47

A. No.
Q. And twenty?
A. No.
Q. And twenty-one?
MR. JACOBY: I'm not sure -- read twenty-one, Jack. I'm not sure there would have been a production. You would have already had that stuff.
MR. GROAT: Well, it's asking concerning subcontractors or suppliers. If there were none, it would strike me he would know there were none.
MR. JACOBY: The answer is no.
- - -
(Discussion off the record)
- - -
BY MR. GROAT:
Q. Since a question was pending, I'm not trying to -- there's a reference to --
MR. JACOBY: And the reason he asked me the question was there was, years and years later, there was a nuisance suit with someone who did some repair work about how much they were owed, this is well after the job, and that's what he's reacting to.

Page 48

THE WITNESS: Hurricane Floyd, one of the last ones.
MR. GROAT: I'm not worried about that.
BY MR. GROAT:
Q. Twenty-two?
A. No.
Q. Twenty-three?
A. No.
MR. GROAT: Would you mark this as next in order, please?
- - -
(Conversation Record received and marked for identification as Defendant's Deposition Exhibit 7)
- - -
BY MR. GROAT:
Q. Would you look at what's been marked as deposition Exhibit Number 7 and tell me when you've had an opportunity to review it?
A. I've reviewed it.
Q. Can you tell me what deposition Exhibit Number 7 is?
MR. JACOBY: Object to the form. You can answer.
THE WITNESS: It's a conversation record

Page 49

written by Don Bitterlich, our project manager.
MR. JACOBY: I'll also raise the objection I raised with respect to 5 and 6. This, to me, is clearly privileged. A record of a privileged communication, in and of itself, is privileged and should not have been produced.
MR. GROAT: If you're going to make a request to return them --
MR. JACOBY: You and I, given what you said, we'll have to talk.
THE WITNESS: Recording a conversation that he had raising questions about an April 8th letter to Don from William T. Morris of KBJ Architects.
BY MR. GROAT:
Q. Now, you know, I'm interested in getting to the -- are you aware of the nature, are you aware of the dispute that led to the letter from the architect that prompted the memorandum?
MR. JACOBY: I'm going to object to the question and probably instruct the witness not to respond since I believe the scope of the question is beyond the scope of the 30(b)(6).

Page 50

MR. GROAT: Are you directing the witness not to respond?
MR. JACOBY: Yes, I am.
BY MR. GROAT:
Q. Let me invite your attention to appendix page thirty-one of defendant's Motion to Compel and I'd ask you to review both that interrogatory and the interrogatory response?
A. I'm done.
Q. My question is, to the best of your knowledge, does what has been labeled as Exhibit Number 7 relate to this interrogatory response?
MR. JACOBY: I'll object to the form of the question.
Do you understand the question?
THE WITNESS: Yeah. I think it's the same. Yes, I think it's the same dispute.
BY MR. GROAT:
Q. Were documents relating to this dispute produced in discovery?
MR. JACOBY: When you use the word dispute, you're talking about the dispute in the answer?
MR. GROAT: I'm talking about the apparent dispute discussed in Exhibit Number 7

Page 51

and also referenced in interrogatory response number eighteen.
THE WITNESS: Yes.
MR. JACOBY: I'll object to the question. You can answer it.
THE WITNESS: Yes.
BY MR. GROAT:
Q. Such documents would have been produced?
A. Nothing went beyond this letter.
I mean, we just told him we're not going to pay him, get lost, that ended the dispute.
What you would have seen is in Don Bitterlich's correspondence, that's the back and forth with them.
There's no -- if you're looking for documents of litigation or anything forward, no, there wasn't any.
Q. My question is, there's a statement in this memorandum, it was my understanding that KBG recognized their exposure for, I take it, for extended overhead, is that the abbreviation, EO?
A. No, no, that's errors and omissions.
Q. Errors and omissions, and damages incurred by KBC and KDC. And my question is,

Page 52

would there be any documents produced that would reflect that understanding?
MR. JACOBY: Object to the form. You can answer.
THE WITNESS: The production would have included any of the correspondence with KBJ. I don't ever recall KBJ writing us a letter and saying I agree. They just went away.
BY MR. GROAT:
Q. Were Keating's or Palafox's counsel conducting negotiations with KBJ that might be reflected in attorney documents?
MR. JACOBY: Object to the form. Any communications with counsel are privileged.
If you can answer this question without divulging privileged communications, feel free to do so.
THE WITNESS: I don't recall counsel even being involved, that it ever got that far with counsel.
BY MR. GROAT:
Q. Again, I'm drawing from the document and the memorandum goes from Mr. Bitterlich, and I haven't had an opportunity to depose him, to Mr. Jacoby, yourself, and Mr. Sencindiver, is

Page 53

that correct?
A. Sencindiver.
Q. And you know, my reading of the memorandum is Mr. Bitterlich wasn't in the loop at this point in time and expresses an understanding, and from that I infer the possibility that there were other people involved in some negotiations with the architect.
What I'm trying to do is find out where those documents might be?
A. It would have been Mike Sencindiver and it would have been, in all likelihood, telephone conversations back and forth with KBJ and Morris.
Q. And Mr. Sencindiver would have been the individual --
A. Yes. I don't recall ever getting to the level of counsel.
\---
(Discussion off the record)
\---
BY MR. GROAT:
Q. Now, I would like you to turn to page twenty-one of the appendix to defendant's Motion to Compel and I would ask you to read both that interrogatory and answer?

Page 54

MR. JACOBY: This is interrogatory number eight, Jack?
MR. GROAT: Yes.
THE WITNESS: Yes.
BY MR. GROAT:
Q. Mr. Jacoby is smiling. Perhaps --
MR. JACOBY: He's smiling -- I think we responded to this, but we'll do it again, not today, but --
MR. GROAT: There has been some response.
BY MR. GROAT:
Q. But just for the record, did the production include electronic mail relating to the project?
A. We didn't have an electronic mail system when this project was being done, so we made a complete production of what we had.
Q. When did the electronic mail system start? Again, I'm asking to the best of --
A. We probably answered this, but --
MR. JACOBY: If you don't recall --
THE WITNESS: It's probably five or six years ago.
BY MR. GROAT:
Q. So at the time of this project, there was

Page 55

no electronic mail system?
A. No.
Q. And exchanges between executives and operational people in the corporation concerning the project would not have been done by electronic mail because the system didn't exist?
A. Didn't exist.
Q. Turning to interrogatory number nine, would you please read that interrogatory and the response?
A. We don't have any of this. We don't have any electronic databases, electronic media, an electronic repository.
MR. GROAT: Would you mark this as defendant's exhibit next in order, please?
\- - -
(Job Cost Ledger received and marked for identification as Defendant's Deposition Exhibit 8)
\- - -
BY MR. GROAT:
Q. Would you examine what's been marked as defendant's Exhibit Number 8 and tell me what that is, please?

