Page 50

Deposition Exhibit Number 9. And I'd ask the court reporter to mark it. It's in two parts.

(Whereupon, two binders of documents were marked for identification as Exhibits 9-Part 1 and 9-Part 2.)

BY MR. GROAT:

Q. And I'd ask you to review it and identify it, if you would, please.

MR. JACOBY: Jack, are you representing that to the best of your recollection, Exhibit Number 9, Parts 1 and Parts 2, are exact copies of the claim submissions made by Keating to the GSA?

MR. GROAT: I will represent that I asked that copies be made of the exhibit. And I've looked at them myself, and to the best of my information, they are. But, you know, we may be missing a page or two and we can straighten that out. But I've asked to have simple copies of the claims made.

MR. JACOBY: For us to take the time to have him go through each page --

Page 51

MR. GROAT: I don't want him to review it in detail.

THE WITNESS: I'm trying to figure out how you want me to answer the question. They appear to represent the volumes that I have and that I put together.

MR. GROAT: And with that clarification, my only purpose in identifying these is, what we've done is Bates stamped the pages at the bottom for ease of identification, and I thought it might expedite the examination if I could refer to specific pages.

MR. JACOBY: Just so you know, not all the pages are Bates stamped.

THE WITNESS: I don't see any Bates stamps.

MR. GROAT: I have Palafox Claim 001.

MR. JACOBY: Well, even the first page, as an example, is not Bates stamped.

MR. GROAT: I understand the first page isn't.

Page 52

MR. JACOBY: So you're saying starting with the letter of June 30, 1998 to Karen Johnson is the first page?

THE WITNESS: The claim number reference?

MR. JACOBY: Let's work with that then.

THE WITNESS: I didn't assume that that was a Bates stamp.

BY MR. GROAT:

Q. Can you clarify your involvement with what has been identified as Deposition Exhibit Number 9?

MR. JACOBY: Object to the form of the question. Also instruct the witness not to testify as to any privileged communications.

THE WITNESS: I don't know what the question is. I don't understand what you want.

BY MR. GROAT:

Q. What, if any, involvement did you have in the preparation of what's been marked as Deposition Exhibit Number 9?

MR. JACOBY: Same objection.

Page 53

You can answer.

THE WITNESS: Developing and providing the documentation, the correspondence from my files and records from meeting minutes and the communications that I had with the GSA as well as the architect.

BY MR. GROAT:

Q. Okay. Who tasked you with this responsibility?

MR. JACOBY: Same objection. You can answer.

THE WITNESS: Well, since I was the project manager, you know, it was my responsibility to put together the information and criteria.

BY MR. GROAT:

Q. During the course of preparing the claim, to whom did you report?

A. Michael Sencindiver and Dennis Martin.

Q. At this point in time, what were Mr. Martin's duties?

MR. JACOBY: At the point in time that he was working on this





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 54

submission?
MR. GROAT: Yes.
BY MR. GROAT:
Q. While you were assisting in the development of what's been marked as Deposition Exhibit Number 9, what were Mr. Martin's duties?
MR. JACOBY: With respect to the Pensacola project, or generally?
MR. GROAT: I'm asking generally.
THE WITNESS: Mr. Martin was an officer, and I understand still is an officer, of Keating Development Corporation.
BY MR. GROAT:
Q. And what were Mr. Martin's duties relative to the preparation of Deposition Exhibit Number 9?
A. Periodically he would review some of the documents that I was preparing.
Q. Did Mr. Martin provide input and advice to you regarding, let's refer to as the claim, what's been marked as Exhibit Number 9?

Page 55

MR. JACOBY: Object to the form of the question. Also instruct the witness not to testify as to privileged communications.
You can answer.
THE WITNESS: I don't have any answer. I don't really understand the question.
BY MR. GROAT:
Q. Okay. What communications did you have with Mr. Martin concerning preparation of the claim?
MR. JACOBY: I'll object to the form of the question and instruct the witness not to testify as to communications he had with Mr. Martin regarding the claim because they're privileged.
If you can answer otherwise, fine.
THE WITNESS: No.
BY MR. GROAT:
Q. Do you recall having communications with Mr. Martin concerning the preparations of the claim?
MR. JACOBY: Same objection.

Page 56

You can answer.
THE WITNESS: Same response.
MR. JACOBY: Well, I think you have to answer this. Did you have communications?
THE WITNESS: I did have --
MR. JACOBY: Not what you said, but did you have them?
THE WITNESS: Yes, I had communications.
BY MR. GROAT:
Q. Did those communications relate to legal advice Mr. Martin was providing you?
MR. JACOBY: Object to the form of the question. You're asking him to give you a legal conclusion. You're also suggesting that the only basis for privilege is attorney-client privilege as opposed to work product privilege, and I'll instruct the witness not to testify.
MR. GROAT: Are you taking the position and instructing the witness not to answer that communications among, and between, representatives of the Keating

Page 57

entities in the preparation of the claim is privileged in anticipation of litigation?
MR. JACOBY: I am taking the position that in the first instance, communications with and/or at the direction of Mr. Martin are privileged. I'm taking the position that communications between Mr. Bitterlich and anybody other than Mr. Martin are also privileged to the extent that they were directed to be taken by Mr. Martin in order to develop the claim as a work product or in anticipation of litigation.
MR. GROAT: In an attempt to clarify your position and avoid a line of questioning, is it your position that communications between Mr. Martin and the deponent concerning preparation of the claim are all privileged?
MR. JACOBY: Yes. I might add that there are two notebooks in front of you that contain not only a number of documents that were created during the course of the project, but also factual statements that are subject to questioning





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 58

for Mr. Bitterlich to the extent that he was involved pre-claim. So I don't know that this precludes you from very much, if any, of the testimony relating to the claims themselves.

MR. GROAT: Well, let me ask the court reporter to mark as next in order Exhibit 10, which is a letter from Mr. Jacoby to Mr. Bitterlich. And we have Bates stamped that as KDC 04437.

(Whereupon, a document was marked for identification as Exhibit 10.)

MR. JACOBY: I think, in fact, this may well be one of the documents identified at Mr. Martin's deposition, if I recall right.

MR. GROAT: Was it?

MR. JACOBY: I believe it was. But in any event, this is a privileged communication from me as counsel for the claimant to Mr. Bitterlich, should not have been produced. And it is certainly something that we may have mentioned to you previously at Mr. Martin's 30(b)(6) deposition, and we're going to

Page 59

request that it be called back. Therefore, I would ask you not to ask any questions -- I'm going to direct Mr. Bitterlich not to respond to any questions. You're welcome to ask him. That's April what?

MR. GROAT: That's an April 13th, 1998 letter.

MR. JACOBY: Okay.

MR. GROAT: Let's go off the record.

(Whereupon, deposition stood in recess at 10:40 a.m.)

(Whereupon, deposition resumed at 10:47 a.m.)

(Whereupon, a document was marked for identification as Exhibit 11.)

