Page 130

mold and mildew occurred. That was after GSA had accepted and taken over the building and began operating it.
Q. Are you aware of any claims regarding errors and omissions relative to the vinyl wallpaper?
A. There was no claim. There was concern that the vinyl wallpaper was the cause of the moisture in the mildew problem, the mold and mildew problem.
Q. Did you, or anyone else associated with Palafox, ever conduct any analysis to determine whether the architectural firm was negligent relative to the provisions for the use of vinyl wallpaper?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: No, not specifically. The only determination that we had was immediately after the discovery of the mold and mildew, we contracted Louis Newlan from Thompson Engineering to develop an assessment of what was the cause and what created the mold and mildew.

Page 131

BY MR. GROAT:
Q. Do you recall what your conclusions were regarding the order of magnitude of the impact of alleged errors and omissions?
MR. JACOBY: Object to the form of the question. I'm not sure it's been asked before, but I don't understand it, in any event.
BY MR. GROAT:
Q. Can you answer that?
A. I concur.
Q. Was your conclusion that errors and omissions impacted Palafox to the extent of $100,000?
MR. JACOBY: I think he testified previously, Jack, he had no recollection.
You can answer the question again.
THE WITNESS: I don't have a specific recollection of the amount.
BY MR. GROAT:
Q. Was it less than $100,000, if you can recall?

Page 132

MR. JACOBY: The witness is instructed not to guess.
BY MR. GROAT:
Q. Is it possible that it was more than $1,000,000?
A. No, it was not more than $1,000,000.
Q. Is it possible that it was more than $500,000?
A. No, I am pretty sure it was not.
Q. Is it possible that it was more than $100,000?
A. It's possible, but I don't have that summary in front of me.
Q. Now, let me invite your attention to what's been Bates marked as 05324, and ask you to look at that letter and identify who made the marks in the left-hand corner of that letter.
MR. JACOBY: And that page is part of exhibit number?
MR. GROAT: I'm sorry. The page is personally part of Exhibit Number 27. I believe this is a document you indicated had notations that might in some

Page 133

way be privileged.
MR. JACOBY: Yes.
The question on the table is who made the notations. If he asks you a question beyond that, I'm going to have you read the whole exhibit.
THE WITNESS: Could have been myself. Looks like it's notations that I may have made when I received the document.
BY MR. GROAT:
Q. I note that they're both small checkmarks and then a bold Magic Marker. Is this the matter in which you might have identified relevant portions?
A. Not specifically other than the bold does characterize a summary. And, you know, I'd have to read through the entire document to be able to determine whether I was -- I don't recall. I have to read the whole document to be able to give you a more accurate answer.
Q. Well, my question goes to, can you identify the likely source of the notations in the left-hand margin? And I would ask





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 134

you to answer that based upon the characteristics of the markings rather than any analysis of the text.
MR. JACOBY: He's only asking if you think you would have made them.
THE WITNESS: Yeah, I probably made these.
BY MR. GROAT:
Q. And from the document, can you identify whether those markings were intended to be transmitted to counsel or whether this was some analysis that you were performing yourself?
MR. JACOBY: In order to answer that question, I instruct the witness to read the entire exhibit.
THE WITNESS: (Complying.)
The question again was?
BY MR. GROAT:
Q. The question was, can you identify the purpose of those marks on what has been marked as KDC 05324.
A. I was just trying to make notes on what I perceived as being issues that we

Page 135

need to respond to.
Q. Who are you making those notes for?
A. For myself in order to draft a summary response letter, perhaps for Mr. Sencindiver.
Q. Now, what, if any, relation did the problems with the gutters have with the mold and mildew situation?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Would you repeat it, please.
BY MR. GROAT:
Q. What, if any, relation did problems with the gutter have -- gutters have with the mold and mildew situation?
MR. JACOBY: Same objection.
THE WITNESS: As far as I'm concerned, none.
BY MR. GROAT:
Q. And what do you base that conclusion upon?

Page 136

A. Because the gutter problem was -- occurred after the mold and mildew. And our consultants arrived that the mechanical system and the operations of the building were the result of it.
Q. I'm sorry, I couldn't quite --
A. The operation of the mechanical system --
Q. Right.
A. -- was the result of the mold and mildew. That was also a conclusion established by CH2MHILL.
Q. Do you recall whose responsibility the operation of the mechanical system was at the relevant points in time?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Yes, the GSA.
BY MR. GROAT:
Q. Do you recall whether the contract specifications provided for Palafox to provide operating instructions to GSA for the building?

Page 137

A. We do a turnover and we provide them with an orientation and operating instructions.
Q. Did you provide the government with operating instructions relative to the HVA system?
A. Yes. It's the HVAC system, and that was provided and the orientation was provided at the conclusion of the punch list phase.
Q. Do you recall whether an operating manual was provided specifying the manner in which the HVAC system should be operated?
A. Yes, the documents and the operations were provided.
Q. And do you recall what the instructions were with regards to the HVAC system?
A. No.
MR. JACOBY: Object to the form of the question.
BY MR. GROAT:
Q. Do you recall whether Palafox provided operation and maintenance manuals





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 138

specifying procedures to assure
satisfactory operation of the HVAC system?
MR. JACOBY: Asked and
answered. I'll let him answer it again.
THE WITNESS: We provided
them with the operation manuals to operate
the equipment. What is also in this
document that we disagree with which
represents some of my bold points is that
the GSA asserts in this one sentence here,
Keating's engineers are not only entirely
responsible for the mechanical design of
the building, but are also entirely
responsible for the initial setup of the
sequence of operations for the building.
The sequence and the operations of the
mechanical system are to be established by
the GSA's maintenance personnel.
BY MR. GROAT:
Q. Do you recall whether any
operation and maintenance manuals Keating
provided set forth the proper procedures to
set up the HVA systems as Palafox contends
it should have been set up?
MR. JACOBY: Objection to

Page 139

the form of the question. Asked and
answered.
You can answer it again. Do
you understand the question?
THE WITNESS: Yes, we
provided them with the operations and
maintenance manuals for the equipment.
Setting the devices and having operations
in sequence of the system's on/off or
cycling, or whatever, means of operating
the system were basically all part of the
operations by the GSA. The consultant that
also installed the control systems, Landis
& Staefa, also were meeting with the GSA
operations people. And that was all
configured and designed and developed by
the GSA.
BY MR. GROAT:
Q. Was Landis a Palafox
subcontractor?
A. Landis & Staefa was contracted
through the mechanical contractor. Landis
& Staefa was part of the system
specifications in the SFO, and then also
within our design and bid documents for the

