Page 210

required.
Q. Do you have an opinion as to whether the scope of the work would have been disruptive to the occupants of the building?
MR. JACOBY: Object to the form of the question. To the people occupying the building at that time?
MR. GROAT: Yes.
MR. JACOBY: I'll object to form, but you can answer.
THE WITNESS: In some of the locations where we had to remove the drywall. Others, other locations where we were just peeling it off were just a matter of aesthetics.
MR. GROAT: I have no further questions subject to reopening on the basis of a showing of cause based upon the privilege list questions and the privileged document questions.
MR. JACOBY: Just so we agree on what were talked about, there's two issues here. One issue has to do with your reservation of your rights dependent

Page 211

upon the documents we identified in our privilege log and whether the privilege attaches; and number two, with respect to the issues between us regarding privileged documents that we inadvertently produced to you and then I've instructed him so far not to respond to questions on?
MR. GROAT: That is correct.
MR. JACOBY: Okay. I just have a couple questions for you, Mr. Bitterlich.
BY MR. JACOBY:
Q. Do you recall previously you were asked about the conversation that you overheard between Mike Sencindiver and Dan Koenig in October 1996?
A. Yes.
Q. First of all, do you recall with respect to that meeting how soon prior to that meeting you had overheard Mr. Koenig speaking to someone who you believed was with the government regarding the intention of the GSA as to the options, the extensions?
A. Prior to the meeting that day was

Page 212

15, 25 minutes prior to the meeting time.
Q. I'm not sure you understand my question.
Did you hear Mr. Koenig's conversation with a third party the same day you sat in the room with Mr. Sencindiver and listened to his conversation with Mr. Koenig?
A. No. That was the day prior.
Q. And you were in Florida the day prior to that?
A. Yes.
Q. Okay. Now, was Mr. Sencindiver speaking with someone in person or was it a telephone conversation? I'm sorry, was Mr. Koenig.
A. No, that was a telephone conversation.
Q. So you were overhearing his side of a telephone conversation?
A. Yes.
Q. And do you recall about how long that you overheard that conversation? The part that you listened to, how long was that, do you think, about?

Page 213

A. Maybe a minute or two.
Q. What did you do after you heard that conversation?
A. I contacted -- I gave a call to Mike Sencindiver in Philadelphia.
Q. Was he there when you called?
A. Yes, he was.
Q. And what is it that you stated to Mr. Sencindiver?
A. That I overheard Dan Koenig having a telephone conversation with someone in regard to the terms of our lease agreement, and that he had made mention that there was not -- that the GSA, or whoever he was speaking to, would not renew their lease after 20 years.
Q. What was Mr. Sencindiver's reaction to the conversation you related to him?
A. He was pretty upset by it because his understanding was that the renewal options were going to be applied.
Q. And then you returned to Philadelphia that night?
A. Yes, I did.





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 214

Q. And do you recall what time of day it was that Mr. Sencindiver spoke to Mr. Koenig?
A. With my schedule, it's late morning. It had to be between 10 and 11.
Q. And I think you've testified previously that Mr. Sencindiver was not speaking with Mr. Koenig on a speakerphone, he was speaking with him on a hand-held phone?
A. Correct.
Q. So you didn't hear anything that Mr. Koenig said; correct?
A. No, I did not hear.
Q. But did you sit there during the entire conversation?
A. Yes, sir.
Q. And again, you're listening to one side of a conversation. What was your sense as to what Mr. Sencindiver gleaned from Mr. Koenig regarding the intentions of the GSA regarding the renewal options?
A. That through that conversation, he had confirmed that it was not the government's intent to renew the lease

Page 215

after the 20-year period.
Q. Okay. Do you recall how long that conversation was?
A. Not very long. Maybe around 10 minutes.
Q. Okay. Now, just one other topic. You were asked questions previously regarding the additional lighting. Do you recall?
A. Yes.
Q. And you had testified that one of the issues might relate to the relamping of the light fixtures?
A. Yes.
Q. And possibly that might explain, among other things, the differences in the test results?
A. Yes.
Q. Were there any other reasons that you can attribute to it, to the difference in test results?
A. Well, I was present at the time when we did the original testing, and what I was informed, since I wasn't present for the second testing, I had recalled from a