Page 56

A. That's from accounting, that's our job cost ledger.
Q. Well, there was one job cost ledger produced dated 8/26/98. Can you clarify who and how that record is maintained?
A. These records are maintained by accounting. This is -- people file their timesheets every week and will identify or are supposed to identify particular projects that they're working on by job number, and then accounting job costs those people to particular jobs, that's what this is a record of.
Q. Now, is this record responsive to interrogatory request number nine?
A. You know, I have to look. I mean, this really isn't a repository for documents. This is an accounting record of who charged what to their timesheets. This is the type of back-up that, again, the GSA auditors would have seen against people's timesheets.
Q. You've referenced timesheets. It also appeared to me that it represented proposed payments on certain estimates, is that correct? For instance, look at page fifty-four?
A. See, this is -- this is a record of

Page 57

costs.
MR. JACOBY: Jack, is there a specific item you want us to look at on page fifty-four?
MR. GROAT: Let me tell you exactly where I'm coming from. This document was produced when the GSA people came.
MR. JACOBY: So the system works.
MR. GROAT: Well, this was produced to them and the entire database wasn't produced to us in response to the request for production.
MR. JACOBY: Actually, though, Jack, the response is plaintiffs will produce all written output and this is written output.
MR. GROAT: This is one date.
I think what this may have done, judging from the date, this may have been prepared in preparation of the submission of the claim, and if there's a continuing database, we would expect the entire database to be produced.
I can't tell if there were changes to this afterwards or how it was developed from this.
I don't know whether this is an item that tracks job costs that people would have used in the company or whether it's simply a repository in the accounting department.

Page 58

MR. JACOBY: Let's just back up a second.
You're suggesting that they did not produce all written output from a database?
MR. GROAT: Well, I'm suggesting that we have this one output. My question is, is there other information available in this database and I don't know the answer to the question.
MR. JACOBY: Other information than what is reflected in this exhibit?
MR. GROAT: Other information.
MR. JACOBY: Do you know the answer?
THE WITNESS: You have to ask accounting. Just off the record --
\- - -
(Discussion off the record)
\- - -
THE WITNESS: You can depose people in accounting to get this, but from my understanding and having been there for twenty-five years, is that this is a record of the costs that are charged to a particular job by job cost category.
It would include overhead, people's timesheets as they come in to payroll on

Page 59

particular jobs marked because they could work on several different jobs, like Joe Streveri would, and then that is -- records that -- that proportion of their time is recorded against this job cost record. And then subcontractors --
MR. JACOBY: Let's go to that page, fifty-four, that you were referring to?
THE WITNESS: Page fifty-four, as they are giving the construction company estimates, it's charged against the particular line item and it records the costs that are incurred on a particular job.
BY MR. GROAT:
Q. Does this reflect actual payments made or does this reflect --
A. This represents outstanding billings.
MR. GROAT: I have no further questions.
\- - -
(DEPOSITION CONCLUDED)
\- - -

Page 60

________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ______
day of ____________________, 20__.

________________________
NOTARY PUBLIC

My Commission expires: ____________________

Page 61

CERTIFICATE

STATE OF NEW JERSEY :
: SS
COUNTY OF CAMDEN :

I, JACQUELINE A. GEARY, Certified Shorthand Reporter - Notary Public, within and for the State of New Jersey, do hereby certify that the proceedings, evidence, and objections noted are contained fully and accurately in the notes taken by me of the preceding deposition, and that this copy is a correct transcript of the same.

________________________
JACQUELINE A. GEARY
Certified Shorthand Reporter,
License No. XI-02142,
Notary Public, I.D. No. 27555

Sworn and subscribed before me this ______ day of ______, 2006.

A
abbreviation 51:22
ability 33:21
able 5:16
accounting 16:18,23 22:16 22:16 33:22 56:1,7,11,17 57:25 58:14,19
accumulated 22:3
accurately 61:12
acknowledgm... 34:1
active 9:8 44:11
actual 33:12 59:14
added 44:8
addition 20:12
additional 21:11
addressing 25:12
administrative 9:12,24 15:4
agency 8:8
ago 7:22 14:20 54:23
agree 41:3 52:8
agreed 39:15
ahead 5:14
AIA 10:15
al 1:5
alert 6:1
amount 34:4
analysis 29:23 30:5,10,11,14 30:24
analyzed 29:18
annoyance 24:1
answer 8:10,12 10:3 15:15 22:13 24:17 26:25 27:11 28:16,20 29:20 30:1,7 33:19 39:20 40:8 41:9 42:2 45:4 47:13 48:24 50:23 51:5 52:4,15 53:25 58:8,12
answered 54:20
anticipation 37:10 38:12
Apartment 7:3
apparent 50:25
apparently 38:4
appear 36:19 40:22
APPEARAN... 2:1
appeared 56:22
appears 37:20
appendix 13:14 19:7,13 23:18 28:9 31:3 50:5 53:23
applications 33:6
April 49:14
Arch 7:3
architect 49:20 53:8
architects 26:7 49:15
areas 20:25
arguably 45:22
Arthur 7:1
ascertained 18:14
asked 15:21 28:2 47:20
asking 30:17 31:23 33:9 38:5 39:6 47:9 54:19
assemble 9:6 15:8
assembled 15:10 15:12 40:14
assistant 9:12,14 9:24 10:8 18:12
assistants 15:5
associate 7:12
Associates 1:5 25:21 26:15 27:4,6,9
association 8:5
assume 6:3 31:25 35:15
assumes 27:16 27:18
attached 37:22 38:25
attention 23:19 27:3 28:8 29:2 31:2,17 41:23 50:5
attorney 37:5 38:24 52:12
attorneys 2:8,17 37:8,22 40:13
auditors 56:19
authority 41:15
available 11:22 12:14,18 58:7
avoid 36:13
aware 11:6,8,9 11:14,18,19,21 12:10,13 15:25 17:25 18:20 29:4,23 30:23 31:9,13,19 34:15 39:15,18 39:20 41:12 45:24 49:18,19
Ayala 9:5 14:17 16:2
A-Y-A-L-A 9:5 16:4
a.m 1:20