MR. JACOBY: I would object again to Exhibit Number 11, which is a conversation record dated April 14th, 1998 from Don Bitterlich to Dennis Martin and me as being clearly a communication with counsel, should not have been produced and we would again asked for it to be called back. It bears Bates KDC 04436.

(Whereupon, a document was

Page 60

marked for identification as Exhibit 12.)

MR. GROAT: Mr. Jacoby, I'll show you this and ask you to identify it for the record.

MR. JACOBY: I'm looking at what's been marked as Exhibit Number 12 bearing Bates KDC 02734 and 35, which is a conversation record prepared by Mr. Bitterlich of his conversation with me and his communication to me dated January 7, 1998. And I, again, take the position this is a privileged communication and would ask for this to be called back.

MR. GROAT: Mark this next in order, please.

(Whereupon, a packet of documents was marked for identification as Exhibit 13.)

MR. JACOBY: You've handed to me Exhibit Number 13, which is a conversation -- which consists of a number of pages with the Bates stamps KDC 04344 through -- strike that actually -- through 47, and then an additional page bearing KDC 04265.

Page 61

The first page indicates it's a conversation record prepared by Mr. Bitterlich on June 9th, 1998 of a conversation with Dennis Martin and me. I, again, maintain that this document, itself, is a privileged document. It would appear that attached to it is a document from Specialty Contractors, Inc. to Keating Development Company dated June 5th, 1998.

And behind that transmittal is a letter dated March 26, 1989, which I suspect is a typo, from Specialty Contractors to Mr. Bitterlich bearing two pages. And the last page, which is KDC 04265, is a letter from Don Bitterlich to Karen Johnson of GSA, which I do not believe is privileged.

At first blush, I believe that possibly the pages 4345 through 47 are also not privileged, which is the transmittal for Specialty Contractors to Keating and the letter behind it. However, I believe that the first page is a privileged document.

MR. GROAT: If you'd mark





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 62

this next in order, please.
(Whereupon, a document was marked for identification as Exhibit 14.)
MR. JACOBY: You've handed me Exhibit Number 14 bearing Bates stamps KDC 02724 through 26. The first page is a FAX transmittal from me to Mr. Bitterlich and Mr. Martin and Mr. Sencindiver and Mr. Bertino dated January 8, 1998. And the two pages behind it is my letter of January 8, 1998 to Mr. Bitterlich with copies to Mr. Martin, Mr. Sencindiver and Mr. Bertino. I maintain that this is a privileged document and should not have been produced.
(Whereupon, a packet of documents was marked for identification as Exhibit 15.)
MR. JACOBY: Exhibit Number 15 bears Bates stamps KDC 0429 through 39. The first page, which I believe is a privileged document, is a conversation record of a conversation January 9th, 1998 by Mr. Bitterlich with Mr. Martin and with me. I believe that that is a privileged

Page 63

document.
Attached to that document appear to be the same -- I'm not going to speculate. It appears to be the same transmittal and letter from Specialty Contractors I referenced earlier, which I do not believe at first blush would be privileged; a letter from Mr. Striviri dated April 22nd to Mr. Morgan. I do not believe that is privileged; what appears to be a copy of one page of Exhibit A to the scope of work for Specialty, which does not appear to be privileged; a communication from Specialty Contractors to Mr. Striviri, which does not appear to be privileged; a letter dated -- I'm sorry, the first page of a letter dated July 15th, 1996 to Specialty from Keating, which does not appear to be privileged; the first page of the subcontract with Specialty Contractors, which does not appear to be privileged; a letter dated October 3rd, 1996 from Specialty to Keating consisting of two pages, which do not appear to be privileged.

Page 64

Again, we would ask for the first page to be called back, and obviously, we'd look at the other pages, but at first blush, I don't think there's an issue. I would like to look at them, though.
MR. GROAT: For the record, my purpose in identifying the exhibits today is to clarify that you would direct the witness not to answer regarding these exhibits.
MR. JACOBY: Correct.
MR. GROAT: And that's why it's somewhat laborious, but I think it's useful at this point that we --
MR. JACOBY: I'm not prepared to tell you today or possibly in the future that -- other than for the documents that I've specifically identified as I believe privileged, for example, the attachments, it's possible that upon further scrutiny, I would not direct Mr. Bitterlich not to respond to questions about those attached documents. I'm just saying that so the record is clear.

Page 65

MR. GROAT: Then for the record, the documents you've identified as documents that you believe are privileged you will direct the witness not to answer any questions concerning?
MR. JACOBY: Yes, sir. Those documents, yes.
MR. GROAT: That's what I thought.
If you would mark this as the next in order.
(Whereupon, a packet of documents was marked for identification as Exhibit 16.)
MR. JACOBY: You've handed me Exhibit 16, which consists of Bates pages KDC 03037 through 03061. The first page appears to be a conversation record from Mr. Bitterlich to me, Mr. Martin, Mr. Bertino, Mr. Clippinger, also an employee of Keating, and Mr. Dirscherl, also an employee of Keating. It's dated March 30th, 1998. At first blush, would appear that this page, KDC 03037 is a privileged document, and I would direct my





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 66

client not to answer questions about that document.
Attached to this document is a conversation record of Mr. Bitterlich with Mr. Koenig dated October 30, 1997; a telecopy sheet to Mr. Koenig; what appear to be excerpts of the specifications; some handwritten notes of Mr. Bitterlich, and including annotations on the specifications; what appears to be something from the SFO, a page from the SFO.
And at first blush, Jack, I would be instructing my client not to respond to the first page, which is the conversation record with me. Depending upon when the notations were made on the attached pages, at first blush, it does not appear that they are privileged.
MR. GROAT: Next in order when you have a chance.
(Whereupon, a packet of documents was marked for identification as Exhibit 17.)
MR. JACOBY: Exhibit 17

Page 67

appears to be bearing Bates stamps KDC 03063 through 87, appears to be identical to Exhibit 16. The first page is identical and is the page to which I initially took exception and I reserve the right to review the other pages. It's possible, as Mr. Groat has suggested, that there might be different annotations on the documents, and I'd want to look at them. But I would certainly instruct my client not to respond to questions as to the first page.
MR. GROAT: Thank you.
(Whereupon, a packet of documents was marked for identification as Exhibit 18.)
MR. JACOBY: You've handed me Exhibit 18, which bears KDC 5333 through 5345. The first page appears to be a cover sheet possibly from a file; I'm not sure what it is. And sitting here today, I don't know whether it's privileged or not.
The second page bearing Bates 5334 is a conversation record dated June 9th, 1998 from Mr. Bitterlich to Mr. Martin and me, and it appears to be a

Page 68

privileged communication.
Looking at the attachments, at first blush, they appear to be similar to the attachments on one of the prior exhibits regarding Specialty Contractors. At first blush, they do not appear to be privileged. I would instruct my client at this stage not to testify as to any questions asked as to KDC 05334.
(Whereupon, a packet of documents was marked for identification as Exhibit 19.)
MR. JACOBY: You've handed me Exhibit 19, which bears Bates KDC 05350 through 370. The first page is a conversation record dated June 2nd, 1998 from Mr. Bitterlich to Mr. Martin and me, and at first blush, appears to be a privileged communication. And that bears Bates 05350.
The second page, bearing 05351, appears to be an Analysis of Partnership versus GSA Rent Payment Application. And I'd have to look at it more closely to see whether that document