Page 140

construction of the project.
Q. I'm sorry, perhaps I didn't
understand. Was Landis a subcontractor of
Palafox?
A. They were a sub subcontractor
through Palafox. KDC contracted KBC as
general contractor. KBC then hired Gulf
Coast Mechanical, of which Landis & Staefa
was a sub to, subcontractor to. They
provide the control system, which was
specified in the SFO.
Q. Did Keating undertake to have
Landis prepare or reprogram the HVA system
to address cycling operation which
allegedly resulted in the building's
depressurization?
MR. JACOBY: Object to the
form of the question.
Do you understand the
question?
THE WITNESS: No.
BY MR. GROAT:
Q. My understanding with regards to
the mildew and moisture problem is that
some of the experts concluded it was

Page 141

related, in part, to depressurization of
the building. Is that your understanding?
A. Yes.
Q. Did Palafox advise Landis to
prepare a proposal to reprogram the HVA
system to avoid what may have been referred
to as a cycling operation that allegedly
resulted in depressurization?
MR. JACOBY: Object to the
form of the question. At what point in
time are you talking about?
MR. GROAT: In late 1997.
THE WITNESS: I don't
specifically recall other than -- I don't
specifically recall. I'd have to see some
documents to remind me.
MR. GROAT: I'm not trying
to do a memory test. If you'd mark this
next in order.
(Whereupon, a document was
marked for identification as Exhibit 31.)
BY MR. GROAT:
Q. Let me show you Bates stamped KDC
00466, and invite your attention to the
very last lines on the first page and the

Page 142

paragraph which continues on the second page and ask if that refreshes your recollection.
MR. JACOBY: Actually, these are 466 and 467 then, the two pages?
MR. GROAT: Did I misstate?
MR. JACOBY: You just said 466. I just wanted to make sure.
THE WITNESS: Yes, we contacted them. And I'm not sure if it was myself or Chuck Vann that made the contact at Landis & Staefa.
BY MR. GROAT:
Q. And do you recall what, if any, action occurred then?
A. I'm not sure how it was administrated out in the field.
Q. Have you, personally, reviewed the operation and maintenance manuals relative to the operation of the HVAC units at the Pensacola courthouse?
A. No.
Q. Did you ever make an inquiry to determine whether operation and maintenance manuals provided for particular sequence of

Page 143

operations of those units?
A. No.
Q. Let me turn to the question of what's been identified in the claim as Item number 4, "Additional Lighting to Meet GSA Demands," and it appears at page 0431.
Are you, personally, familiar with the circumstances set forth in what is identified as Item number 4?
A. Yes.
Q. And what was the basis of your familiarity?
A. That I was involved with the construction phase and also with the post-construction phase of the issues.
Q. Did Keating conduct an evaluation of the lighting levels originally installed?
MR. JACOBY: At what point in time are you talking about?
MR. GROAT: Prior to the installation of additional lighting.
THE WITNESS: Did Keating do a what?
BY MR. GROAT:

Page 144

Q. An evaluation of the lighting levels.
A. There was evaluations done in the design phase, but during the course of the construction, the evaluation performed was by testing by the GSA during the punch list phase.
Q. Let me invite your attention to the third paragraph and stating that, "GSA required additional lighting supplementing its punch lists of June 16th through 20th, 1997 and sign-off inspections of July" 17th --
MR. JACOBY: 16th.
BY MR. GROAT:
Q. -- "16th, 1997 and July 24th, 1997." Now, did Keating ever conduct an analysis of the lighting levels in the building after the preparation of those punch lists?
A. An analysis? What was the --
Q. Did they conduct an analysis subsequent to the preparation of these punch lists?
A. Not that I can recall seeing the

Page 145

document of other than something that perhaps Chuck Vann may have done with our electrical contractor, which was just walking through the building.
Q. Does Keating contend that the lighting levels, as they were originally installed, met the contract specifications for the required level of illumination?
A. Yes. And in a form that the design was adhered to according to the SFO, the layout and the design of the lighting as well as the positioning in the ceiling plans was performed according to the specifications, and the installation of the fixtures that were specified were approved and reviewed by the GSA. So our assumption was that we met the requirements.
Q. Let me invite your attention to page 0512. This was a document that you prepared?
A. Yes, sir.
Q. And the annotations on the document were prepared by whom?
A. I wrote the document, and the notes on here appear to be Dan Koenig's

Page 146

response.
Q. Do you recall receiving this document?
A. Yes.
Q. Let me invite your attention to 0521 continuing on to 0534, and ask you to identify that.
A. What was the question, regarding 521 to --
Q. 0521 to 0543. My understanding is it's a document with attachments.
A. It's a summary of a -- it's a transmittal from GSA, Dan Koenig issued to me, with a summary of the light levels that were conducted, tests that were done on December 11th and 12th, 1997.
Q. Now, did Palafox ever investigate the conclusions reached -- the observations reached in this report?
A. I'm not sure of investigate. Mr. Vann, Chuck Vann, was in attendance during this walk-through from the content that I read on the transmittal.
Q. Is there a dispute that the light levels reflected in this report were, in

Page 147

some manner, incorrectly or improperly measured?
A. Yes. The dispute is that these light levels that were taken were also light levels that were available to be tested during the punch list phase in June. So these are light levels that are now being questioned four or five months later after GSA had operation of the building and accepted it for four months.
Q. So is it your contention that these light levels reflected at 0521 met the contract specifications?
A. Excuse me, on what date?
Q. Excuse me. The document starting at 0521, is it your contention that these readings reflect compliance with the contract specifications, or is it your --
A. No, I'm not --
MR. JACOBY: You have to let him finish his question.
BY MR. GROAT:
Q. Was it your contention that GSA waived compliance with the contract specifications because of its failure to

Page 148

identify this in an earlier punch list?
A. We were -- Keating was not operating the building for four months, so bulb replacements and issues like that were not under the control of Keating. We provided the building, we built the building, we designed it, and according to the SFO, we installed the light fixtures with our contractor and lamped the building.
This was done four months after the operation had been accepted and maintained by the GSA. So we didn't have any control over the relamping of any of the fixtures or the maintenance of the building at that time.
Q. Is it your contention that relamping of the fixtures or maintenance of the building would have resulted in the discrepancies noted in the government's transmission which begins at page 0521?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: I'd have to

Page 149

hear the question again.
MR. GROAT: Would you read the question back, please.
(Whereupon, the court reporter read back as requested.)
THE WITNESS: No. Could have. Could have had some impact on some of these, but not -- I'm not contending that relamping is the issue.
BY MR. GROAT:
Q. Then what is the issue?
A. That this testing was being performed four months after the punch list and review of the building was performed.
Q. Now, let me invite your attention to page 0544. Would you identify that document, please?
A. It's a conversation record which I had written to Dan Koenig.
Q. Okay. And what did you indicate -- would you read the first paragraph into the record beginning with "Based upon."
A. "Based upon your light level testing conducted on December 11th and 12th





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

of 1997, which was issued on December 22nd of 1997, we ordered those fixtures scheduled on our attached summary."

Q. Now, based upon your understanding, did Mr. Koenig have authority to order work outside the scope of the original contract?