Page 216

phone conversation with Chuck Vann that a lot of the testing was being done with a meter and they were holding the meter in certain areas of the room that, for example, where you could see shadows on the wall, perhaps remote areas of a particular room which would record a lower level of lighting.
Q. Did Mr. Vann object to that practice? Did Mr. Vann indicate to you that he objected to that practice?
A. Oh, yes, that it was not being done in the same manner that it was performed when we did the punch lists.
Q. And who did he object to?
A. I can't recall if he made comments to the people that he was with at the time, which I believe was Dan Koenig and Jim Marrs, but he related it to me through the telephone conversation that it was not being done in a consistent manner, and that he was pretty concerned or upset by it. That it was kind of a -- it was being performed in a manner to establish lower levels than what had been tested prior.

Page 217

Q. Did you ever relate Mr. Vann's comments to you to anyone at GSA or the court system?
A. Yes. I was -- I discussed it with Dan Koenig later, and it was also my understanding as well as with Chuck Vann in conversation that this additional testing was done on the basis that they had accepted the building, they were operating the building. When I say, "they, that's GSA.
And at that particular time, the courts had not taken -- had not occupied the building because there were still issues outstanding with their completion of the communication system as well as the security system. And that that could have been really the basis for a lot of these issues being developed further and further and further, that there was reason not to occupy the building because, you know, there were damages. And we got into acoustic panels and we had the mold and mildew. And now there's another lighting issue developed after we had done the punch





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 218

list work, done the testing, and now we retested.
Q. How would you describe the relationship between Keating on one hand and the courts and the GSA on the other during the time period what you described as the post-construction time period?
A. Describe the relationship?
Q. Yes.
A. It was cordial, but at that point in time, it was also a bit contentious only because of the fact that the subcontractor work had not been completed.
Q. The subcontractor work --
A. Subcontractor work by the courts for the communication system and the security system, which also needed to be completed in order for them to occupy the building.
Q. Do you recall when the judges first occupied the building?
A. I don't believe they occupied until sometime after March the following year, which may have been '98.
Q. And these various issues that were

Page 219

raised with respect to punch list and with respect to acoustical panels and the mold and mildew, were they used as bases by the GSA to withhold rent from Keating?
A. Yes.
Q. Okay.
MR. JACOBY: I have no further questions of this witness.
MR. GROAT: Just two points for the record. I've been thinking about your general fraud allegations and, you know, I'm considering the possibility of identifying Judge Vincent as a potential witness, just to tell you.
MR. JACOBY: Sure.
MR. GROAT: You smile when I say that. And the second point would be I'd ask that we agree to some schedule on the record as to your proposing a call-back of these. Now, I don't know what's reasonable, and whatever you suggest, but I think in an effort to formalize things, it might be a good idea -- if you want to take a break and discuss it off the record, or whatever, but I think it would be a good

Page 220

idea if we put a date down when we could expect a request to call back documents --
MR. JACOBY: Well, we have two problems. One is the call-back of the documents identified today, and the other is how to identify the other documents.
MR. GROAT: You're exactly right.
MR. JACOBY: And my sense still tells that me, you know, you mentioned you thought there were around 100 documents or more. So my first question to you is, if you've identified 100 documents or more, those are 100 documents that you could identify for me by Bates number so I could check to see whether I felt that they were privileged.
MR. GROAT: Yours aren't Bates.
MR. JACOBY: Okay. Well, then in that case, I would ask you to make copies of those 100 documents and let us look at them, and we could do that very quickly.
Second of all, to the extent

Page 221

that there's a concern that there are additional documents you haven't identified that are privileged, then I would propose, but I need to talk with my client and counsel in Washington, that I go to wherever these documents are located and go through the documents and/or have someone else go through to see if there's any other documents that were produced we believe are privileged. But certainly those 100 documents we can look at pretty quickly and give you an answer like we did today.
And then once we would do that, we would follow the appropriate motion with the Court, in addition to our desire to get all of -- certainly all of Ms. Curran's records pre-litigation, which we are continuing to press for. We will press for all of them. I'm not going to just satisfy myself to go fishing and hope I get a letter.
MR. GROAT: Well, my suggestion would be that we attempt to do both informally. There's some possibility I may have a copy of these documents on a





fb5a00a6-400f-4121-ba8e-7fe87b923ad1

Page 222

CD which we might be able to make available, which would simplify things. And we'll take a look at the question of providing the documents --

MR. JACOBY: You know what I'm talking about. I mentioned to you at the break.