B
back 28:3 51:13 53:13 58:1
back-up 56:18
based 29:10 31:14 41:14
basically 15:8
basis 18:18 41:6
behalf 1:15
believe 12:20 14:24 32:17 41:10 49:24
belong 8:6
Bertino 42:12 42:21 43:16
best 8:12,23 24:6 33:21 41:6 50:10 54:19
better 11:12
beyond 6:15 41:11 49:25 51:9
bid 10:10,11,13 29:8,11
big 25:6
bigger 25:3
bill 21:18
billings 59:16
Bitterlich 4:3 18:25 36:1 37:20 38:9,22 40:19,20 41:2 42:4 45:6 49:1 52:23 53:4
Bitterlich's 40:21,22 51:13
board 8:8
books 42:7
boundaries 6:9
box 15:18 17:9 17:16,19 23:3
boxed 16:22 29:5
boxes 15:9 17:7 18:4,5,7,22,24 18:25 19:2,3,9 19:10,22,25 20:4,5,6,9,10 20:12,14,23 21:11 22:17 25:5 29:1
BRANCH 2:11
Braude 45:18 46:7,12
briefly 7:5,10
broad 8:16 23:25
build 26:11
building 7:17 8:1,2 25:21,22 26:8,9 42:16
builds 26:10
burden 24:2

C
C 1:8 5:1 61:1,1
called 10:11,16
CAMDEN 61:5
canceled 32:18 32:20,22 33:13 33:16
capacity 41:20 43:11
case 16:1 18:1 18:21 25:12 30:16 40:17
cases 8:15
cash 30:14,24
category 24:8 58:23
Catherine 9:15
cause 23:25
caution 14:5
cc 42:9
cc'd 44:15
certain 56:23
certificate 14:22
Certified 1:22 61:8,19
certify 61:10

**chairman** 42:17
**changes** 57:20
**charge** 42:19 45:16
**charged** 56:17 58:22 59:10
**check** 28:4 32:22 33:13,16
**checked** 43:2
**checks** 32:18,20
**chief** 17:2
**Civil** 1:16
**claim** 31:1 37:9 37:24 38:8,16 41:11,15 42:6 42:7 44:17 57:17
**claims** 1:1 35:15
**clarification** 20:16 21:12
**clarify** 56:4
**cleaned** 5:17
**clear** 32:9
**clearly** 37:1,7,8 37:21 38:3,23 49:4
**client** 37:17 38:24
**clients** 26:6
**Clippinger** 42:12,23
**close** 25:24
**CM** 44:8
**Colgate** 7:7
**college** 9:20
**come** 6:3 8:25 9:1 13:17 16:10 22:15 58:25
**comes** 15:11 41:4
**coming** 23:6 57:5
**commencing** 1:19
**commercial** 2:11 25:25 26:1
**Commission** 60:17
**communication** 49:5
**communicatio...** 13:21 14:7 52:14,16
**company** 7:16 7:21,25 8:4 10:12 25:20,23 26:3,3,5 27:13 42:17,17,19,22 44:5 57:24 59:9
**Compel** 3:21 12:25 13:9 19:14 50:6 53:24
**complete** 18:16 54:17
**completed** 23:1
**completed-to-...** 37:23
**concept** 16:11
**concerning** 27:5 47:9 55:5
**concluded** 34:2 59:21
**conditions** 10:15 10:15,17,18
**conducted** 40:4
**conducting** 45:16 52:11
**conference** 17:10,24 18:3 18:6 40:14
**confusion** 20:21
**connected** 17:22 21:20
**considering** 35:15
**construction** 7:16 10:12 22:24 25:22 26:1 42:22,25 43:16 44:5,10 59:9
**contain** 33:25
**contained** 61:12
**contention** 29:4
**contents** 11:6,10 11:15 12:10 45:10
**Continued** 4:1
**continuing** 57:18
**contractor** 25:25 26:1
**contractors** 26:11
**conversation** 4:7 4:11 36:5 38:21 48:12,25 49:12
**conversations** 53:13
**copied** 20:8
**copies** 37:17 40:22 42:9 43:7,14 44:1
**copy** 19:15,18 23:12 43:17,25 61:14
**corporate** 26:19 27:8,12,15
**corporation** 7:17 8:2,3 26:9 55:4
**correct** 14:24 21:1 31:7 34:12,14,16,19 53:1 56:23 61:14
**correspondence** 10:9 21:19 22:18 51:13 52:6
**cost** 4:15 55:18 56:2,3 58:23 59:5
**costs** 56:11 57:1 57:23 58:22 59:11
**counsel** 5:22 7:17,19,22 9:15 12:16 13:23 14:9,16 15:7,11 38:13 38:14 52:10,14 52:18,20 53:17
**COUNTY** 61:5
**couple** 14:20 19:10
**court** 1:1 8:7
**Courthouse** 44:18
**Cozen** 1:17 2:3 45:6
**current** 15:19
**currently** 21:19

**D**

**D** 5:1
**damages** 51:24
**Dan** 42:13,24 43:10,19
**Daniel** 7:15 25:24 26:4 42:11
**database** 57:9 57:18,19 58:4 58:7
**databases** 55:13
**date** 11:20 14:19 57:14,16
**dated** 3:17 12:5 56:4
**day** 60:11 61:25
**DC** 2:15
**dealing** 45:13
**deceit** 8:7
**December** 1:19 3:17 11:20,20 11:23,24 12:3 12:5
**Dee** 9:5 16:2 17:5 18:12 20:24
**deemed** 31:14
**Defendant** 1:11 1:15 2:17
**defendants** 13:8
**defendant's** 3:11,15,18,21 3:22 4:4,8,12 4:16 5:7 10:22 12:7,25 13:1,7 14:3 36:2,6 41:23 44:20 48:13 50:6 53:23 55:16,19 55:24
**Defense** 6:12
**degree** 9:19
**Dennis** 1:14 3:3 5:3 7:1 14:22 20:20
**department** 2:10 57:25
**deponent** 8:23 11:21
**depose** 52:24 58:18
**deposition** 1:14 3:10,11,15,19 3:23 4:5,8,12 4:16 5:6,7 6:19 6:22 10:22 11:2 12:2,7 13:2 35:6 36:3 36:6 45:2 48:13,18,21 55:19 59:21 61:13
**design** 31:6
**designated** 8:23
**designating**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - -

| | |
|---|---|
| PALAFOX STREET ASSOCIATES, L.P. and THE KEATING DEVELOPMENT COMPANY, | : Civil Action |
| Plaintiffs | : File No. 99-898-C |
| vs | : |
| UNITED STATES OF AMERICA, | : |
| Defendant | : |

\- - -

Wednesday, May 17, 2006
Philadelphia, Pennsylvania

\- - -

Oral deposition of DON BITTERLICH, taken pursuant to Notice, at the law offices of Cozen O'Connor, 1900 Market Street, Philadelphia, Pennsylvania, commencing at approximately 9:40 a.m., on the above date, before Teresa M. Catullo, RPR, CSR and Notary Public.