Page 69

is privileged.
The third page is a document that appears to be a rent payment summary bearing Bates 05352, which I'd have to look at more closely to see if that is privileged.
The next page, bearing Bates 5353, appears to be the same as the prior page with substantial annotations. And at first blush, it would appear that this is a privileged document. It bears receipt stamp June 1st, 1998.
The next page, bearing 5354, is a FAX transmittal sheet from me dated May 29, 1998 to Mr. Bitterlich. I'm not sure what was forwarded with it. The reference is four pages, so I don't know what is referred to.
The next page is 5355, a FAX transmittal from Don Koenig at GSA dated May 28, 1998 to which is attached 5356, which is a letter from Mr. Koenig dated May 28, 1998. It does not appear to be privileged.
Behind that are two pages,





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 70

5357 and 5358, which appears to be that same rent payment summary I mentioned before that have substantial annotations. And at first blush, I can't tell whether it is or is not privileged.

The next page, 5359, is a FAX transmittal which appears to be the same FAX transmittal from Mr. Koenig to Mr. Bitterlich. And following that, the same letter with that same rent summary without annotations.

Page 5362 is a handwritten notation to Don Bitterlich, updated schedules. I don't know who that's from.

5363 is the schedule that appeared initially as 5351, but without annotations that may or may not be privileged. Likewise, 5364 and 5365.

Behind that is another conversation record dated June 2nd, 1998 from Mr. Bitterlich to Mr. Martin and me bearing Bates 5366 which appears to be privileged.

Attached to that is a copy of a letter dated June 1st, 1998 from Karen

Page 71

Johnson and Mr. Bitterlich which contains annotations that I recognize to be in Mr. Bitterlich's handwriting that I believe would also be privileged. That's 5367.

And then behind it are three pages of photographs, 5368 through 5370, and they have annotations on them, and I'd have to investigate further to see whether they relate to or are, themselves, privileged.

Without going through all the documents again, to the extent I identified something as being privileged, I would instruct my client at this stage not to respond to any questions about it.

MR. GROAT: Thank you for clarifying it.

(Whereupon, a document was marked for identification as Exhibit 20.)

MR. JACOBY: Exhibit 20 is a single page bearing Bates KDC 04531, which is a conversation record dated March 27, '98 from Mr. Bitterlich to Dennis Martin and me.

I would take the position at

Page 72

this stage that this is a privileged document, and I would instruct the witness not to respond to any questions regarding it.

(Whereupon, a document was marked for identification as Exhibit 21.)

MR. JACOBY: You've handed me Exhibit 21, which is a single page bearing Bates 04532, which is a conversation record dated March 26, '97. Looking at this, I suspect it's misdated, but it's dated March 26, 1997 from Mr. Bitterlich to Mr. Martin and me.

At this stage, I would take the position this is a privileged document and instruct the witness not to answer any questions about it. I think it is misdated looking at the body of it, but that's neither here nor there.

(Whereupon, a packet of documents was marked for identification as Exhibit 22.)

MR. JACOBY: You've handed me Exhibit 22, which is a series of pages bearing Bates KDC 04355 through 65.

Page 73

The first page is a conversation record dated June 8th, 1998 from Mr. Bitterlich to Mr. Martin and me. At first blush, it appears to be a privileged document which should be returned, and I would instruct the witness not to testify as to any questions asked about it.

The following pages appear to me to be versions of documents, claim documents, which were prepared in conjunction with Keating's claim. I can't tell you the exact date they were prepared. I, however, recognize them as being those documents, and I would, therefore, without further scrutiny, also maintain that they are privileged and should be returned, and I would instruct the witness not to testify as to them.

(Whereupon, a packet of documents was marked for identification as Exhibit 23.)

MR. JACOBY: You've handed me Exhibit 23, which bears Bates KDC 05371. It's not going to be consecutive.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 74

MR. GROAT: What is it?

MR. JACOBY: I think I'm wrong, Jack. Through -- no. I guess it is. Through 85.

The first page is a conversation record dated June 1st, 1998 from Mr. Bitterlich to Mr. Martin and me that at first blush appears to be a privileged document, and I would ask that the document be returned and that Mr. Bitterlich not answer questions about it.

The following pages through 5378 appear to be communications with the GSA or third parties. And at first blush, I'm not prepared to take a position on those documents.

The document on page 5379 is a letter from Mr. Bitterlich to Mr. Koenig ending at 382, and the only reason I'm unsure is there appears to be a sticker attached to it with an annotation from Mr. Bitterlich dated May 4th, 1998. And I don't know whether that sticker itself would be a privileged communication, an

Page 75

internal communication.

The last three pages, 83 to 85, do not appear to be privileged at first blush.

To the extent I've identified documents as privileged, I would ask that they be returned, and I'm also prepared to direct the witness at this time not to respond to questions about them.

(Whereupon, a document was marked for identification as Exhibit 24.)

MR. JACOBY: You've handed me Exhibit 24, which consists of two pages, KDC 05386 and 87, which appears to be a conversation record dated May 26, 1998 from Mr. Bitterlich to Mr. Martin and me.

And the second page is a transaction report from a FAX, and I recognize the receiver as being the FAX number at this firm. At this stage, I would instruct the witness not to answer any questions about the first page certainly, and ask that the document be returned to us.

(Whereupon, a document was

Page 76

marked for identification as Exhibit 25.)

MR. JACOBY: You've handed me Exhibit 25, which is a document bearing Bates KDC 5388 through 92. The first two pages appear to be a letter dated May 18, 1998 from me to Mr. Bitterlich with a copy to Mr. Martin. And on the first page, Mr. Bitterlich has written a note back to Mr. Martin and me dated May 20th. Attached to my letter appears to be an enclosure bearing three pages, from 90 to 92.

And sitting here, I am not sure whether those documents themselves would be privileged. At this stage, I would take the position they are because I'm reporting them to the client, but I'm not sure. I will certainly maintain that the first two pages are privileged and ask that they be returned and direct the witness not to respond to any questions about them.

MR. GROAT: For the record, perhaps you could clarify, there's a Mr. Richard Frazier mentioned in these. Let's mark it and we'll see what it is.

Page 77

(Whereupon, a packet of documents was marked for identification as Exhibit 26.)

MR. GROAT: This is of Reynolds Construction, I believe, but there's a note there "Confidential." I don't know what it regards.

MR. JACOBY: You've handed me Exhibit 26, which bears Bates KDC 4385 through 88. The whole document consists of four pages, a letter dated April 30, '98 from Mr. Bitterlich to Mr. Koenig which itself would not be privileged. There's a sticker, a Post-It, that appears to be on the first page from Mr. Bitterlich to Mr. Frazier dated May 4th, 1998. I do not believe either this letter or the sticker is a privileged document.