A. My understanding was that he did have direction to provide that based upon his interaction with the other parties of the GSA and the other entities that were involved in the building.

(Whereupon, a discussion was held off the record between the witness and his counsel.)

MR. GROAT: Did you want to take a break?

MR. JACOBY: No, he just wanted to make sure as to the clarification.

BY MR. GROAT:

Q. Now, if GSA had provided the light level testing, which appears at page 0521, prior to the earlier punch lists, would it be your position that Palafox is entitled



to the compensation for doing that work?

MR. JACOBY: Did you understand the question?

THE WITNESS: You have to repeat it again.

MR. GROAT: Would you read it back, if you would.

(Whereupon, the court reporter read back as requested.)

THE WITNESS: If they would have performed -- they performed the light level test similar to what they performed in December. And that was done during the punch list phase during the walk-through in June. We performed and we added fixtures and we made alterations and relocated fixtures based upon their initial inspection in June. That was -- and all that work was completed and followed up during the punch list phase and installed.

This test was performed in December after the building had been furnished and four months after the building was in operation and controlled by the GSA.



MR. GROAT: Well, could you read back my original question, if you would, please.

(Whereupon, the court reporter read back as requested.)

THE WITNESS: This is a separate test that was done after the occupancy of the building. If you're asking a yes or no question, we performed and we made corrections to all the testing that was performed at the punch list time. This work was done -- this testing was done four months after the building had been turned over. There is differences in the conditions of the building at that point in time. It was under the operation of GSA for four months and the GSA and the affiliates had already furnished the building.

BY MR. GROAT:

Q. Well, you previously testified, I believe, that you didn't believe remolding would have resulted in the discrepancies alleged; is that correct?

MR. JACOBY: Objection to



the form of the question.

THE WITNESS: Could have in some of the instances. In other words, if a lamp is designed to be in there at a certain wattage, or lume, and it was replaced incorrectly in a different location, which we did not have control over, that was under the use and operation of the GSA at the time, we didn't have control of that. That would not be the sole source of the lighting tests that were done later.

BY MR. GROAT:

Q. Well, if the problem was relamping, why was Palafox's response to the discrepancies to install additional fixtures? Why wouldn't Palafox take, I assume, the less expensive course and simply, you know, make the correction or relamping that would solve the problem?

A. I didn't say that the sole source was relamping. You did.

Q. Well, you suggested that that could have been part of the problem; isn't that correct?

Page 154

A. I said that that could have been part of the problem. I think in your response to me, you were stating that that was the cause of the problem, why didn't we solve it by relamping.
Q. I said if it was the cause of the problem.
A. It could have been part of the problem. We did not have control of the building.
MR. GROAT: I guess if you could read back my original question, I'd appreciate it very much.
(Whereupon, the court reporter read back as requested.)
MR. JACOBY: If that's the question on the table, I believe he's given you his answer, maybe an answer you don't like, but his answer twice now.
BY MR. GROAT:
Q. Well, is it possible to answer that question yes or no?
A. No.
Q. Let me give you a hypothetical question. If you had been presented with a

Page 155

punch list -- presented with the document which appears at Palafox 0521 as a list of discrepancies with the punch lists, would Palafox have taken the position that those discrepancies were not valid?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: If it was done -- if the tests were done, which they were done in June, we took all the corrective action that was necessary in June.
MR. JACOBY: The question he's asking you, if the results in June had been the results shown beginning on 521 rather than the results that you were given in June, would you have done the work shown from these later tests without seeking reimbursement from the GSA for them; am I correct, Jack?
MR. GROAT: Yes.
THE WITNESS: Yes, we would have performed corrective work.
MR. GROAT: Fred, why don't

Page 156

we take a brief break.
(Whereupon, deposition stood in recess at 2:05 p.m.)
(Whereupon, deposition resumed at 2:58 p.m.)
BY MR. GROAT:
Q. Let's talk about plaster ceiling in the adjoining areas, page 0788. I'd like to turn to the damage question on this, and we can turn right to page 0791.
And who compiled the compilation of summary of costs for this claim?
A. I developed it with a spreadsheet and people that were involved and then passed it on to be reviewed by Mike Sencindiver, Dennis, and I believe counsel also was involved with the review.
Q. Okay. Now, for instance, let's go to line 1 where you put the grout ceiling deck voids Keating Building --
A. Grout cell deck voids.
Q. Excuse me. And there's a charge here to Keating Building Corporation, $7,101. Where would that information be

Page 157

derived from?
A. That information was based upon work that had to be performed to fill cavities that were along the metal deck and the wall within the cells. That was additional costs that were assumed by Keating Building Corporation.
Q. How do we know that to be the case?
A. How do we know --
Q. That these additional costs were incurred.
MR. JACOBY: I'm going to respond because I believe that your auditors came in and audited all of the backup and would have seen the backup information for these items.
Was there backup information, time and material?
THE WITNESS: Yes. As well as the work was a directive by the U. S. Marshals to fill those voids.
MR. GROAT: Well, you know, one, I understand you took the position that because information was available to

Page 158

the auditors, it wasn't going to be produced in response to discovery. And I'm inquiring as to this witness his personal knowledge regarding how the figure, $7,101, were derived.
MR. JACOBY: You'll understand that he doesn't have it verbatim.
MR. GROAT: I understand he doesn't have it -- I'm seeking the methodology that he utilized in compiling --
MR. JACOBY: Why don't you describe the documents that you referred to to come up with this --
THE WITNESS: Well, we had -- we generated for each cost event item, and the "CE" represents cost event. Those cost events were derived and I compiled data and documentation coming from the general contractor, Keating Building Corporation, costs that he incurred from the subcontractors in order to perform the work that was there. And normally, that was done either on a T&M or a lump sum

Page 159

quotation basis. And it was estimated by Chuck Vann and passed on, reviewed by myself and also by the GSA at the time.
BY MR. GROAT:
Q. Now, was this done personally by you or did someone else do this under your direction?
MR. JACOBY: Which aspect?
MR. GROAT: The derivation of the $7,101 figure.
THE WITNESS: That was developed by myself through the information that I had obtained on the record.
BY MR. GROAT:
Q. Now, this information was compiled for the specific purposes of this claim; is that correct?
A. This information here, yes, sir.
Q. And as far as how the information was derived, did you, personally, extract this from some database or information center, or did some accountant or other assistant go out and obtain the information and bring it back to you?
A. No, this was information that I

Page 160

was able to pull, it's a resource, from the costs that we had incurred on that particular event.
Q. Now, when you say -- if you could paint me a picture, what does "pulled" mean?
A. Excuse me?
Q. What do you mean by "pulled"?
A. I obtained the backup information from Chuck Vann as a resource of the cost that was incurred for grouting these from the general contractor. He had a change order with the subcontractors in order to perform this work.
Q. So mechanically, what happened? Did you go to Chuck Vann and ask him?
A. Yes. I would collect costs from him and he had the backup data for the costs.
Q. And so Chuck Vann would provide you information regarding the costs incurred by Keating Building Corporation?
A. That's correct.
Q. And you would put that into the claim; is that correct?