MR. GROAT: Yes.

MR. JACOBY: Certainly to the extent that you may want to call Judge Vincent as a witness, I'm assuming you'll also be calling Ms. Curran as a witness; I would hope so. And if you're going to tell me you're not, I'd like to know that sooner rather than later. We certainly want to take her deposition, but we can't do that until after we get the disclosure of her files with respect to the period prior to the claim being submitted.

MR. GROAT: Okay. We'll take a close look at the question of, you know, her files and I'll get back to you.

MR. JACOBY: And I also repeat my request again, as you did with Mr. Fleming, if you're prepared to provide

Page 223

to me an affidavit for Ms. Curran to the effect that she never received and there was no first donation agreement signed.

MR. GROAT: Okay. You can request.

MR. JACOBY: I would like to see that under oath.

MR. GROAT: Okay. Thank you very much.

(Whereupon, the deposition concluded at 4:58 p.m.)

__________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ________

day of ____________________, 20__.

________________________
NOTARY PUBLIC

My Commission expires:

Page 224

CERTIFICATION

I, TERESA M. CATULLO, a Certified Shorthand Reporter and Notary Public, do hereby certify that I reported the deposition of DON BITTERLICH, in the above-captioned matter; that the said witness was duly sworn by me; that the foregoing is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter.

I FURTHER CERTIFY that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel in connection with the action, nor financially interested in the action.

__________________________
TERESA M. CATULLO, CSR, RPR

DATED: ________________
CERTIFICATION NO. XI01943

**U. S. Department of Justice**

Civil Division
Phone: 202-616-8260
jack.groat@usdoj.gov

JSGroat
154-99-898

*Washington, D.C. 20530*

July 26, 2006

By Electronic Mail and First Class Mail

Herman M. Braude, Esq.
Michael A. Lewis, Esq.
Braude & Margulies, P.C.
1200 Potomac Street, N.W.
Washington, D.C. 20007

Re: Palafox Street Associates, L.P., et al., v. United States,
Court of Federal Claim No. 99-898

Dear Messrs. Braude and Lewis:

Based upon my initial and very preliminary review, I anticipate that the Government will object to the introduction into evidence of significant portions of plaintiffs' exhibit No. 1, Palafox's claim to the contracting officer. The purpose of this letter is both to alert Palafox the Government's objections and to afford Palafox the opportunity to proposed steps to address the admissibility of this large composite exhibit.

In the absence of our review of Palafox's pretrial memorandum, we are not aware of the precise manner in which Palafox anticipates utilizing exhibit No. 1. While the Government will have no objection in moving into evidence the claim for the limited purpose of establishing the issues placed before the contacting officer, the Government will object to the Court's consideration of significant portions of the claim and various attachments for the purpose of establishing truth of the matters asserted therein.

For instance, each of the claim items contains a summary and statement of the claim. Based upon discovery, we understand that the claim was prepared with the assistance of counsel; Palafox actually resisted the Government's attempt at discovery into communication between its corporate officials and counsel concerning the preparation of the claim upon the basis of privilege. The narration thus represents constitutes a brief prepared in anticipation of litigation in support of Palafox's claims and not a business record that might properly be admissible as evidence in support of Palafox's claim.

Palafox's claim contains numerous summaries and itemizations of the particular monetary claims. For example, Exhibit 1.1 subtitled "Present value of Lease Renewal Periods," reflects assumption regarding future insurance costs and the effective discount rate. Exhibit 2.4, "Summary of Costs, Claim No., 2," similarly reflects various alleged costs, the derivation and basis of which are not apparent from the document. Based upon discovery, we understand that these numbers in some case represent estimates prepared by Mr. Bitterlich and others.