\- - -

APPEARANCES:
F. WARREN JACOBY, ESQUIRE
Of Cozen O'Connor
1900 Market Street
Philadelphia, Pennsylvania 19103

Counsel for Plaintiffs

JOHN S. GROAT, JR., ESQUIRE
U. S. Department of Justice
Commercial Litigation Branch
Civil Division
1100 L Street, N. W.
Room 11050
Washington, D. C. 20005
Counsel for Defendant

ALSO PRESENT:

Amanda Wood, Esquire
Assistant General Counsel
U. S. General Services Administration



INDEX


| WITNESS: | PAGE |
|---|---|
| DON BITTERLICH | |
| BY MR. GROAT | 14 |
| BY MR. JACOBY | 211 |


\- - -

EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | Volume 1 of Claim Submissions Part 1 | 50 |
| Exhibit 9 | Volume 2 of Claim Submissions Part 2 | 50 |
| Exhibit 10 | Bates KDC 04437 | 58 |
| Exhibit 11 | Bates KDC 04436 | 59 |
| Exhibit 12 | Bates KDC 02734 through 35 | 59 |
| Exhibit 13 | Bates KDC 04344 to 04347 and KDC 04265 | 60 |
| Exhibit 14 | Bates KDC 02724 through 02726 | 62 |
| Exhibit 15 | Bates KDC 0429 through 0439 | 62 |
| Exhibit 16 | Bates KDC 03037 through 03061 | 65 |
| Exhibit 17 | Bates KDC 03063 through 03087 | 66 |
| Exhibit 18 | Bates KDC 5333 through 5345 | 67 |
| Exhibit 19 | Bates KDC 05350 through 05370 | 68 |
| Exhibit 20 | Bates KDC 04531 | 71 |
| Exhibit 21 | Bates KDC 04532 | 72 |




EXHIBITS(continued)


| | | |
|---|---|---|
| Exhibit 22 | Bates KDC 04355 through 04365 | 72 |
| Exhibit 23 | Bates KDC 05371 through 05385 | 73 |
| Exhibit 24 | Bates KDC 05386 and 05387 | 75 |
| Exhibit 25 | Bates KDC 05388 through 05392 | 75 |
| Exhibit 26 | Bates KDC 04385 through 04388 | 77 |
| Exhibit 27 | Bates KDC 5316 through 5332 | 80 |
| Exhibit 28 | Bates KDC 5407 through 5413 | 83 |
| Exhibit 29 | Bates KDC 5394 through 5398 | 84 |
| Exhibit 30 | Bates KDC 4243 through 4257 | 86 |
| Exhibit 31 | Bates KDC 00466 and 00467 | 141 |


(All exhibits retained by counsel.)

\- - -



(Whereupon, the deposition commenced at 9:40 a.m.)

...DON BITTERLICH, having been duly sworn and/or affirmed, was examined and testified as follows...

MR. GROAT: There were a couple matters, one, a privilege list. Mike, in E-mails, indicated that we were working on one, or not?

MR. JACOBY: Yeah. I hope to have it for you, sent to you before you come back up the next time. It's been drafted for me. I will have it to you.

Since you've raised the issue of privilege log, you saw the letter Mike sent you. Are you going to respond?

MR. GROAT: We'll respond to the letter.

MR. JACOBY: Okay. Because one of the issues we have is whether we want to take Diana's deposition, as an example, and possibly, John Fleming's, but we really -- until we can get a resolution, Jack, on the privilege log, we're just not sure how to deal with that.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 6

MR. GROAT: In my privilege review, too, I've come across some additional documents, and I'll be serving those on Mike, or should I serve them directly on you? I have a videotape that I have located --
MR. JACOBY: I found some videotapes, too.
MR. GROAT: We've made one videotape available, but I can't tell if this one's been served or --
MR. JACOBY: Just send it to me. I'll get a copy here for Mike.
MR. GROAT: I'll CC him on the service.
MR. JACOBY: Because we found a couple of videotapes, too, that are post-claim.
MR. GROAT: That's exactly right.
MR. JACOBY: I've got a feeling it's the same thing.
MR. GROAT: It may well be. It will be odd if we're sending each other back copies of the video.

Page 7

MR. JACOBY: Well, it's actually good. And I've also got that call-back issue that I raised with you at Dennis Martin's deposition, that one document that you produced that I said should have been privileged. I'll identify it for you on our privilege log. I don't know that it was or wasn't Bates. Do you remember it came up in deposition?
MR. GROAT: Yes, I do, and we numbered it as an exhibit, so you should have a copy of the exhibit.
The other thing is, in the course of review for this deposition, I've come across, based on your statements earlier, that you did not intend to waive privilege. I have come across what I would estimate to be, it has to be more than 100, it could be multiple hundreds of similar documents in the documents that were produced.
And, you know, I intend today to go ahead with the deposition. If you want to review the documents, and I suggest we do it on that basis, if you want

Page 8

to review or recall or claim a privilege --
MR. JACOBY: Are they Bates documents? Do you have them with you?
MR. GROAT: No. I have the documents here with me and they are Bates of the documents that I've copied from your records, and I have them here today. But we'll be discussing those today. And I recognize that you'll probably claim privilege.
In some cases, the document that I showed Mr. Martin last time, I thought, was a marginal call on privilege. However, if you're asserting privilege on a document that we showed Mr. Martin, I can't imagine that you wouldn't be on these. And by no means do I have an inclusive collection of the documents. There must be in excess -- I'm certain they're in excess of 100. There may be multiple hundreds of similar documents. In some cases, they reflect conversations with you concerning your claim.
MR. JACOBY: Do you have an inventory of those documents?