MR. GROAT: In the interest of moving this along, could we have the deponent testify.

BY MR. GROAT:

Q. Could you clarify what the notation on the last exhibit refers to?

MR. JACOBY: Right here.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Just for the record, I'm pointing just to the Post-It or sticker that appears on the first page on Exhibit 26.
BY MR. GROAT:
Q. On Exhibit Number 26, could you clarify the meaning of the handwritten annotation on the side of the first page of the exhibit?
A. The meaning of it?
Q. Yes.
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: I'd have to study this through and try to recall it.
BY MR. GROAT:
Q. Do you know who prepared it?
A. What, the sticker?
Q. Yes, the sticker.
A. That's my handwriting.
Q. And do you know what the notations are regarding?
A. What's stated on the sticker. I don't know the purpose of it.
Q. I see. Could you review the



letter, and to the best -- is there a chance you'd be able to refresh your recollection by review of the letter?
A. There's a chance.
Q. Please do.
A. (Complying.)
Q. Have you had a chance to refresh your recollection with regards to the meaning on the exhibit that you were examining?
A. Yeah. It basically is just a letter that I wrote to Dan Koenig updating the status of work being performed during the post-construction period, and I copied it to Richard Frazier, who was our general contractor performing some of the work on-site.
Q. And which general contractor? He was the general contractor for the entire project?
A. No, he was not. He was the general contractor that we had hired in order to perform some of the work that was being performed post-construction.
MR. GROAT: So as I



understand it then, there wouldn't be a privilege associated with --
MR. JACOBY: I have no objection to that document.
MR. GROAT: Would you mark this as the next in order, please.
(Whereupon, a packet of documents was marked for identification as Exhibit 27.)
MR. JACOBY: You've handed me Exhibit 27, which bears Bates KDC 5316 through 32. The first page appears to be perhaps a file tag or something that at first blush does not appear to be privileged. That's 5316.
The second page is a conversation record dated December 9th, 1997 from Mr. Bitterlich to Mr. Koenig which itself does not appear to be privileged.
Having said that, the document contains annotations by Mr. Bitterlich to me dated March 24th, 1998 with a copy to Mr. Martin, which I do believe are privileged. That's 5317.



5318 is a FAX cover sheet to me.
5319 is what appears to be a confirmation of receipt.
5320 is a copy of a conversation record that Mr. Bitterlich had on March 23rd, '98 with Mr. Koenig which doesn't, itself, appear to be privileged; however, this document has a notation on it from Mr. Bitterlich dated March 24th, 1998 to me regarding this document with a copy to Mr. Martin. And I do believe that makes it privileged unless you want to redact the annotation.
Page 321 appears to be a conversation record dated December 2nd, '97 from Mr. Bitterlich to Koenig that at first blush does not appear to be privileged.
322 is a FAX transmittal from Mr. Koenig to Mr. Sencindiver dated March 1st, 1997 which has an annotation in Mr. Bitterlich's handwriting sending a copy to me and Mr. Martin. Other than a redaction, I'm not sure that would render this privileged.

Pages 323 through 324 are a letter from Mr. Koenig dated November 28th, 1997 to Mr. Sencindiver, which, in and of itself, would not be privileged; however, there appear to be annotations on that letter from Mr. Bitterlich which may render it privileged.

5325 is an attachment that deals with rooms identified as having moisture in the walls, which may or may not be privileged. Without speaking with Mr. Bitterlich, I wouldn't know the context in which this was prepared or whether it was delivered to me.

Page 5326 is a letter dated November 14, '97 from CH2MHILL to HLM bearing four pages which does not appear to be privileged. Having said that, on the last page of that letter, Bates 5329, there's an annotation in Mr. Bitterlich's handwriting. Again, I don't know how that was directed.

On 5330 is a FAX sheet from Mr. Koenig to Mr. Bitterlich dated November 18, 1997; does not appear to be privileged.



Attached to that is a copy of a letter dated November 18, 1997 from Mr. Koenig to Mr. Bitterlich which contains annotations. So I don't know whether that's privileged. Among other things, it is possible that the transmittal identified these things and were being called out by Mr. Bitterlich. I just don't know without talking with him.

So I probably, at this point, in an excess of caution, have to identify the entire package as privileged, although I think probably some of these would not be, or could be redacted. And again, I would ask that, to the extent that we conclude that these are privileged and can't be redacted, that they be returned to me or redacted and that I would instruct the witness not to testify as to any questions asked about them.

(Whereupon, a packet of documents was marked for identification as Exhibit 28.)

MR. JACOBY: You've handed me Exhibit 28, which bears Bates KDC 5407



to 13. The first page is a FAX sheet from Mr. Bitterlich to me. However, it contains annotations to a Mr. Frazier. It contains other annotations. I don't know whether this document is, therefore, privileged or not without talking to Mr. Bitterlich.

The next two pages, 5408 and 09, appear to be letters to third parties that may not be privileged.

Page 5410 is a note dated April 23rd, '98 from Mr. Bitterlich to me that I believe would be privileged unless it was waived by consent of the third party.

The next two pages appear to be communications involving third parties. That's 5411 and 5412, which do not appear to be privileged. And 5413 is a FAX transmittal confirmation.

To the extent that these documents are privileged, I would ask that they be returned and I would instruct the witness not to answer questions regarding them.

(Whereupon, a packet of



documents was marked for identification as Exhibit 29.)

MR. JACOBY: You've handed me Exhibit 29 bearing KDC 5394 through 5398. The first page is a conversation record dated 5/11/98 from Mr. Bitterlich to me that appears at first blush to be privileged.

Behind it is a FAX transmittal from Mr. Koenig to Mr. Bitterlich bearing 5395, which does not appear to be a privileged communication.

5396 is a communication which does not appear to be privileged to which is attached at 5397 a sketch.

And then 5398 is a letter dated April 20, '98 from Mr. Koenig to Mr. Bitterlich.

At first blush, only the first page would appear to be privileged, and I would ask that it be returned to me and that Mr. Bitterlich not answer questions regarding it.

Although this has not been marked --





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 86

MR. GROAT: I'm sorry, why don't we go ahead and do that.
(Whereupon, a packet of documents was marked for identification as Exhibit 30.)
MR. JACOBY: You've handed me Exhibit 30, which bears Bates KDC 4243 through 4257. The first page, 4243, is a conversation record dated May 4th, 1998 from Mr. Bitterlich to Mr. Martin and me that appears to be privileged.
Attached to it is a document, KDC 04244, which appears to be a memorandum from Judge Vincent dated May 29th, 1996 to Mr. Koenig, Mr. Bitterlich and Chris Bolt, B-O-L-T, at KBJ which contains as annotation. It's not clear whether, because of the annotation, the document is privileged or whether the annotation could be redacted.
Behind it are schedules appearing as KDC 04245 through 47 -- strike that -- through the end of the document, 257, that don't appear to be privileged. I'd have to ask Mr. Bitterlich, but I

Page 87

suspect that these are documents prepared in the order and course and not meant to be privileged.
So I would tell you that certainly the first page and possibly the second page are privileged documents that should be returned, and I would instruct the witness not to testify about them.
MR. GROAT: Thank you.
BY MR. GROAT:
Q. Now, if we could, turn to page 0004 that we've identified as what's been marked Deposition Exhibit 9. And I'd ask you who prepared the textual explanation of what is marked as Item number 1, Renewable Options Period?
MR. JACOBY: Object to the form of the question.
You can answer so long as you do not divulge privileged communication.
THE WITNESS: I do not recall.
BY MR. GROAT:
Q. Did you draft the document?