Page 161

A. Yes, sir.
Q. Now, for instance, we have line 4, janitorial services, Keating Building Corporation, $500. What would that figure refer to?
A. That was cleanup costs that were required after the work was performed. It was either done with laborers or an actual janitorial firm. I don't recall.
Q. And how would you have obtained that information?
A. Also from Chuck Vann based upon either hours or it was an estimated number of hours that were used by a laborer to clean up the area.
Q. Do you know whether these figures represent actual costs paid or whether they represent estimated expenditures?
MR. JACOBY: Which figures?
MR. GROAT: All the figures in claim 9.
THE WITNESS: Some may have been estimated, others are actual.
BY MR. GROAT:
Q. Is it possible to ascertain which





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 162

represent estimated figures and which represent actual figures from the claim?
A. Well, the only material costs that would be direct would be Item 1 and 2. 3 was based upon labor time and to prep and prepare the areas, and same thing with the janitorial services. So they may have been estimated hours and time that were provided by Chuck.
Q. Let's turn to line 5. How did you calculate the seven hours at $100 an hour claimed for that?
A. That was based upon calls and correspondence between Chuck Vann, myself and Mr. Bertino, and reviewing the correspondence involving this particular issue with him.
Q. Did officials of Keating Building Corporation, for instance, keep contemporaneous time records that would reflect the amount of time devoted to this particular item?
A. No. They were based upon the amount of correspondence and also review of the actual claim with them.

Page 163

Q. Would there be memorandum or notes reflecting the basis for these calculations?
A. I maintained a spreadsheet for every one and broke it down. I don't know if that was part of the documentation that you had before.
Q. Was that an electronic spreadsheet or was that a --
A. I think it was like an Excel or a Lotus spreadsheet, one of the documents we had before.
Q. I'm sorry, you indicated one of the documents --
A. One of the documents that I think was raised in a question before.
Q. Well, if you could, let me give you the exhibits and perhaps you could point it to me. I think there was a reference here to a spreadsheet and some documentation. Is it Exhibit 30 that you're referring to?
A. No.
MR. JACOBY: There were two or three pages attached at the back.

Page 164

MR. GROAT: I think master time sheet summary; is that the one?
MR. JACOBY: I don't know. There were two or three pages that were attached.
MR. GROAT: Let me show you what's been marked Exhibit 22 and ask if --
MR. JACOBY: Those are the sheets I recall seeing.
THE WITNESS: Right.
MR. GROAT: Do you mind if I look over the witness's shoulder since we only have one document?
MR. JACOBY: No, that's fine.
BY MR. GROAT:
Q. Can you just explain to me, are these the type of sheets you're talking about?
A. Yeah. This was the master spreadsheet that was developed for each claim and identifying the correspondence and the discussion for it.
Q. My eyes are to the point --
A. Well, this is obviously reduced,

Page 165

too.
Q. So there would be electronic documents that would reflect these calculations for each claim?
A. This is a spreadsheet that was prepared, yes.
Q. And this would be -- let me, for the record, state that this is KDC 04356.
And can you tell me what that is?
A. What it identifies is all the personnel that were listed along each claim. And here's the claims. These are the people that were involved, their rate and then number of hours that were estimated that they were involved with the discussions and correspondence.
Q. And you've pointed to KDC 04356. Are you also indicating now, I believe --
A. And these are just extended. These are summaries off of each one of these.
Q. By these, you're referring then to documents such as the document which is marked KDC 04357; is that correct?





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 166

A. Yes. And the others that are similar for each claim.
Q. Now, for instance, on KDC 04357, we have Dennis Martin, Esquire, president, hourly rate $125, total hours, 34. Who would have calculated that 34 figure?
A. That was an estimate that I had developed based upon the review of meeting notes and the documentation that they have reviewed pertaining to each claim.
Q. Did the individuals involved review your calculations regarding estimates of the amount of time spent on a particular --
A. Yes.
Q. Now, for instance, at 0751, if you could return to that again, there's an estimate here of .68 month. I believe that's the abbreviation.
A. .0 --
Q. I'm sorry. I'm looking at Palafox claim 0791. What does the ".68 MO" refer to?
A. That is a percentage of the monthly cost.

Page 167

Q. And what does that reflect?
A. That reflects the percentage of that particular month for the expenses incurred by the project manager and the project superintendent.
Q. And how was that figure calculated?
A. Gosh, I can't recall offhand.
Q. At this point, you can't recall?
A. I can't recall offhand, no.
Q. Did you attempt to calculate how long the project was delayed based on this work?
MR. JACOBY: Object to the form of the question.
THE WITNESS: I don't recall the project being delayed.
BY MR. GROAT:
Q. Is there anything that would refresh your recollection as to how this calculation was performed?
A. Perhaps.
Q. And what would that be?
A. I don't know if there was a -- could have been a memo or an exchange of

Page 168

correspondence deriving how to extrapolate the overhead costs that we were incurring.
Q. At this point, you're not aware of any such --
A. I'm not sure. It could have been based upon the time that was involved with this particular claim for that particular month. Again, I'm not certain how we developed that at this time. I'd have to review my notes.
Q. Was an attempt made to apportion the expenses with regards to other expenses that Palafox might have been incurring at the site?
A. Yes, that was the purpose of it.
Q. And can you explain -- have I refreshed your recollection as to what the number means?
A. Well, it's an apportionment, but I don't know how we specifically derived it at this time.
Q. Are there calculations that reflect this apportionment?
A. There likely could be with the backup of, you know, other documentation

Page 169

that developed -- I had when I developed these numbers.
Q. Now, let me return, for instance, to the breakdown of costs reflected in 0749, claim number 8. I'm sorry, Palafox claim page 0749. And ask if these calculations were performed in the same manner.
A. Yes, with the exception that I believe these costs with Reynolds were -- I acquired directly from Reynolds. The costs with Gulf Side Mechanical were obtained through Chuck Vann and our general contracting.
Q. Now, with regards to claim number 8, you have a PM living expenses. Did Palafox incur any additional expenses as the result of the requirement to add aluminum jackets to pipe insulation?
A. Yes, sir.
Q. Did Palafox incur any additional PM living expenses in connection with the requirement to add aluminum jackets to pipe insulation?
A. Yes, sir.