These and other itemizations do not appear to meet the requirement for admission of summaries into evidence pursuant to Rule1006. See Amarel v. Connell, 102 F.3d 1494 (9th Cir. 1997); Conoco Inc. v Dept. of Energy, 99 F.3d 387, 393 (Fed. Cir. 1997; Martin v. Funtime, Inc., 963 F.2d 110, 115-16 (6th Cir. 1992); Fagiola v. National Gypsum Co., 906 F.2d 53, 57-59 (2d Cir. 1990). For any proposed summary exhibits pursuant to Rule 1006, we would insist upon Palafox's production of specific source documents for each specific figure on each proposed summary.

Depending upon the purpose Palafox intends introduce specific portions of Exhibit No. 1, numerous other evidentiary problems appear to exist. Exhibit 3.2, a lease status report, appears not to be an executed copy. Numerous conversations records appear not to be records admissible as business records, but rather statements of Palafox's contentions prepared in support of its claim and in anticipation of litigation.

The comments above are by no means inclusive, but are intended to illustrate the Government's position that there as significant questions as to the admissibility of substantial positions of exhibit No. 1 for the truth of the matters asserted therein. Should Palafox wish to address the issue, we propose that Palafox advise the Government of (1) the basis upon which Palafox contends that specific documents in exhibit No. 1 are admissible, and (2) what, if any, steps if Palafox intends to take to correct problems regarding the admissibility of specific documents contained in Palafox Exhibit No. 1.

Thank you for your time and attention to this matter.

Yours truly,

JOHN S. GROAT
Attorney
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

cc: F. Warren Jacoby, Esq. (electronic mail)
Amanda Wood, Esq. (electronic mail)

LAW OFFICES
BRAUDE & MARGULIES, P.C.
1200 POTOMAC STREET, N.W.
WASHINGTON, D.C. 20007

(202) 471-5400
(202) 471-5404 FAX

August 3, 2006

**BY ELECTRONIC MAIL**

John Groat, Esq.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

**Re: Palafox Associates, et al. v. United States**

Dear Jack:

This is in response to your letter of July 26, 2006 concerning certain items on our exhibit list.

With regard to my clients' June 30, 1998 certified claims (Exhibit 1), from your letter it would appear that the government may be objecting to the introduction of all or portions of those binders into evidence, but I am afraid that I do not understand the basis or scope of the government's objections. You admit that the documents may be relevant to "establishing the issues placed before the contracting officer," and we certainly agree, but you also express concern that they may be offered "for the purpose of establishing the truth of the matters asserted therein." Please be assured that the "matters asserted therein" are indeed the same "issues" that were "placed before the contracting officer" and that are now on appeal to the Court. You are free to argue over the meaning or the weight that should be attributed by the Court to all or any portion of the materials in the binders, but we also believe that the tabbed claim binders themselves provide both the Court and the parties with useful method of identifying the key components of each of the many individual issues in this case. Virtually all of the documents contained in the binders are also already part of the record.

To the extent that you are raising an objection as to whether any of the items contained in the binders can be introduced without any testimony to establish the truth of the contents of such items, this is a matter of evidence which will be dealt with at trial, and is not the basis for your objection to the binders or their contents being included on our exhibit list.

I'm also confounded by your statement that "Palafox actually resisted the Government's attempt at discovery into communication between its corporate officials and counsel concerning the preparation of the claim on the basis of privilege." The assertion of privilege that you describe would have been entirely appropriate, of course, but in any event I am not aware of any

discovery efforts along those lines that we have "resisted." I understood that your recent attempt at getting Fred Jacoby's files was premised on the mistaken belief that he had been a "transactional" attorney who had some involvement in Keating's bid preparation in 1995, and not that you were seeking access to his privileged attorney-client and work product communications concerning the claim preparation. Furthermore, you have already taken the deposition of Dennis Martin, who supervised the preparation of the claims and certified them.