Page 9

MR. GROAT: I do not have an inventory of all the privileged documents, but among the documents that were produced to us, there are a vast number very similar to the ones that you -- and I'm alerting you to that fact. I suggest we go ahead with the deposition today. I had indicated to Mike Lewis that, you know, we wanted the list for this deposition. You know, we would regard the deposition as open until we get the review of the list. We can talk about it when I get the list.
MR. JACOBY: I don't think anything that's going to be on our privilege log, which may or may not include the documents you referenced -- that's our problem, because I have a concern, Gerson Kramer handled the production from the Braude & Marguiles office, and I have a concern that documents may have been produced inadvertently that should have been designated as privileged.
If that's true, then we're not going to have them on our log because we don't know that they were produced as an





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 10

example. I mean --
MR. GROAT: Well, that's going to be a problem, because the sheer quantity of documents that I have located that are privileged, I haven't brought them all here today. I just identified documents that I thought might be relevant. The sheer quantity of documents that are produced that might be privileged, and, you know, we have them in our files, and certainly, we would regard --
MR. JACOBY: Have you tagged them?
MR. GROAT: No. There's so many that I didn't even attempt to do that, if you understand. When I went through and pulled documents for today's deposition, I just found multiple copies of documents that I think you'll -- they include --
MR. JACOBY: You and I have to discuss, I guess, two things then. One, is the procedure an acceptable procedure for us to identify the documents in your possession which we would deem privileged; and then number two, what to do about those

Page 11

documents.
And it may well be in the height of irony that I'm going to have to come down to your offices, and to the extent possible, I may have to go through, to the extent there's no privilege attaching for you, I may have to go through your documents to identify those documents produced that may have been privileged.
MR. GROAT: Well, I would suggest that the appropriate procedure -- you know, I tried to think about this, too. The appropriate procedure would be for you to go through the original inventory of documents that was produced, and tell us what's privileged there, because in some cases, what I've done is categorized the documents by subject area in this case. So you would have a considerable amount of my work product if you went through the documents.
MR. JACOBY: Well, here's my concern. When the team of people led by Mr. Kramer produced documents, they pulled out and put into a separate box the

Page 12

documents that they deemed privileged, which are the documents I am putting onto this log. The problem is, Jack, is that apparently Gerson did not deem -- for whatever reason, didn't pick up on it, didn't put that document into the privilege box. So I've got this conundrum --
MR. GROAT: I understand. We'll have to discuss that. To tell you the truth, I tried to think about how to fix it. I don't know. We'll have to leave the matter open and attempt to resolve it.
MR. JACOBY: Yeah. Because my problem is, I don't have those documents in the production as being separate because they were produced. You know, rather than take the time now, and I guess we'll agree to disagree, if, and when, you get the documents that I deem privileged that you're using as exhibits.
MR. GROAT: And just identify them today and we'll see --
MR. JACOBY: Sure. We'll add them to our list.

Page 13

Two more items. One, the witness would like to read and sign; and number two, I'm assuming, since this is not a 30(b)(6), that the usual stipulations other than to the form of the question.
MR. GROAT: Which specific -- the usual stipulations are something to which I can't agree. If you tell me specifically what they are --
MR. JACOBY: I am told that you do not waive any -- the usual stipulations that I'm used to in federal court practice is that you do not waive any objection other than to the form of question if you don't object during the deposition.
MR. GROAT: I have no objection to that stipulation.
MR. JACOBY: Okay. Thank you.
MR. GROAT: And that's the stipulation we use for the deposition.
MR. JACOBY: Good.
(It is stipulated by and between counsel for the respective parties

Page 14

that sealing, certification and filing are waived; and that all objections, except as to the form of the question, are reserved until the time of trial.)
BY MR. GROAT:
Q. Would you state your name for the record, please?
A. Don Bitterlich.
Q. And, sir, would you tell me where you presently reside?
A. Where I reside is -- I live at 101 Medinah Drive. That's M-E-D-I-N-A-H. Blue Bell, Pennsylvania.
Q. And, sir, where are you presently employed?
A. With Keating Building Corporation.
Q. And in what capacity?
A. I'm a senior project manager.
Q. Have you ever been deposed before?
A. Yes.
Q. And can you tell me in what cases you have been deposed.
A. It was probably over 15 years ago and in regard to an insurance claim with a developer that I previously worked for.

Page 15

Q. Are there any other instances in which you recall being deposed?
A. No.
Q. Have you ever testified before?
A. Yes, in that same claim.
Q. And were there any other instances in which you testified?
A. No.
Q. I'll be asking you a series of questions today concerning this lawsuit. And you're aware of what I'm referring to by this lawsuit?
A. Yes.
Q. When I'm attempting to describe the corporation, is it satisfy to refer to the corporation as Palafox, should I refer to the corporation as Keating when I'm addressing this project, or can we --
A. Either's fine.
MR. JACOBY: Let me help for clarification. There's really, at a minimum, two entities, Keating entities involved with the project, Jack. There's Keating Building Corporation, which was the entity which did the construction work.

Page 16

And then there is Keating Development Company and its relationship with Palafox which was the developer, which I guess owns the site as developer and the improvements, whatever that means.
So they're really two separate entities and you can -- you know, I just want to make sure we don't confuse them when we do this.
MR. GROAT: Exactly.
BY MR. GROAT:
Q. Well, is it reasonable, or would you consider it proper, to refer simply to Palafox when I'm referring to the organization that contracted with the General Services Administration for construction of the Pensacola courthouse?
A. Yeah, that would be fine.
Q. Okay. Is there any reason that you can't give complete and full answers to the questions that will be posed today?
A. Only on the basis of not being able to recall.
Q. Are you under any medical treatment or medical disability that would

Page 17

interfere with your ability to answer the questions fully and completely today?
A. No.
Q. Have you ever been involved in any proceedings, whether judicial or administrative, in which case your credibility was either called into question or a determination was made that your representations were untruthful, incomplete or fraudulent?
A. No.
MR. JACOBY: Object to the form of the question.
You can answer. Give me a chance to object.
BY MR. GROAT:
Q. Have you ever been involved in any such proceedings?
MR. JACOBY: Same objection.
You can answer.
THE WITNESS: No.
BY MR. GROAT:
Q. Can you, please, briefly summarize what steps you took to prepare for the deposition today.

Page 18

MR. JACOBY: I caution the witness that he's not obliged to divulge communications he had with counsel. Other than that, you can respond to the question.
THE WITNESS: I reviewed the documents that are in front of me, and only these documents.
BY MR. GROAT:
Q. How many hours did you take in the course of this review?
A. A couple.
Q. Did you have any discussions concerning the documents, your review in this deposition?
MR. JACOBY: Same caution.
You can answer.
THE WITNESS: Just as a matter of discussion in reviewing these documents.
BY MR. GROAT:
Q. And can I ask how long those discussions were, please?
A. Perhaps 15 minutes.
Q. Can you, please, briefly summarize

Page 19

your formal education.
A. High school graduate and also graduated with a BS in Civil Engineering from Temple University here in Philadelphia.
Q. Have you taken any other formal courses or done any other graduate work after receiving a Bachelor of Science degree?
A. No, sir.
Q. Can you, please, briefly summarize your work history from where you're presently employed back, if you would, from the present to the past.
A. I'm currently working with Keating Building Corporation. For about two years, I worked with a developer here in Philadelphia renovating historic buildings. Then I spent close to nine to 10 years with Keating Building Corporation through the '90s. Prior to that, I worked with general contractors, and also with the same developer through the '80s, and developed at least some 35 historic renovation projects.