Page 88

A. This?
Q. Yes.
A. I do not recall.
Q. Are there any documents that would refresh your recollection as to the process in which this claim was prepared?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Possibly.
BY MR. GROAT:
Q. What would those documents be?
A. I don't know.
Q. Do you recall who provided information generally in the course of the preparation of Palafox's claim which has been marked as Deposition Exhibit Number 9?
MR. JACOBY: Object to the form of the question and instruct the witness not to testify as to any privileged communications.
You can identify the people if you want.
THE WITNESS: Possibly Tracy Grier.

Page 89

MR. JACOBY: Just so it's clear, are you talking about this specific item, or are you talking about everything?
THE WITNESS: No, just this.
MR. JACOBY: Just Item number 1.
THE WITNESS: Just the document that you -- you're discussing this summary --
BY MR. GROAT:
Q. Palafox claim at page 0004, and it would be through page 00011; is that correct?
A. Yes.
Q. Now, it's your recollection that Tracy Grier may have provided information relative to that claim; is that correct?
A. Correct.
Q. What would that information have been, to the best of your recollection?
A. I have no idea.
Q. Did you conduct any independent investigation into the facts underlying or what's identified here as Item number 1?





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 90

MR. JACOBY: Do you understand the question?
THE WITNESS: No. Independent investigation, I don't understand what you're --
BY MR. GROAT:
Q. Did you go out and research the facts underlying what has been identified as claim number 1, Renewable Option Period?
MR. JACOBY: I'll object to form.
You can answer, if you can.
THE WITNESS: No, not that I have any knowledge of.
BY MR. GROAT:
Q. Are you personally familiar with the facts set forth under Item number 1, Renewable Options Period?
MR. JACOBY: Any of the facts or all the facts?
MR. GROAT: The facts.
THE WITNESS: Personally?
BY MR. JACOBY:
Q. Yes.

Page 91

A. No.
Q. Who would be the person associated with the Keating entities most familiar with the facts set forth under Item number 1, Renewable Options Period?
A. Michael Sencindiver.
MR. JACOBY: Can I just speak with my client?
MR. GROAT: Please do. I'd like everything clarified as much as possible.
(Whereupon, a discussion was held off the record between the witness and his counsel.)
MR. JACOBY: Could you read back the question asking whether he's familiar with any facts related to this claim.
(Whereupon, the court reporter read back as requested.)
MR. JACOBY: And my point of clarification was any of the facts relating to it?
MR. GROAT: Yes.
MR. JACOBY: Okay.

Page 92

Do you understand the question?
THE WITNESS: Yes. Only with respect to the conversation with Dan Koenig.
BY MR. GROAT:
Q. Okay. And could you specifically refer to the page to which you refer?
A. Yes, 008.
Q. And what specific paragraph?
A. Q.
Q. And what, if any, familiarity do you have with the facts set forth in paragraph Q?
A. I initially informed Michael Sencindiver that I overheard a conversation which it was not the intent to renew the options.
Q. Okay. What conversation did you overhear?
A. I can't recall specifically, but it was a conversation that Dan Koenig had with a member of the GSA in regard to the lease agreement and renewal period.
Q. Where did this conversation occur?

Page 93

A. At the project site prior to a meeting in the field office trailer.
Q. And with whom was Mr. Koenig -- the person Mr. Koenig was discussing this matter to was associated with whom?
A. Was associated with whom?
Q. Was the person Mr. Koenig had this alleged discussion with a government employee, a Keating employee, or employed by some other entity?
A. I don't know specifically who he was speaking with, but it was definitely not a Keating employee. It was related to a GSA member or government member.
Q. And to the best of your recollection, what was said?
A. I don't recall specifically.
Q. And to the best of your recollection, what was the substance of the conversation?
A. It was related to the term of the lease agreement being 20 years and not being extended for the renewal options to the 30-year term.
Q. And to the very best of your





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 94

recollection, what did Mr. Keating say?
MR. JACOBY: Mr. Koenig.
MR. GROAT: Mr. Koenig say. I'm sorry.
THE WITNESS: I don't recall specifically.
BY MR. GROAT:
Q. Now, to the best of your recollection, what is the total substance of that communication you overheard?
MR. JACOBY: Object to the form of the question.
You could answer.
THE WITNESS: You stated the total --
BY MR. GROAT:
Q. To the best of your recollection, what can you recall regarding the substance of that communication?
A. I believe I stated previously that it was based upon the lease agreement being 20 years with two five-year renewals and that it would not be renewed.
Q. Now, to the best of your recollection, did Mr. Koenig state, as a

Page 95

matter of fact, that the lease agreement would not be renewed?
A. I don't recall.
Q. Did Mr. Koenig express a belief that the lease agreement might not be renewed?
A. My understanding in the conversation was that it was not the intent to renew the renewal periods.
Q. And to the best of your recollection, was Mr. Koenig expressing his personal belief at the time?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: No, because it was a conversation with another member representing the government.
BY MR. GROAT:
Q. Upon what basis do you conclude that Mr. Koenig was not expressing his personal belief?
MR. JACOBY: Object to the form of the question.
You can answer.

Page 96

THE WITNESS: Could you repeat the question.
MR. GROAT: Could you read it back, if you would, please.
(Whereupon, the court reporter read back as requested.)
MR. JACOBY: Same objection.
You can answer.
THE WITNESS: Just at the tone and the direction of the conversation.
BY MR. GROAT:
Q. And you concluded what from the tone and the direction of the conversation?
MR. JACOBY: I think it's asked and answered.
You can answer it again.
THE WITNESS: That it was apparent that there was not an intent to renew the lease for the five-year renewal periods.
BY MR. GROAT:
Q. Did Mr. Koenig express a belief that it might not be advantageous to the government to --

Page 97

A. No, I wasn't in --
MR. JACOBY: Let him finish his question first.
MR. GROAT: Thank you.
BY MR. GROAT:
Q. Did Mr. Koenig express a belief that it might not be advantageous for the General Services Administration to execute the options?
A. No.
Q. When did this conversation take place?
A. You mean time and date?
Q. Exactly.
A. I have -- can't recall.
Q. Did you communicate the substance of what you overheard to any other person?
A. Yes, to Michael Sencindiver.
Q. And when was that?
A. Moments after I heard the conversation.
Q. And what did you relate to him?
A. That -- I only heard one part of the conversation, and that -- from what I understood from what I had heard, that it