Page 170

Q. What additional living expenses?
A. Well, Chuck Vann was completed with the punch list work, and a lot of this auxiliary work that we're claiming here was performed after the construction phase was completed, after the punch lists had been completed and signed off. And the work attributable here to this claim prolonged Chuck's expenses on the project down in Pensacola.
Q. Now, which of the punch list work was completed last?
A. Which of the punch --
Q. Punch list work was completed last.
A. I don't know the specific punch list items. Punch list work was being completed during the phase of June, July and also in August.
Q. Did you perform an analysis to determine, for instance, whether Mr. Vann had to be in Pensacola to oversee the aluminum pipe jacket insulation work until the very end of the project, whereas some of the other work might have been completed

Page 171

at some earlier period of time?
MR. JACOBY: Object to the form of the question.
Do you understand it?
THE WITNESS: It's a little convoluted, I think, in what you're asking.
BY MR. GROAT:
Q. That's right. If you could answer it clearly, I'd appreciate it.
A. I mean, this is an apportionment of his time, evaluating and reasonably evaluating his involvement with having to deal with this particular issue and the claim and what would be reasonable to be reimbursed for his time and our cost with his involvement with this particular claim.
Q. Did Mr. Vann have to be in Pensacola to oversee the completion of all the punch list work?
A. It depends on the item. He could have perhaps made -- commute such as I was doing, but at that particular time when there were other claims such as we have here, principally the principal amount of

Page 172

his time and effort was attributable to the claim issues.
I'd like to add, in addition, a lot of this work that was being derived at the time were after the punch lists had been signed off and completed.
Q. Now, at page 0749, you have a telephone FAX expense. How did you calculate that?
A. That was just an estimated cost.
Q. And copy and reproduction?
A. Estimated cost.
Q. And UPS?
A. Same. I would assume that a lot of these costs were pretty low compared to what was incurred with all the correspondence and communication back and forth between the offices and with GSA.
Q. Now, when you use the calculation of, for instance, the hourly wages here, what figure did you use for wages? Is this the individual's hourly wage as paid by --
A. They were provided to me through our Accounting Department.
Q. Does this reflect the actual

Page 173

hourly wage of the individual or does this reflect the term sometime used loaded -- and I don't mean to use that in a pejorative term -- but a loaded figure that reflects --
A. Overhead and costs?
Q. -- overhead and other costs?
A. Yes.
Q. So the hourly figure reflects overhead and other costs associated with the individual?
A. The cost of that individual to the firm, yes.
Q. Let me turn to page 0660, please, and ask if you calculated the claims in the same amount in this case.
MR. JACOBY: Could you repeat the question, please.
MR. GROAT: Yes. I'd invite the witness's attention to page 0660 and ask if you calculated the claim in a similar manner in this case.
THE WITNESS: Yes.
BY MR. GROAT:
Q. Now, there's a line item here that

Page 174

talks about GSA approved costs. Can you explain what that represents, please?
A. Well, to the best of my recollection, there were damages that were incurred that had been reviewed with Mr. Koenig, and I believe that he had reviewed them also with members of the courts and perhaps Jim Marrs to the costs that were incurred of the damages that were incurred.
Q. Well, let me invite your attention to page 0656 and see if you can clarify what you're referring to by reference to that page.
MR. GROAT: And while we do that, I have to take a quick break.
(Brief pause.)
BY MR. GROAT:
Q. I had a question pending. I'm sorry, I left the room. I thought it might have been answered in my absence. I invited your attention to the approved costs line, and then asked you to refer to page 0656 and asked if that clarified the basis for this claim, this representation

Page 175

concerning a GSA approved cost.
MR. JACOBY: Object to the form of the question.
If you can answer, answer.
THE WITNESS: Yeah, it references Exhibit 7.6, which is in the documents that we've provided which includes a conversation record memo to Dan Koenig from myself with the summary of the costs that had been provided from Chuck Vann from Keating Building Corporation.
BY MR. GROAT:
Q. There's a reference in your claim to GSA approved costs. The references to approval is approval by whom?
A. These were reviewed with Dan Koenig at the site and also he may have also issued them. I'm not sure, at this time, if they were issued for review by Jim Marrs or any others involved with the work being performed by Tenmark and ADT. But they were considered to be reasonable.
Q. And where is that reflected in the documentation?
A. In what?

Page 176

Q. Is there any documentation that reflects that, in fact, GSA approved these costs?
A. I don't recall.
Q. Do you recall who had conversations with GSA representatives with regards to these costs?
A. I did with Dan Koenig.
Q. I see a lot of memoranda regarding these claims. Is there any memorandum reflecting GSA's approval of the submitted costs?
A. I don't recall. I'm looking through. Looks like later here, even in Exhibit 7.8, the costs had been updated and submitted again to Dan Koenig and copied to Jim Marrs. I don't believe there was any physical sign-off by Dan Koenig on these costs, because they were costs that he would have to then have approved to be reimbursed to Keating and back-charging Tenmark and ADT. And my recollection is that they would not accept those back-charges through the GSA from Keating Development or Keating Building Corporation

Page 177

or their subcontractors, that they denied that they -- they basically denied that their men had done those damages.
In fact, I think there was a letter later where there was correspondence where one of the members of the courts gave accolades to one of the subcontractors for their work, when, in fact, they really wrecked the building.
They destroyed the ceiling tiles when they were pulling their low voltage wires through, they were popping doors open and ruining the alignment of the doors, and we would have to go back and continually reset the doors and hardware and do a lot of additional work on Keating's behalf in order to get the building operational again after the damages that were incurred by their subcontractors.
Q. Now, was this based on reports that were made to you or your personal observation at the site?
A. Both. There were reports I was getting on a regular basis, if not several

45 (Pages 174 to 177)



fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 178

times daily, by Chuck Vann when I was not in town. And when I was in town, I observed it and we also went around and photographed and we have photograph documentation, much greater and video documentation of some of the damages that were performed.
Q. Now, was it your practice generally, when a significant event occurred on the project, to prepare a memorandum for the record documenting that event?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Most cases, I did write a memo to Dan, yeah.
BY MR. GROAT:
Q. Is there any memorandum in the file that's available to you here that reflects approval of the costs claimed by the General Services Administration?
A. No, other than the discussions that we had. He felt that they were reasonable. He reviewed them. He also

Page 179

witnessed the damages and reviewed the photographs, and had to take it back and administrated through to the courts. And I believe -- I don't recall the other entity that may have been involved with hiring and issuing the contracts to Tenmark and ADT. I believe ADT was probably with the Marshal Service. Tenmark's with the courts.
Q. To the best of your recollection, is it your contention that GSA, in fact, approved these costs?
A. They reviewed and felt that they were justified and valid.
Q. Who specifically reviewed the costs?
A. Dan Koenig with myself and Chuck Vann as well as with Jim Marrs from the courts.
Q. And what specifically was said regarding the costs?
A. That they believed that they were reasonable and that we had incurred the costs due to the damages performed by their subcontractors.
Q. And when would this conversation