With regard to the cost/damage summaries contained in those claim binders, the exhibits themselves are self-explanatory as to how those figures were derived. In fact, the GSA conducted an extensive audit of such numbers and issued their audit findings as the result. To insist upon the backup for these summaries, given that audit, is unreasonable. Moreover, you have had numerous opportunities to take discovery into those figures and, in many respects, you have done so. In any event, we will have live witnesses in Court to further elucidate and testify as to our damages calculations, but again the question of the admissibility of that information is one of evidence that will be dealt with at the trial, at which time you can object, if appropriate.

Finally, your letter makes reference to various exceptions to the hearsay rule that you believe are unavailable in this case. We do not intend, nor do we believe the Court's rules require us, to explain to you in advance the authority under or basis upon which we may offer a particular exhibit. Nevertheless, I do look forward to discussing these matters further with you when you return from leave, in the hope of mutually resolving any legitimate concerns that you may have about our proposed exhibits.

Very truly yours,

Michael A. Lewis

cc:

Fred Jacoby, Esq.
Dennis Martin, Esq.
Herman M. Braude, Esq.

**U. S. Department of Justice**

Civil Division
Phone: 202-616-8260
jack.groat@usdoj.gov

JSGroat
154-99-898

*Washington, D.C. 20530*

July 26, 2006

By Electronic Mail and First Class Mail

Herman M. Braude, Esq.
Michael A. Lewis, Esq.
Braude & Margulies, P.C.
1200 Potomac Street, N.W.
Washington, D.C. 20007

Re: Palafox Street Associates, L.P., et al., v. United States,
Court of Federal Claim No. 99-898

Dear Messrs. Braude and Lewis:

Based upon my initial and very preliminary review, I anticipate that the Government will object to the introduction into evidence of significant portions of plaintiffs' exhibit No. 1, Palafox's claim to the contracting officer. The purpose of this letter is both to alert Palafox the Government's objections and to afford Palafox the opportunity to proposed steps to address the admissibility of this large composite exhibit.

In the absence of our review of Palafox's pretrial memorandum, we are not aware of the precise manner in which Palafox anticipates utilizing exhibit No. 1. While the Government will have no objection in moving into evidence the claim for the limited purpose of establishing the issues placed before the contacting officer, the Government will object to the Court's consideration of significant portions of the claim and various attachments for the purpose of establishing truth of the matters asserted therein.

For instance, each of the claim items contains a summary and statement of the claim. Based upon discovery, we understand that the claim was prepared with the assistance of counsel; Palafox actually resisted the Government's attempt at discovery into communication between its corporate officials and counsel concerning the preparation of the claim upon the basis of privilege. The narration thus represents constitutes a brief prepared in anticipation of litigation in support of Palafox's claims and not a business record that might properly be admissible as evidence in support of Palafox's claim.

Palafox's claim contains numerous summaries and itemizations of the particular monetary claims. For example, Exhibit 1.1 subtitled "Present value of Lease Renewal Periods," reflects assumption regarding future insurance costs and the effective discount rate. Exhibit 2.4, "Summary of Costs, Claim No., 2," similarly reflects various alleged costs, the derivation and basis of which are not apparent from the document. Based upon discovery, we understand that these numbers in some case represent estimates prepared by Mr. Bitterlich and others.

These and other itemizations do not appear to meet the requirement for admission of summaries into evidence pursuant to Rule1006. See Amarel v. Connell, 102 F.3d 1494 (9th Cir. 1997); Conoco Inc. v Dept. of Energy, 99 F.3d 387, 393 (Fed. Cir. 1997; Martin v. Funtime, Inc., 963 F.2d 110, 115-16 (6th Cir. 1992); Fagiola v. National Gypsum Co., 906 F.2d 53, 57-59 (2d Cir. 1990). For any proposed summary exhibits pursuant to Rule 1006, we would insist upon Palafox's production of specific source documents for each specific figure on each proposed summary.

Depending upon the purpose Palafox intends introduce specific portions of Exhibit No. 1, numerous other evidentiary problems appear to exist. Exhibit 3.2, a lease status report, appears not to be an executed copy. Numerous conversations records appear not to be records admissible as business records, but rather statements of Palafox's contentions prepared in support of its claim and in anticipation of litigation.