Page 20

Q. And what was that developer?
A. That developer was Historic Landmarks for Living. That's during the '80s.
Q. Okay. Now, if you could, help me construct the time line. You're presently employed by Keating. How long have you been employed by Keating?
A. I was with Keating through the '90s. Principally, I guess, can't be specifically certain, probably around '92 through to perhaps around '99 or 2000. And I spent two years with a developer, Dranoff Properties, D-R-A-N-O-F-F, and came back to Keating about a year and a half ago.
Q. Why did you leave your employment with Dranoff Developers?
A. Better opportunity with Keating again.
Q. And when were you first employed by Keating?
A. That was back in the early '90s, as I had stated.
Q. And what position did you have prior to that?

Page 21

A. The deposition was with Historic Landmarks back in the '80s.
Q. And what position did you have with Historic Landmarks?
A. I was the vice president of construction design.
Q. And why did you leave that employment?
A. The company basically disbanded.
Q. And prior to your work with Historic Landmarks, where were you employed?
A. I worked with a general contractor, Schafer Gordon.
Q. And for what period of time were you employed by Schafer Gordon?
A. Early '80s for around three to four years.
Q. And why did you leave that employment?
A. Better opportunity with Historic Landmarks.
Q. And where were you employed prior to Schafer Gordon?
A. Was probably my first job in the

Page 22

business with Wynne-Hill Development.
Q. And for what period of time were you employed by Wynne-Hill Development?
A. Maybe three or four years.
Q. And what was your employment prior to that?
A. I was place kicker for the Seahawks. And before that, I was in college.
Q. What jobs have you had when you've been employed with Keating? I refer you both to Keating Development Corporation and Keating Building Corporation.
A. Yes, sir.
MR. JACOBY: I'm not sure I understand the question.
BY MR. GROAT:
Q. Well, what entity of Keating -- with what entity of Keating have you been employed?
MR. JACOBY: In any particular order?
BY MR. GROAT:
Q. Well, has your career changed over a period to the extent that at certain

Page 23

periods, you were employed by Keating Development Company and at some certain times, you were employed by Keating Building Company?
A. Has my career?
Q. Has your employment changed over time?
MR. JACOBY: Have you ever been employed by any Keating entity other than Keating Building Corporation.
THE WITNESS: Yes, for a period of time.
MR. JACOBY: That's the question.
BY MR. GROAT:
Q. That's fine. And what period of time were you employed by a Keating entity other than Keating Building Corporation?
A. About a year ago.
Q. And what period of time was that?
A. Oh, gosh, from January through to July.
Q. In what capacity did you then serve?
A. I was serving as a senior project

Page 24

manager.
Q. In what capacities have you been employed by Keating Building Corporation?
A. As a project manager, a senior project manager.
Q. Now, you were first employed by Keating Building Company in the '90s; is that correct?
A. Yes, sir.
Q. And in what capacity were you first employed by Keating?
A. As a senior project manager.
Q. With Keating Building Corporation, to whom have you reported?
MR. JACOBY: During what time period?
MR. GROAT: Since being retained as a senior project manager.
MR. JACOBY: Just chronologically.
THE WITNESS: Reported to Mike Bertino, who was the senior vice president when I first initially began with Keating in the '90s.
BY MR. GROAT:

Page 25

Q. And since that point in time, has it changed?
A. Yes. Since Mike Bertino has left the firm, I reported to Bradley Statler, who is now president.
Q. And have you reported to other individuals in your capacity as a senior project manager?
A. With Keating Building Corporation?
Q. Yes.
A. No other -- well, other executive level personnel between myself and Brad.
Q. Is the organization such that you have an individual that you report directly to on specific projects, or is there some other process which I should be aware?
A. It will vary.
Q. Now, drawing your attention to the Pensacola courthouse project, when did you first become aware of that project?
A. When I was assigned to it.
Q. And when would that have been?
A. That's difficult to recall. It was during -- shortly after the award of the best and final offer.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 26

Q. And how would you have become aware of the project?
A. I was asked to serve as the project manager to oversee the design phase and through the construction to the end of the project.
Q. Who asked you to assume these duties?
A. It was difficult to recall. It would be between Mike Bertino along with Mike Sencindiver.
Q. Now, were you reporting to Mike Sencindiver at this point in time, or was there some other relation that causes you to identify him at this point in time as the individual who discussed this matter with you?
MR. JACOBY: I object to the form of the question.
You can answer. Do you understand the question?
THE WITNESS: No, I'm not sure.
BY MR. GROAT:
Q. You've identified Mike Sencindiver

Page 27

as an individual that you may have discussed your assuming duties as project manager for the Pensacola courthouse project; is that correct?
A. Yes, sir.
Q. Why would you have discussed this matter with him?
A. He was a vice president for Keating Development Corporation.
Q. Now, at that time, you were working for Keating Building Corporation; is that correct?
A. I can't recall exactly if I was working for Keating Building or Keating Development. I was representing Keating on the project.
Q. Now, I may be mistaken, I thought that you identified a period, I believe it was six months ago, in which you were working for Keating Development Corporation. I understood --
A. Not six months ago.
Q. Well, you indicated a period January to July?
A. That was for another Keating firm.

Page 28

Q. Another Keating firm.
A. You said Keating associated firm?
Q. Yes. So I misunderstood. What was the other Keating associated firm you worked for and you identified the period January to July?
A. That was an affiliate company owned by Dan Keating based in Houston, Global Construction.
Q. Now, during your career with all the Keating entities, can you identify the periods of time in which you were working for Keating Development Corporation and the periods in time in which you were working for Keating Building Corporation?
MR. JACOBY: Jack, just so we agree, maybe that's his source of confusion, when you use the word "working," are you talking about providing services for as opposed to being on the payroll of? I don't know whether he's making that distinction.
MR. GROAT: That would be very helpful, as a matter of fact.
BY MR. GROAT:

Page 29

Q. Could you clarify, by any chance, whether you're actually directly employed by Keating Building Corporation or directly employed by Keating Development Corporation?
A. I can't recall exactly when my paycheck was coming from either/or the other entity.
Q. Does that change over a period of time?
A. Only during the course of the Pensacola project.
Q. And why would that have been the case?
A. I was representing Keating Development as well as working with Keating Building Corporation during the design phase of the project, and continued through the building phase as well.
Q. So during the Pensacola project, you were working with Keating Development Corporation?
A. Yes, sir.
Q. And by working with, in this case, does that mean you were actually employed