Page 98

was not the intent to renew the options based upon a conversation that Dan Koenig was having with someone.
Q. And did you have any other discussions regarding this conversation with -- what, if any, other discussions did you have regarding this conversation?
MR. JACOBY: With anyone else?
MR. GROAT: With either him or with anyone else.
MR. JACOBY: This is other than communications with counsel?
BY MR. GROAT:
Q. I'd ask you to identify communications with counsel, identify the fact that you had them. I don't want the substance of those communications?
MR. JACOBY: During what time period, Jack? I mean, obviously during the claim preparation period he had conversations with counsel. You're not going to identify each and every one of them.
BY MR. GROAT:

Page 99

Q. Well, to the best of your recollection, what conversations did you have regarding --
A. Specifically with Michael Sencindiver. And then the other conversations would have been with counsel or perhaps with Mr. Martin as well.
Q. By counsel, do you mean Mr. Jacoby?
A. Yes, sir.
Q. Were there any other individuals with whom you had contact regarding this alleged conversation?
A. None that I can recall.
Q. Did you record your recollection of this conversation in any documents?
A. No. Or shall I say not that I'm aware of.
Q. When you communicated this information to Mr. Sencindiver, what, if any, communications, or did -- excuse me, what was the substance of the conversation?
A. "Are you sure that's what you heard?"
Q. And what did you respond to that

Page 100

question?
A. Yes. And I said, "I only heard part of the conversation, but it was my understanding that on the basis of the conversation that I had overheard, that the lease agreement was not going to be renewed beyond the 20th year."
Q. Did you have any other conversations regarding this matter with any persons?
MR. JACOBY: Other than as he just testified to?
BY MR. GROAT:
Q. Other than you've just testified to.
A. No.
Q. Are you aware of any actions or conversations Mr. Sencindiver had after the conversation you had with him?
A. Am I aware of any -- would you, please, repeat.
Q. Are you aware of any conversations or actions taken in light of your conversation with Mr. Sencindiver?
MR. JACOBY: Actions taken

Page 101

by him, Mr. Sencindiver?
MR. GROAT: Actions taken by Mr. Sencindiver.
THE WITNESS: Yes.
BY MR. GROAT:
Q. And what knowledge do you have regarding any actions taken?
A. The following day, Mr. Sencindiver had a telephone conversation with Dan Koenig.
Q. And how did you become aware of this telephone conversation?
A. To my recollection, I was present in his office during the course of that conversation.
Q. And what do you recall hearing concerning that conversation?
A. Just Mr. Sencindiver's side of the conversation with Mr. Koenig.
Q. So the conversation was not on a speakerphone?
A. No, it was not.
Q. What do you recall regarding the statements made by Mr. Sencindiver?
A. Just discussions regarding the





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 102

lease term and the agreement of it.
Q. To the best of your recollection, what did he state in this telephone conversation?
A. I don't recall.
Q. Do you recall whether he posed the question to Mr. Koenig of whether the General Services Administration intended to exercise additional options?
A. I don't have a specific recollection of how he phrased the question.
Q. What is the substance of your best recollection of what you overheard that day?
A. The substance of it?
Q. Yes.
A. Mr. Sencindiver was wishing to confirm the GSA's opinion that they were going to renew the lease after 20 years.
Q. Were any other matters discussed in the conversation you overheard that day?
A. Not that I can recall.
Q. Do you recall that the conversation by Mr. Sencindiver addressed

Page 103

that sole issue of the government's exercise of the lease option?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: I don't recall.
BY MR. GROAT:
Q. Are there any other matters set forth under Item number 1 in which you have personal knowledge?
A. None that I was directly involved with.
Q. Is it fair then to state that any of the knowledge that you acquired then would have been in the course of the review of documents and in conversations with other persons?
MR. JACOBY: Object to the form of the question. Do you understand the question? Do you want it read back to you?
THE WITNESS: Yeah, have it read back.
(Whereupon, the court

Page 104

reporter read back as requested.)
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: It seems that I've -- or the review of the documents that are within this claim and also at the beginning of the project, as I stated before, with the best and final offer and the SFO.
BY MR. GROAT:
Q. Let's turn to Item number 2, "Mold, Mildew on Exterior Walls with Vinyl Wall Covering" which appears at page 0130. Do you recall whether you drafted this portion of the claim?
A. I did not draft this. I prepared the documents.
Q. Do you recall who drafted this?
A. No.
Q. Do you recall if this was done by counsel or other persons working for Keating?
MR. JACOBY: He just testified he doesn't recall who did it, but

Page 105

he can answer the question again.
THE WITNESS: The same answer.
BY MR. GROAT:
Q. Was there anyone else working with you in the preparation of this claim that might have prepared what's been marked as Item number 2?
MR. JACOBY: Object to the form of the question.
THE WITNESS: Well, at this point, as I stated before, it was being reviewed with Michael Sencindiver as well as Dennis Martin and likely with counsel.
BY MR. GROAT:
Q. Generally, who drafted the particular claim text or recitation in the claim package?
MR. JACOBY: You're talking about the summary such as Item number 2 and we just discussed Item number 1?
MR. GROAT: Exactly.
THE WITNESS: I believe I answered that already.
BY MR. GROAT:

Q. Do you have any recollection as to who generally prepared these factual summaries?
A. I believe I answered that already.
Q. Could you repeat it, please.
A. I don't recall what my exact words were.
Q. But you have no knowledge of who generally prepared these factual --
A. I had stated before that these were being prepared and I was developing the backup. I prepared them, gave them and we reviewed them with Mr. Sencindiver, Mr. Martin and likely with counsel as well. And that would be Mr. Jacoby.
Q. Well, my question went to, do you have any knowledge as to who generally prepared these factual summaries?
MR. JACOBY: I'm going to object to your use of the word "generally." I don't know what that word means. I think his repeated testimony is pretty clear as to his recollection of who prepared these textual claims summaries.
BY MR. GROAT:



Q. Is it your testimony that you have no recollection of who prepared the textual summaries other than that you've testified to, Mr. Sencindiver, Mr. Martin and counsel?
A. I just testified that I do not recall specifically who drafted these summaries other than they were prepared between myself, Mr. Sencindiver, Mr. Martin and with counsel.
Q. Now, do you have personal knowledge of the mold, mildew problem which occurred at the site?
A. Yes.
Q. I'd ask you to look at the second sentence that appears on page 0130 starting with, "This mold mildew occurred where the interior wall finish was vinyl wall covering." Is that a correct statement based on your observations?
A. Yes.
Q. What specifically did you observe?
MR. JACOBY: At what point in time?
MR. GROAT: At the project



relating to the occurrence of mold and mildew as referenced in the claim.
THE WITNESS: That the only location where mold and mildew existed was at exterior walls where vinyl wall covering had been applied on the interior surface of the wall.
BY MR. GROAT:
Q. Now, I'd like you to read in the record, if you would, please, the next sentence which starts, "Keating provided vinyl wall covering." Could you read that into the record, please.
A. "Keating provided vinyl wall coverings on these walls in accordance with the project specific finish schedule prepared by the GSA and included in the SFO and the lease."
Q. Now, you've testified previously to your involvement in the design specifications. Did you have the opportunity to review the SFO and the lease?
MR. JACOBY: At what point in time?