Page 180

have occurred?
A. Sometime during the process of the documents that you have here.
Q. Would it have been your typical practice to make a memorandum for the record to record such a conversation?
A. Typically, I don't believe that I prepared such a document on this case because it needed to be reviewed and approved. It had to be approved and back-charged through the courts. Quite frankly, Dan Koenig did not have the authority to reimburse us for the costs. He had to go on back-charging, assess that through the contracting parties, to Tenmark and ADT, to back-charge them.
Q. So is it fair to say GSA didn't approve the costs?
A. GSA reviewed the costs and felt that they were reasonable and the costs had been incurred.
Q. Let me turn to claim number 6 at page 0601 and I'd ask you, did you calculate the summary of costs for this claim in the same manner as the other

Page 181

claims that we've discussed?
A. Yes.
Q. Let me turn to claim number 5 at page 0553, and ask if you calculated the summary of costs for what's marked as claim number 5 in the same manner as the claims that we've discussed.
A. Yes.
Q. If you could turn to page 0431 of what I've marked as Palafox's claim, and there may be a problem here with -- that will be in Volume 1, yes.
A. On that back light one, the last one, we only assessed the premium costs. There were costs that we had performed ourselves in trying to rectify or help solve the problem which were not in the claim.
MR. JACOBY: What's your number there?
MR. GROAT: I referred him to page 0431.
MR. JACOBY: Additional Lighting?
MR. GROAT: Yes. And then

Page 182

I'd also like him to refer to page 0438 and ask if he calculated the claims as to claim number 4, Additional Lighting, in the same manner.
THE WITNESS: Yes, sir.
BY MR. GROAT:
Q. Now, with regard to the claims that we've been through, I'd like to address Palafox's accounting system. Are you familiar with the accounting system Palafox had in place --
A. No.
Q. -- at this point in time?
A. (Indicating in the negative).
MR. JACOBY: You have to answer yes or no. You can't shake your head.
THE WITNESS: I said no.
BY MR. GROAT:
Q. Did Palafox have an accounting system that allowed it to track costs of the particular claim items, to the best of your knowledge?
A. You mean, did they have an accounting system to track the claim costs?

Page 183

Q. To track particular claim costs.
A. No. That is the reason why I provided and demonstrated with this document here that there was an estimate that was done.
Q. Okay. As a project manager, could you have directed that actual records be kept of the actual costs incurred relating to a particular claim item?
MR. JACOBY: Object to the form of the question.
THE WITNESS: I don't believe so, because the claims were not claims until we realized that we were going to be stuck with the costs and have to rectify them. I would have had to recognize that we were not going to be dealt with fairly and reasonably during the course of the -- at the beginning of this. I mean, we felt that we were really trying to correct the situation.
BY MR. GROAT:
Q. Assuming that you were directed to perform work which you regarded as outside the scope of the contract, could you have

Page 184

directed that a cost code be created and maintained that would have tracked the actual expenditure of costs?
MR. JACOBY: Object to the form of the question. Are you saying for Palafox or KDC, because there's a difference?
MR. GROAT: Let me go for both.
BY MR. GROAT:
Q. Could Palafox have tracked the actual costs incurred on a particular claim item?
A. Could have always assumed that there could have been a procedure to have done that. But at the time, it was not performed. You know, I'm not familiar with the accounting system. It was not something that I would have been able to direct or be able to identify each of the issues, because the issues were being derived by the GSA during the course of the post-construction phase.
Essentially, we considered the project to be -- and the obligations to

Page 185

be completed until we were notified of additional issues here.
Q. Well, for instance, turning to page 0431, this is item number 4, the Additional Lighting to Meet GSA Demands. As I understand it, you contend that the government's submission of a punch list of light levels on 12/23/97, and that's at 0521, directed you to do work outside the scope of the contract; is that correct?
A. Yes.
Q. Would it have been possible for you -- actually, I guess we have several people. Could Palafox, KBC and KDC have tracked the actual costs incurred to make these corrections?
MR. JACOBY: Object to the form of the question.
THE WITNESS: I don't think so.
BY MR. GROAT:
Q. Upon what do you base that response?
A. Because at the time, we didn't realize that we would be elevating it into





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 186

a claim and not be reimbursed.
MR. JACOBY: Jack, so I understand, because you asked him a question before, and I think he's confused, to me anyway. Are you comparing things like project manager time with, as an example on page 438, direct charges for Hardy Electric and things like that? I'm confused because I'm not sure --
MR. GROAT: I think what they have done is tracked direct charges in some cases and haven't in others.
MR. JACOBY: Well, why don't you explain -- what's your basis for that statement? I know you're not here to answer questions, but --
MR. GROAT: Well, I'm told here that we have, in some cases, estimates of the amount of time spent.
MR. JACOBY: Okay. But the estimates -- as I said, you need to make a distinction because he's already testified that KBC provided him with direct costs, either T&M or lump sum, for third party costs. In the case of 438, I guess that

Page 187

would be Hardy Electric, maybe architectural supplies, I don't know what else. So this testimony's gotten very confusing and muddled, and I want to make sure we don't lose sight of that earlier testimony.
MR. GROAT: Let's be specific.
BY MR. GROAT:
Q. Again, on page 0438, we have --
MR. JACOBY: Hang on a second. Why don't you get it in front of you.
THE WITNESS: 0 --
MR. JACOBY: 438.
BY MR. GROAT:
Q. For instance, laborer, 4.0, would that have been a cost directly tracked by Keating Building Corporation or would that represent an estimate?
A. For this particular work, it was an estimate from Chuck Vann based upon the hours that were incurred.
Q. And my question goes, for instance, for laborer cleanup. Would it

Page 188

have been possible to track those actual costs and time records when you realized that -- you realized when you received the direction that you would contend it was outside the scope of the contract; is that correct?
A. Correct.
Q. Now, would it have been possible to track the actual costs incurred by Palafox, KBC and KDC in connection with this alleged additional work?
MR. JACOBY: Again, you're jumping around. You asked him about the laborer for cleanup a minute ago, now you're going to the alleged additional work, and he's already testified that Hardy Electrical, Architectural Specialties was tracked specifically with a change event.
MR. GROAT: Okay.
BY MR. GROAT:
Q. Is that true in this claim, that there would be three items that would have been tracked specifically as to this event, Hardy Electric, Acoustic and Architectural Specialties?