The comments above are by no means inclusive, but are intended to illustrate the Government's position that there as significant questions as to the admissibility of substantial positions of exhibit No. 1 for the truth of the matters asserted therein. Should Palafox wish to address the issue, we propose that Palafox advise the Government of (1) the basis upon which Palafox contends that specific documents in exhibit No. 1 are admissible, and (2) what, if any, steps if Palafox intends to take to correct problems regarding the admissibility of specific documents contained in Palafox Exhibit No. 1.

Thank you for your time and attention to this matter.

Yours truly,

JOHN S. GROAT
Attorney
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

cc: F. Warren Jacoby, Esq. (electronic mail)
Amanda Wood, Esq. (electronic mail)

UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

PALAFOX STREET ASSOCIATES, LLP, : Docket No.
: 99-898C
Plaintiff, :
vs :
THE UNITED STATES, :
Defendant. :

---------------------------------x

Friday, August 18, 2006
Philadelphia, Pennsylvania

- - -

ORIGINAL

Oral Deposition of DENNIS MARTIN taken pursuant to Notice, at COZEN, O'CONNOR, 1900 Market Street, Philadelphia, Pennsylvania, commencing at approximately 9:13 a.m., on the above date, before Tracey L. Pinsky, CSR, RPR and Notary Public.

A P P E A R A N C E S:

F. WARREN JACOBY, ESQUIRE
of Cozen, O'Connor
1900 Market Street
Philadelphia, PA 19103
Counsel for the Plaintiff

JOHN S. GROAT, JR., ESQUIRE
Of U.S. Department of Justice,
Commercial Litigation Branch
Civil Division
1100 L. Street, N.W.
Washington, D.C. 20005
Counsel for the Defendant

I N D E X


WITNESS PAGE

DENNIS MARTIN

By Mr. Groat 4

P R O C E E D I N G S

(It is hereby stipulated and agreed by and between counsel that sealing, certification and filing are waived;

It is further stipulated and agreed by and between counsel that all objections, except as to the form of the question, are reserved until the time of trial.)

DENNIS MARTIN, after having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. GROAT:

Q. What, if any, inquiry did you make regarding the liability, or potential liability, of Keating Development Company to Keating Building Corporation for costs arising as the result of the Pensacola Courthouse Project?

MR. JACOBY: When you said inquiry, the inquiry currently or at the time or some other point in time?

MR. GROAT: At any point in time what inquiries have you made?

MR. JACOBY: I'll object to the form, you can answer.

THE WITNESS: Well, when we prepared the claim back in whatever it was, '97, '98, we needed to get the costs from the building company because they were performing some of the work and people were on their payroll. So we gathered the cost from both the building company and the development company and put them together.

BY MR. GROAT:

Q. Upon what basis, if any, can Keating Building -- excuse me, Keating Development Company hold Keating Building Corporation -- excuse me. Upon what basis, if any, can Keating Building Company hold -- Building Corporation hold Keating Development Company liable for alleged extra costs and expenses?

A. Well, if we had a contract, construction contract, between the Development Company and the Building Company, and to the extent that we can recover those costs in this claim, we owe them to the Building Company.

Q. Now, do you know specifically the provisions of the building contract that relate to this?

A. Well, the building contract incorporates the plans and specifications,

solicitation that its development company has with the government. So that if there was something in those plans that they did that was extra, then we as the development company owe the building company for those.

Q. Okay. Was this a written contract or an oral contract?

A. Well, there is a -- you know, there is the written construction contract.

Q. And who would have entered into the written construction contract?

MR. JACOBY: What entities?

MR. GROAT: Yes, what entities.

THE WITNESS: It would have been -- I have to look back. It would either be the development company -- would be the development company usually and as the owner and the building company as the builder.

BY MR. GROAT:

Q. Now, is it your recollection that -- what is your recollection as to the -- as to the parties that entered into this written construction contract?

MR. JACOBY: I think he already testified he thought the parties were KDC and KBC.