Page 30

by Keating Development Corporation?
A. As I recall, yes.
Q. And to whom would you have been reporting during this period that you've identified in which you were working for Keating Development Corporation?
A. Michael Sencindiver.
Q. And were you working for -- for what period of time were you working for Keating Development Corporation on the Pensacola project?
A. From what I had mentioned earlier, after the award when I was notified to be involved with the project, after the award of the best and final offer through the design phase and through the construction phase to the completion and after.
Q. And to the best of your recollection, what were the dates that encompassed that period?
A. Oh, I can't recall the specific dates.
Q. I notice you brought with you the claim that was prepared in this case. Can you refresh your recollection by reference

Page 31

to the claim documents that are in front of you?
A. For employment periods?
Q. For the period during which you were working on the Pensacola courthouse project.
A. No, it wouldn't be contained in here. It started with the design phase which preceded construction phase. The claim documents in front of me are more specific to the time period to the construction phase.
Q. To the best of your recollection, when would you have been approached by either Mike, is it Bitterlo, or Mike Sencindiver, regarding assuming duties relative to the Pensacola courthouse project?
MR. JACOBY: Do you mean Mike Bertino?
MR. GROAT: Mike Bertino.
THE WITNESS: Mike Bertino and Mike Sencindiver. And the question again is?
BY MR. GROAT:

Page 32

Q. The question is, to the best of your recollection, when were you approached about taking duties relative to the Pensacola courthouse project?
A. I don't recall exactly. It was, as I stated, after the award of the project and we were beginning to prepare for design phase.
Q. Did you have any involvement at all in the preparation of the offers submitted by Keating for the Pensacola project?
A. No.
Q. When you were approached regarding duties concerning the project, what happened then?
A. I was provided the SFO, which was the base criteria, as well as the best and final offer.
Q. And what actions did you take?
A. I began to familiarize myself with the content.
Q. And where were you located physically at this point in time?
A. I was working with Keating in

Page 33

their main office, which, at that time, was located in Bala Cynwyd.
Q. And based upon your review of the SFO and best and final offer, what action did you take?
A. I began to prepare for the schedule of meetings that were going -- we commenced with KBJ Architects.
Q. Were you involved in the selection of KBJ Architects?
A. No.
Q. Did you have meetings with KBJ Architects concerning the project?
MR. JACOBY: During what time period?
BY MR. GROAT:
Q. You've identified the period of your preparations in the preparation of the schedule. What, if any, meetings did you have with KBJ in connection with these preparations?
A. Only that which were part of the design phase.
Q. Did you review the drawings prepared by KBJ Architects?





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 34

MR. JACOBY: During what time period?
MR. GROAT: In the course of preparing the schedule.
MR. JACOBY: At this point, Jack, you're really focusing on the design development phase?
MR. GROAT: Yes.
BY MR. GROAT:
Q. Drawing your attention to the design development phase, what was your relation with KBJ Architects?
MR. JACOBY: Do you understand the question?
THE WITNESS: No, I'm unclear. What was my relationship with them?
BY MR. GROAT:
Q. Yes.
A. I represented Keating Development Corporation as their project manager for the project through the design phase.
Q. Did you have direct contact with KBJ Architects?
A. Yes.

Page 35

Q. And who did you have contact with?
A. Chris Bolt primarily through the construction phase. I can't recall the project architect's name that was involved during the design phase. She later left the project and Chris Bolt took over. However, Chris Bolt was involved during the design phase as well.
Q. Who was your principal contact at KBJ Architects?
MR. JACOBY: During the design phase?
MR. GROAT: During the design phase.
THE WITNESS: I can't recall.
BY MR. GROAT:
Q. With whom do you recall contact at KBJ Architects during the design phase?
A. Oh, gosh. There was a principal, I believe his first name was Will. I can't remember his full name.
Q. Do you recall any of the people that you did have contact with at KBJ Architects during the design phase?

Page 36

A. Well, the gentleman who was, I believe, was the principal in charge, Will. I can't remember his full name. And the project architect that was involved with the development of the drawings, I can't recall her name either.
Q. Were the two individuals you identified the individuals you recall having contact with at KBJ Architects?
A. Yes.
Q. Now, you've indicated there was a design phase. Do you recall what period of time that design phase encompassed?
A. It began, I believe, in the fall and completed sometime the following April or May, late spring.
Q. And what action, if any, did the Keating entities take at the completion of the design phase?
MR. JACOBY: When you refer to Keating entities, you mean Keating Building Corporation and Keating Development Company?
MR. GROAT: Exactly.
THE WITNESS: What action?

Page 37

BY MR. GROAT:
Q. Yes.
A. Well, during the design phase, myself and the project manager representing Keating Building Corporation at the time, we developed the scope of the work and the design through meetings with KBJ and representatives of the GSA and the other government entities.
Q. And who was the other project manager for the Keating entities?
A. Joe Striviri.
Q. And what was his role in this period of time?
A. He was the project executive, senior project manager involved with the bidding of the project to establish its cost.
Q. Now, during the design phase, what were your assigned duties?
A. To keep track of the progress of the design as well as the construction and keep it coordinated within the time frame to complete the project on time.
Q. And what were Mr. Striviri's

Page 38

duties?
A. To develop the pricing and the scope in the contract, subcontracting for Keating Building Corporation, which served as the general contractor on the project.
Q. To whom did Mr. Striviri and you report in connection with the project this period of time?
A. Joe Striviri reported to Mike Bertino, who was the senior vice president of Keating Building Corporation.
Q. And you reported to whom?
A. I had communication with Mr. Bertino and also with Mike Sencindiver.
Q. During this period which you've referred to as the design phase, were you working with Mr. Striver --
A. Striviri.
Q. -- Striviri concerning this work and producing a joint project, or did you have independent duties and pursuing independent work during the period?
MR. JACOBY: Object to the form of the question.
You can answer.