MR. GROAT: During the design, what you've identified as the design portion of the project.
THE WITNESS: Yes. More specifically, the SFO. I did have opportunity to review the lease. I was not as familiar with the lease other than the fact that the SFO was an exhibit of it and an active document for the design.
BY MR. GROAT:
Q. Now, to the best of your recollection, is this statement true that Keating provided vinyl wall coverings in accordance with the project finish specifications prepared by the GSA and included in the SFO and the lease?
A. Yes.
MR. JACOBY: Actually, I don't believe that's what the sentence says.
MR. GROAT: Thank you.
BY MR. GROAT:
Q. To the best of your recollection --
A. I'm figuring you're --





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 110

Q. I was summarizing.
A. Okay.
Q. Is the statement as it appears in the claim, to the best of your knowledge, true?
A. Yes.
Q. To the best of your knowledge, did Keating design the building with knowledge of the information contained in the SFO?
A. Yes.
Q. To the best of your knowledge, was the architect that Keating retained aware of the fact that the SFO provided for the use of vinyl wallpaper?
A. Yes.
Q. To the best of your knowledge, did Palafox ever communicate to the GSA prior to the appearance of the mold, mildew problem an opinion that vinyl wallpaper was unsatisfactory?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Prior to?
BY MR. GROAT:

Page 111

Q. Prior to the actual occurrence of the mold, mildew -- mold and mildew at the building.
A. No.
Q. Do you have professional experience with regard to the occurrence of mold and mildew in buildings?
MR. JACOBY: Object to the form of the question.
You can answer. Do you understand the question?
THE WITNESS: Do I have experience?
BY MR. GROAT:
Q. Yes.
MR. JACOBY: Actually, the question was professional experience. That's why I object.
THE WITNESS: I have experience --
MR. JACOBY: What is your question, is it experience or professional experience?
MR. GROAT: Experience.
THE WITNESS: I have

Page 112

experience with it.
BY MR. GROAT:
Q. What is that experience?
A. With respect to the Pensacola courthouse.
Q. Was that the only experience that you have with the occurrence of mold and mildew in buildings?
A. Yes.
Q. Did you review the design documents concerning the use of vinyl wallpaper?
MR. JACOBY: At what point in time, Jack?
MR. GROAT: Any point in time.
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Yes.
BY MR. GROAT:
Q. Did you reach any conclusions regarding the design documents as they related to the use of vinyl wallpaper?
MR. JACOBY: Object to the

Page 113

form of the question.
You can answer. Do you understand the question?
THE WITNESS: I don't understand, did I reach any conclusions during the design.
BY MR. GROAT:
Q. Well, I understand that you reviewed the -- did you review the design documents as it relates to the use and specification of vinyl wallpaper?
A. Yes.
Q. What, if any, conclusions did you reach regarding the specifications as they relate to the use of vinyl wallpaper?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: It was part of the SFO requirements and contract and that was what was selected by the GSA to install.
BY MR. GROAT:
Q. Did you or anyone else have conversations with Palafox's architect

Page 114

regarding the use of vinyl wallpaper in the project?
MR. JACOBY: Object to the form of the question. At what point in time, Jack?
BY MR. GROAT:
Q. To the best of your recollection, were there any communications?
MR. JACOBY: Same objection.
THE WITNESS: During the design phase?
BY MR. GROAT:
Q. Let me direct your attention to the design phase. Were there any communications by you or any other representatives of Palafox with the architect regarding the specifications provision for the use of vinyl wallpaper?
A. Vinyl wallpaper was provided as a basis of selection for the GSA and one of the finish package; in other words, the scope of the finishes.
Q. Do you have any recollection of any specific conversations with Palafox's architect regarding the provision for the

Page 115

installation of vinyl wallpaper?
A. Not that I can recall.
Q. Now, during the construction phase, do you have any recollection of any communications with Palafox's architect as to the specifications providing for the installation of vinyl wallpaper?
A. No, none specifically.
Q. Well, you've indicated none specifically. Do you have any general recollection of any conversations?
A. Only to the extent that we were installing it. I mean, it's the finish and that was what we were providing. That's all.
Q. In what you've identified as the post-construction phase, do you have any recollection of any communications with Palafox's architect regarding the specifications provision for the installation of vinyl wallpaper?
A. Not that I can recall.
Q. Did you have any communications with other Palafox employees or representatives or subcontractors regarding

Page 116

the fact that the specifications provided for the installation of vinyl wallpaper?
MR. JACOBY: At what point in time?
MR. GROAT: In the post-construction phase.
THE WITNESS: There was conversations and there was communications, but none specifically that I can recall.
BY MR. GROAT:
Q. Do you recall with whom those conversations would have been?
A. None specifically that I can recall.
Q. Do you recall any conversations regarding the specifications provision for the installation of vinyl wallpaper with Palafox architect?
MR. JACOBY: In the post-construction period?
MR. GROAT: In the post-construction phase.
THE WITNESS: With the selections? There was so much --
BY MR. GROAT:

Page 117

Q. Okay. In the post-construction phase, are you aware of any communications between Palafox and Palafox's architect regarding vinyl wallpaper?
A. I don't recall any specific communications.
Q. Do you recall specific conversations among the Keating personnel affiliated with the Keating entities regarding the use of vinyl wallpaper?
A. There were discussions. I don't recall any specific conversations or discussions.
Q. Do the documents appended to the claim refresh your recollection as to any communications?
MR. JACOBY: The claim for Item 2?
MR. GROAT: Yes.
THE WITNESS: Upon the review that I have here, most of my conversations were between myself and Chuck Vann on the site and with the consultants, Thompson Engineering.
BY MR. GROAT:





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 118

Q. Are you aware of any claim by Palafox that the architect was, in some way, responsible for any problems resulting from the installation of vinyl wallpaper?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: I don't specifically recall that conversation or communication.
BY MR. GROAT:
Q. Are you aware of any claim by Palafox against the architect alleging errors and omissions in the architect's work?
MR. JACOBY: Object to the form of the question. Also object to the extent that the source of and the basis for your question are privileged communications that were inadvertently produced to you by Keating during discovery.
MR. GROAT: Do you want the question read back, or are you instructing him not to answer?
MR. JACOBY: Yes, I am.

Page 119

MR. GROAT: You're directing him not to answer?
MR. JACOBY: I am.
MR. GROAT: In an attempt to move things along, is it your position then, will you direct the witness not to answer any question regarding alleged errors and omissions by the architect?
MR. JACOBY: I have a concern sitting here today that the fruit of the tree is basically the source primarily, if not solely, from privileged communications that were inadvertently given to you in discovery. And because of that, I am not comfortable having this witness engage in that conversation either because the base of your knowledge is solely that privileged document or that his communications could be deemed a waiver of whatever privilege might exist with respect to that document.
Primarily that issue. I'm not sure if there are any other specific issues like that.
MR. GROAT: I understand.