Page 189

MR. JACOBY: Walk through both pages. There's more than one page. Actually, there's three pages.
THE WITNESS: The question is which are direct costs?
BY MR. GROAT:
Q. Which are direct costs incurred? That might simplify it.
A. Similar to the other claims that we've discussed is that where there is actually a contractor referenced such as Hardy, Acoustic, Architectural Specialties on page 438, and then on the subsequent page, on 439, where we have a cost incurred from Reynolds Construction, those were costs that were directly incurred from subcontractors.
Q. Now, as to the costs not directly incurred regarding subcontractors, would it have been possible to track the costs allegedly incurred as the result of the government's alleged direction to correct the problem?
A. I don't think it would have been possible or practical with all these claims





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 190

and issues with respect to this project.
Q. Do senior officials at Palafox keep contemporaneous time records?
A. I don't know.
Q. Did you keep contemporaneous time records by issue?
A. By issue?
Q. Yes.
A. No. I was involved with all the issues. I didn't keep contemporaneous time records until I did the summary which you reviewed.
Q. Now, with regards to the gutter installation at the Pensacola courthouse, I'd invite your attention to what's been marked as Exhibit 29, specifically page KDC 05396, and ask you to review that.
A. What was the question again?
Q. Let me review the document, if I may.
MR. GROAT: Could you read the question back, please.
(Whereupon, the court reporter read back as requested.)
BY MR. GROAT:

Page 191

Q. Have you had a chance to review it?
A. Yes.
Q. Were the gutters actually installed at the Pensacola courthouse installed in a manner as provided in the specifications and drawings approved by the architect?
A. Yes.
Q. Were there field changes made in the installation of the gutters?
MR. JACOBY: At what point in time?
MR. GROAT: In the course of their installation.
THE WITNESS: I'm not certain.
BY MR. GROAT:
Q. May I have the exhibit back, please. I'll try to keep this package together. Thank you.
Let me invite your attention to what was marked as page KDC 05336, which is part of Exhibit 18, and ask you to review that. And this goes with the front

Page 192

page of that, if you would.
MR. GROAT: I believe this is one of the disputed documents and I don't think this was a disputed item in the document. Are you directing him not to answer any questions regarding that particular document?
MR. JACOBY: I have the same reservation I had before. I'll let him testify to it; however, I'm concerned that to the extent that the question you posed and the issue you raise was initiated from what I believe is a privileged communication, I reserve the right later to move for a motion in limine. It's the same qualification as before.
MR. GROAT: I have no objection to your moving for appropriate relief, but --
MR. JACOBY: I'm reserving my right that this isn't a waiver to the privilege. Do you have a question you want to ask him?
MR. GROAT: Yes, I do.
BY MR. GROAT:

Page 193

Q. What's your understanding regarding the controversy expressed in the letter that I've asked you to review?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: The contractor was concerned with fastening the gutter through the bottom, which was identified, I believe, on one of the contract drawings that they had later received. And in particular, because if you were to penetrate the bottom of the gutter, you would actually be penetrating the gutter liner and potentially creating a leak point. And since the gutter was located on top of the wall, then there would be a possibility or potential over time to be a cause for a leak. And that was one of the connections that this contractor did not wish to perform.
BY MR. GROAT:
Q. Was there a controversy with regards to the gauge of sheet metal to be used?

Page 194

MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: A heavier gauge gutter? What was the question?
BY MR. GROAT:
Q. Well, was there a controversy regarding an appropriate gauge of metal to be used in the construction of the gutter?
MR. JACOBY: Same objection.
You can answer.
THE WITNESS: I don't believe there was controversy. I just reviewed these and I don't see anything in here that says that there was any kind of a controversy on the gauge of the gutter.
BY MR. GROAT:
Q. Do you have any recollection of a controversy?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: None that I recall.
MR. GROAT: Now, this is one

Page 195

of the documents that you want to take and call back, and what I want to do is ask the witness to identify only the addressees and the info addressees shown on the document in the interest of moving things along --
MR. JACOBY: That's fine.
This is Exhibit 17. You want to ask him about the first page?
MR. GROAT: You're exactly right.
MR. JACOBY: KDC 03063.
Okay. Fine.
BY MR. GROAT:
Q. Sir, would you please identify all the addressees and the info addressees on this memorandum?
A. Okay. Fred Jacoby is counsel next to me. Dennis Martin is the -- was then the president of KDC. Michael Bertino, VP or Keating Building Corporation. Tim Clippinger was the project executive for Keating Building Corporation. Dan Dirscherl was later the VP of operations for Keating Building Corporation.
At the bottom, I have

Page 196

initials for Tim Clippinger, Mike Bertino.
Q. Could you identify each individual's affiliation as we go along?
A. Yeah. I'm repeating some of the ones that were on top.
Q. I see.
A. J. Mullen, I'm not sure who that is on the bottom here. Al Bonavito, he was the mechanical estimator, and Igor Beanstock was the project manager for Cosentini, our mechanical engineer under KBJ Architects.
MR. JACOBY: In that case, I withdraw my objection for privilege.
It's your testimony that this gentleman here from Cosentini got a copy of this conversation record?
THE WITNESS: Maybe not with these markings. There may have been one prior.
MR. JACOBY: Why don't you look at it and let us know since I'm sure Mr. Groat would like to know.
MR. GROAT: I'm sure Mr.

Page 197

Jacoby wants to know, too.
MR. JACOBY: Just simply stated, to the extent --
THE WITNESS: Igor Beanstock was copied on this.
MR. JACOBY: Okay. Then I withdraw my privilege objection to this document.
BY MR. GROAT:
Q. Now, if I can draw your attention to the annotations on the contract provisions. I don't have a copy of the document in front of me, but I believe you'll see on the left-hand side of the page as to the contract specifications, you'll see annotations. Is that the case in this copy? There's several copies of this document. I believe you're looking at the right page now. It starts, I think, at page -- it includes specifications 312 of jackets, and I'd ask who made the marginal notations.
A. Your question is who made that notation?
Q. Yes, who made those notations?

Page 198

A. That is my notation. That's my handwriting.
MR. JACOBY: Jack, do you have a third one next to -- it says CE 356, is that your notation?
THE WITNESS: Yes, sir.
MR. JACOBY: Okay.
BY MR. GROAT:
Q. Let me retrieve that exhibit, if I may, please.
Let me invite your attention to Exhibit 15, which is Bates stamped KDC 04029. And what I'd like you to do is go through again, if you would, please, and identify all the addressees and info addressees.
MR. JACOBY: Identify the people up top first and then the people down below.
THE WITNESS: Same as before. You had Fred Jacoby, our counsel; Dennis Martin, president of KDC. And on the notes below, it included Tim Clippinger, Mike Bertino, Dan Dirscherl, Mike -- MVS is Mike Sencindiver. I have

Page 199

down there DM for Dennis Martin, Fred Jacoby, as well as Rick Frazier from Reynolds Construction.
MR. JACOBY: Withdraw my privilege on that document.
Is it your testimony that a copy of that document was sent to Mr. Frazier?
THE WITNESS: Yes.
MR. JACOBY: I withdraw my privilege.
BY MR. GROAT:
Q. Now, I invited your attention to a letter from Specialty Contractors regarding what I described as a possible controversy in the specifications. Do you recall any change in the specifications as to the gutters?
MR. JACOBY: At what point in time?
MR. GROAT: During the course of construction.
THE WITNESS: There were -- the only thing I recall is the issue that I discussed earlier was the attachment