Page 39

THE WITNESS: We were working together, although his duties were clearly based on the general contractor's responsibilities to develop scope and packages for the subcontractors.
BY MR. GROAT:
Q. And could you contrast the respective duties and responsibilities of the both of you during this period of time?
MR. JACOBY: Could you read back the question, please.
(Whereupon, the court reporter read back as requested.)
MR. JACOBY: Object to form.
You can answer.
THE WITNESS: Principally, my contact and communication was to the GSA and discussing and maintain the time line and the scope of our work and development of the documents and the specifications required for the building.
BY MR. GROAT:
Q. In comparison?
A. Joe Striviri was principally occupied with developing the scope packages

Page 40

to be subcontracted for the construction.
Q. And when was the design phase completed?
A. I answered that previously. It was late spring.
Q. Upon the completion of the design phase, what, if any, duties did you assume relative to the Pensacola courthouse project?
A. Overseeing the construction by Keating Building Corporation, representing Keating Development Company with changes and additions to the work that was designed and being performed.
Q. When the project shifted from what you've identified as the design phase, was there any change in the organization of the Keating entities with regards to the Pensacola courthouse project?
MR. JACOBY: Object to form.
You can answer. Do you understand the question?
THE WITNESS: I don't understand the question or what the purpose of it is.

Page 41

BY MR. GROAT:
Q. Well, I'm trying to understand your duties after the design phase was completed. And you've indicated that you then assumed responsibilities to oversee the construction; is that correct?
A. Correct.
Q. To whom did you report when you assumed duties to oversee the construction?
A. I was still reporting to Mike Sencindiver.
Q. Were there any other individuals for the Keating entity at this point in time overseeing the construction of the project?
A. The project manager on site was Chuck Vann. That's an abbreviation of his full last name.
Q. And what were his duties in relation to yours?
A. He was the on-site project manager coordinating the trades along with our building superintendent, construction superintendent, who was Frank Schoell, also on-site full-time.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 42

Q. And what relationship did you have with Mr. Chuck Vann in connection with the project?

MR. JACOBY: Object to form.

You can answer.

THE WITNESS: My relationship is, I was the development company, Keating Development Company, project manager. He was the project manager for Keating Building Corporation.

BY MR. GROAT:

Q. To whom did Mr. Vann report?

A. Michael Bertino.

Q. During the construction phase of the project, what was the organizational relationship between Keating Development Corporation and Keating Building Corporation?

MR. JACOBY: Object to the form of the question.

If you understand the question, you can answer it.

THE WITNESS: Could you repeat the question.

(Whereupon, the court

Page 43

reporter read back as requested.)

MR. JACOBY: Same objection.

THE WITNESS: Keating Development was the developer and owner; Keating Building Corporation was the general contractor for Keating Development Company.

BY MR. GROAT:

Q. Did you and Mr. Vann regularly communicate regarding the progress on the job?

A. Yes.

Q. Describe and contrast, please, Mr. Vann's duties and your duties during the construction phase of the project.

MR. JACOBY: Object to the form of the question.

You can answer.

THE WITNESS: I was the representative for the development company and the owner contracted by the GSA. My communications were specifically to coordinate between requirements of the GSA and their entities through Dan Koenig, who

Page 44

was the project manager from the GSA.

Chuck Vann oversaw the activities on the site and the construction aspects that a general contractor would be required to perform.

BY MR. GROAT:

Q. Was there any change in the organization of the Keating entities during the construction phase of the project?

MR. JACOBY: Jack, I know we agreed what the definition of Keating entities is, but when you talk about changing the organization of the entities, you're making a difficult question, because are you talking about the relationship between the two entities, are you talking about the relationship within one or the other of the entity?

MR. GROAT: I'll try to be more specific.

BY MR. GROAT:

Q. Did your assignment and duties with Keating Development Corporation change during the construction phase of the project?

Page 45

A. No.

Q. Did Mr. Vann's duties and responsibilities with Keating Building Corporation change during the construction of the project?

A. No.

Q. When did the construction phase of the project end?

A. When the punch list was completed and the building was accepted by the GSA at the end of July, I believe it was '97.

Q. During the construction phase of the project, where were you located?

A. I was commuting between Bala Cynwyd, our main office, and Pensacola.

Q. What percentage of time did you spend in the main office and what percentage of the time did you spend on-site?

MR. JACOBY: During the construction phase?

MR. GROAT: During the construction phase.

THE WITNESS: During the construction phase, I was on-site perhaps

Page 46

two through four days every other week and sometimes more frequently.
BY MR. GROAT:
Q. During the construction phase of the project, what percentage of the time was Mr. Vann on-site?
A. Full-time.
Q. You've identified the construction phase of the project ending in July of 1997. Subsequent to the construction phase of the project, what, if any, duties did you assume regarding the Pensacola courthouse project?
A. Subsequent meaning after?
Q. After completion, what you've identified as completion of punch list items in July of 1997.
A. I continued to serve as the project manager with Keating Development.
Q. And how long did you continue to perform those duties?
A. Through the following year.
Q. So that would have been through 1998?
A. Yes, sir.

Page 47

Q. And after the construction phase, what would you characterize that subsequent phase to be?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Post-construction.
BY MR. GROAT:
Q. During the post-construction phase, what were your duties?
A. Representing Keating Development with respect to the issues concerned with the GSA and performance of the building.
Q. Did you have any other duties during this period of time, during the post-construction phase?
MR. JACOBY: With respect to the Pensacola project?
MR. GROAT: With respect to the Pensacola project or with respect to other Keating projects.
THE WITNESS: Not that I recall.
BY MR. GROAT:

Page 48

Q. And when did you conclude your duties in what you've identified as the post-construction phase?
A. I don't recall.
Q. What project or duties did you assume after the post-construction phase of the Pensacola courthouse project?
A. I don't recall.
Q. Did you subsequently assume duties as project manager for another project?
A. Yes, most likely.
Q. And do you have any recollection of what that project was at that point in time?
A. No, I don't recall.
Q. Now, I see you brought with you two volumes. Can you explain what those are, please.
A. They are a summary of the claims that we have to the GSA.
MR. GROAT: Now, in an effort to expedite identification of specific changes in these claims, I have had some documents Bates stamped. So for ease of reference, I suggest at this point

Page 49

in time we refer to copies of what I believe to be these documents, and what I'd like you to do now is please review what I'd ask the court reporter to mark as the deposition exhibit next in order.
MR. JACOBY: Both volumes are identified as GSA 1?
MR. GROAT: I'm sorry, Fred. I have 1 and 2 here. You should have gotten a copy of 2. I apologize.
MR. JACOBY: I have volumes 1 and 2, Jack. There's only a mark on top GSA 1 on Volume 2. That's all.
MR. GROAT: I really don't understand the GSA-1 in the reference. You have Volumes 1 and 2?
MR. JACOBY: Yeah. You want to call that Bitterlich-1 then together?
MR. GROAT: The Court rules provide that we're supposed to mark the deposition exhibits next in order, so I thought we'd follow the number that's been marked.
MR. JACOBY: That's fine.
MR. GROAT: This will be