Page 120

May we go off the record for a moment?
MR. JACOBY: Sure.
(Whereupon, a discussion was held off the record.)
(Whereupon, deposition stood in luncheon recess at 12:20 p.m.)
(Whereupon, deposition resumed at 1:10 p.m.)
MR. GROAT: Why don't you set forth your position. We indicated our intention on filing a motion to compel with regard to the errors and omissions. If you want to state your position, that's fine.
MR. JACOBY: Before we went back on the record, I indicated to counsel for the GSA that, as I indicated previously, I think on the record, that I believe that his questions with respect to errors and omissions relating to the architect are either directly a source or the fruit of the tree of privileged documents, that they should not have, and they should have probably volunteered to return, especially written on my own letterhead.

Page 121

Having said that, in order to allow the testimony to go forward today and not disrupt things, I'm willing to allow Mr. Groat to ask questions not based on my letter itself, but on the subject matter with the qualification that, number one, I reserve the right to file a motion in limine to strike that testimony depending on the outcome of the privileged document issue; and number two, the testimony is without a waiver of our privilege. I don't want it to be deemed somehow that having identified a letter from my office on the subject to allow him to testify is deemed a waiver of any privilege that attaches.
So with those qualifications, I'm going to let you ask the questions.
MR. GROAT: Let me take a look. I just want to see if we can -- I'm looking at Dennis's dep as it relates to this question and --
MR. JACOBY: I think there was at least one document that you

Page 122

identified that we told you we thought was a privileged document.
MR. GROAT: That's what I'm trying to take a look at. I thought he answered questions regarding errors, though.
MR. JACOBY: Is there a glossary? I don't recall.
MR. GROAT: I have a glossary here, so if they're identified, I can tell you where it is.
MR. JACOBY: No, I don't think this letter was.
MR. GROAT: If you take a look at page 49 and 50 of the thing, you'll see that we raised the questions at Mr. Martin's deposition based on a letter from Mr. Bitterlich from --
MR. JACOBY: What line number?
MR. GROAT: Page 49, line 12.
MR. JACOBY: Well, the issue there, I instructed him not to answer because I thought it was beyond his

Page 123

30(b)(6). We didn't even get to the underlying issue. Do you have that letter here?
MR. GROAT: I believe I do, but we discussed errors and omissions in --
MR. JACOBY: Well, I don't think -- as I said, I think he didn't testify. I think I instructed him not to testify on the bottom on line 22, but if you had that letter here to Don from KBJ Architects, if you want to ask him a question about that letter, you can feel free to subject -- I'll still reserve my rights and go on. Bottom line is I want to let the guy testify --
MR. GROAT: I understand. I'm just trying to figure out how to do it.
MR. JACOBY: Yeah.
MR. GROAT: Okay. The following questions will be subject to your moving in a motion in limine based upon successful assertion of whatever privileges you claim would be appropriate.
MR. JACOBY: Right. And

Page 124

subject to my contention that by testifying in response is not waiving any privilege that attached to otherwise privileged documents.
MR. GROAT: For these limited questions, I agree to that stipulation.
BY MR. GROAT:
Q. Sir, do you have any knowledge concerning claims concerning errors and omissions by the architect?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Yes.
BY MR. GROAT:
Q. And what is that knowledge?
A. During the concluding part of the project, I developed a summary of our general contracting change order costs for additional costs incurred due to omissions or errors in the documents which resulted in additional costs to the project.
And with that summary, what I did is I broke it down between different

Page 125

disciplines, mechanical, electrical, plumbing, sprinkler, architectural.
Q. And for whom did you prepare this analysis?
A. I prepared it for our use as well as to identify to Will at KBJ the costs that we had incurred.
Q. And what action was taken based upon this analysis?
A. It was identified that perhaps these costs might be reconciled with their final invoice.
Q. Do you know, in fact, that that was done?
A. I'm not sure.
Q. Who would have been responsible to take action on those recommendations?
MR. JACOBY: Object to the form of the question.
You can answer.
At Keating, Jack, or at KBJ?
MR. GROAT: At Keating.
THE WITNESS: At Keating, it would more than likely have been between Michael Sencindiver and likely -- more





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 126

likely, Sencindiver than Dennis, Dennis Martin.
BY MR. GROAT:
Q. Do you recall any discussions with Mr. Martin concerning the question of errors and omissions?
MR. JACOBY: It's a yes or no question.
THE WITNESS: No.
BY MR. GROAT:
Q. Do you recall any conversations with Mr. Sencindiver?
A. Sencindiver, yes.
Q. Do you recall any?
A. Yes.
Q. And what is that recollection?
A. Generally that I provided him with the list in the order of magnitude of what I believed to be costs that were attributable to design omissions or errors.
Q. And do you recall what that analysis concluded?
A. Concluded?
Q. Concluded.
A. It was just a summary of costs

Page 127

that we had incurred with our general contracting change orders.
Q. And what was the bottom line of that summary as far as the monetary impact?
A. I don't know. I don't recall. I'd have to have the document in front of me to be able to.
Q. Do you recall what the subject matter of the errors and omissions were?
MR. JACOBY: Object to form.
You can answer.
THE WITNESS: As I stated before, the subject matter were change orders which were incurred by Keating Building Corp. as general contractor, and I had broken it down into mechanical, electrical, different disciplines of the construction design.
BY MR. GROAT:
Q. What errors and omissions did you conclude impacted upon Palafox?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: I don't

Page 128

understand --
BY MR. GROAT:
Q. Was it --
A. -- the question. You have to rephrase that.
Q. Was it your conclusion that the architect had made certain errors and omissions?
A. Yes. And several of the details of the change orders, yes.
Q. And do you recall what the subject matter of those errors concerned?
A. Only generally, as I've testified earlier is, that I broke it down into the different disciplines, mechanical, plumbing, electrical. I don't have any recollection of any specific change order at this time without having a summary in front of me.
Q. Do you recall whether any of these -- whether this analysis concluded that the architect made errors and omissions relating to the provision for the use of vinyl wallpaper?
A. No, not during the construction

Page 129

phase. Not at all.
Q. Do you recall whether there were any conclusions regarding errors and omissions by the architect during the design phase relative to the use of vinyl wallpaper?
A. Not on the use of vinyl wallpaper, no.
Q. Do you recall whether you reached conclusions as to errors and omissions regarding moisture penetration into the building?
MR. JACOBY: Object to the form of the question.
You can answer.
During what time period, Jack?
BY MR. GROAT:
Q. During your entire contract.
A. Well, there was a concern with -- to get outside of that summary that I had prepared, which was during the construction phase based upon the construction documents, the vinyl wall covering was not an issue until post-construction when the





fb5a00a6-400f-4121-ba8e-7fe87b923ad1