Page 200

concern. I'm not -- I can't specifically recall any changes in the specs. That was being administrated between Chuck Vann and Chris Bolt in constructing the building.
BY MR. GROAT:
Q. Let me invite your attention to what's been marked as KDC 04038, and if you to review this October 3rd, 1996 letter, please.
MR. GROAT: Off the record.
(Whereupon, a discussion was held off the record.)
THE WITNESS: And the question again?
BY MR. GROAT:
Q. The question was, I asked you to review the letter that I referenced.
MR. JACOBY: That's the one. Okay.
BY MR. GROAT:
Q. Have you had an opportunity to review that letter?
A. Yes.
Q. What does that letter concern?
A. It's a letter from Specialty

Page 201

Contractors to Joe Striviri, who was the project manager during the bid phase.
Q. And what does the reference refer to to the gauge of sheet metal?
MR. JACOBY: Object to form.
You can answer.
Read the entire letter.
THE WITNESS: "I recently received a letter" --
MR. JACOBY: I don't want you to read it out loud.
BY MR. GROAT:
Q. My question was, have you had a chance to review the letter?
A. Yes.
Q. And my question is, to what does the reference regarding the gauge of metal refer?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: That there was a clarification that was trying to be made between Specialty Contractors and Joe Striviri on the gauge of the aluminum.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Don Bitterlich May 17, 2006
Philadelphia, PA

Page 202

BY MR. GROAT:
Q. Were you aware of that exchange in any way?
A. Not during this period of time, no.
Q. Did you ever become aware of that exchange?
A. Yes, because I got a copy of this later.
Q. And what was the ultimate resolution of that issue?
A. I'm not sure.
Q. Who would be the person at Keating's entities to best know what was the resolution of the issue?
A. Well, from what I'm reviewing the other documents, it appears that the gauge of the aluminum -- it says here the gauge of the aluminum for the roofing system is .032. So it was actually identified within the content of the contract, Exhibit A, issued by Keating Building.
Q. So the issue was resolved based on -- you referenced a specific page, and unfortunately, I don't have a copy of it in

Page 203

front of me. It was resolved with reference to what?
A. KDC 04034.
Q. And what was that resolution?
A. It identifies the gauge of the aluminum to be used.
Q. When you're completed reviewing the document, if I may see it, I'd appreciate it.
Can you explain why, as stated in the October 3rd, 1996 letter, sheet A113 calls for gutters and hangers to be of .50, whereas --
A. Is that .50 or .05?
Q. .050. Excuse me. And was that matter ever resolved?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: I thought I answered that previously. I was not involved with the coordination between Joe Striviri and Specialty during the writing of that contract.
BY MR. GROAT:

Page 204

Q. Do you know whether the gutters installed were .050 or .032?
A. I don't know other than what I'm reading right there in that document.
Q. Let me show you what's been marked Exhibit 14 and Bates stamped KDC 02724. This is one of the documents on which privilege is claimed, and just ask you to explain the note at the bottom left-hand of the page.
MR. JACOBY: Jack, you're referring to the note here?
MR. GROAT: I wondered if that, per chance, were another direction to send this to somebody. I don't know and just ask if you could explain.
MR. JACOBY: Well, why don't you just explain what these notations are.
THE WITNESS: The note is that I put this into the file for cost event number 332, and then copied it to TC, Tim Clippinger, MSB, Mike Bertino, and DD is Dan Dirscherl.
BY MR. GROAT:

Page 205

Q. Could you explain the organization where those individuals are associated?
A. Keating Building Corporation.
Q. Let me show you what's been marked as Exhibit 13 and Bates stamped KDC 04344, and ask you to identify the addressees and info addressees on that memorandum.
A. We did this one already.
MR. JACOBY: No, they're all the same.
MR. GROAT: Just looks the same, I think.
MR. JACOBY: Answer his question.
THE WITNESS: Fred Jacoby is counsel; Dennis Martin is president of Keating Development Corporation; TC is Tim Clippinger with KBC; MSB, Mike Bertino, vice president, KBC; Dan Dirscherl, vice president of operations, KBC. Then I have DM, that's Dennis Martin with KDC; Mike Sencindiver. Fred Jacoby, file of CE 366 and Rick Frazier with Reynolds.
MR. JACOBY: So a copy of this was sent to Rick Frazier at Reynolds?

Page 206

THE WITNESS: Yes.
MR. JACOBY: I withdraw the privilege.
MR. GROAT: Thank you.
BY MR. GROAT:
Q. Let me show you what is marked Exhibit 12, Bates stamped KDC 02734, and ask you to identify the info and addressees on this document.
A. Fred Jacoby, counsel; copy to Mike Sencindiver, Dennis Martin and file cost event 332.
Q. May I retrieve the document.
Entirely predictable question, let me show you Exhibit 11 and ask you to identify the individuals and organizations of the addressees.
To speed this examination up, will you identify any individuals --
A. Are there any new ones?
Q. Not any new ones. Any that are not directly associated or employees of Keating or its entities.
A. No.
MR. JACOBY: Or Cozen.

Page 207

THE WITNESS: No. PC is Pete Cocchia who is a VP of Finance. Pat Braia was the controller. JM, I don't recall.
BY MR. GROAT:
Q. I'm sorry, JM is?
A. JM, I don't recall. Could have been an accountant involved with the project.
Q. Would it have been someone associated with Keating in this case?
A. Oh, yes, sir.
MR. GROAT: I'd like to take a break, so five or 10 minutes, if you would, and we'll get right back.
(Whereupon, deposition stood in recess at 4:25 p.m.)
(Whereupon, deposition resumed at 4:40 p.m.)
BY MR. GROAT:
Q. Let's turn to page 0145, Remediation of Mold and Mildew, Exterior Wall Systems.
A. Zero what?
Q. 0145. And I'd ask you whether you

Page 208

calculated the costs and the summary of costs on this page in the same manner as you did for other costs which we've previously discussed.
A. Yes.
Q. Now, did you have the opportunity to personally review the condition in the building after the discovery of mold and mildew?
A. Yes.
Q. What, if anything, did you observe?
A. I arrived at site and walked to the locations where there was mold and mildew.
Q. Approximately how many locations were there mold and mildew?
A. I can't -- in virtually all the rooms which had vinyl wall covering on the exterior wall. More apparently, though, on certain walls or in certain elevations of the building.
Q. And do you have an estimate of the number of rooms in which there were mold and mildew based on your recollection?

Page 209

A. I'd have to look at my summary. Maybe -- it was probably over 15, somewhere between 15 to 20, somewhere in that range.
Q. Did you have the opportunity to review the building during the remedial measures taken for mold and mildew?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Excuse me. I'm sorry. Did I have a chance to review --
BY MR. GROAT:
Q. Sure. Did you have an opportunity to view the building during the course of the measures taken to remediate the mold and mildew?
A. Yes.
Q. And what did you observe?
A. I observed the work being performed, removal of the vinyl, and in many cases, sometimes removal of the wallboard, the drywall, and the replacement. Some of it was the treating of it with the solutions that were





fb5a00a6-400f-4121-ba8e-7fe87b923ad1