THE WITNESS: I thought it was KDC. Occasionally what happens is at the financing closing the bank or finance entity wants the contract then with the single purpose entity for that project. And it will be assigned at closing from the owner from KDC over to Palafox. That may or may not happen here. I don't recall, but that happens fairly frequently.

BY MR. GROAT:

Q. Who makes the determination to -- by Keating Building Corporation to recover any costs?

MR. JACOBY: Do you understand the question?

THE WITNESS: What person?

BY MR. GROAT:

Q. Yes. What person or entity from Keating Building Corporation makes the determination to recover costs?

MR. JACOBY: I'll object to the form. You can answer.

THE WITNESS: Well, the project people and then the project exec would say this is an extra cost.

BY MR. GROAT:

Q. When you say the project people and

project exec, who specifically in this case would make the determination to seek reimbursement for alleged additional costs?

A. I think the project exec -- I'm trying to remember, might -- it was Joe Straveri (phonetic). I can't remember who the project manager was. We had Don Bitterlich on the development side.

Q. So is it your testimony you don't know specifically who would make that determination to seek additional costs on behalf of Keating Building Corporation?

MR. JACOBY: Object to the form.

THE WITNESS: It would have been the project people. One of the things that you have to understand, I'm the executive vice president of the building company. I'm president of the development company. There is a large overlap here. If something happens on the project, for example, the mold, situation, something has to happen fast, we say, you know, do it. The project guys are doing it. We are doing it. There isn't a lot of correspondence or things going back to and forth saying -- that the project people will say, well, this isn't in my contract or something.

And it doesn't mean that we stop doing it.
BY MR. GROAT:
Q. Is the ownership of Keating Building Corporation and Keating Development Company identical?
A. Virtually, Dan Keating, The Third owns a hundred percent of the development company and he and his children own a hundred percent of the building company.
Q. Now, is Keating Development Company liable to Keating Building Corporation for alleged excess costs and expenses in the absence of any recovery against the United States in this action?
MR. JACOBY: I'll object to the form. Your question is if Keating Building Corporation has claims and KDC does not recover for the claims, does KDC still owe KBC for those claims?
MR. GROAT: Yes.
THE WITNESS: Again, if KDC does not recover the claims, then no payment will be made to KBC for the KBC costs.
BY MR. GROAT:
Q. Under the terms of the construction contract is there any -- is Keating Development

Company potentially liable to Keating Building Corporation for the excess costs?

MR. JACOBY: Object to the form. I think you may have asked the same question; but if you can answer, you can answer.

THE WITNESS: It would be liable, but not have to pay. I mean, typically we come from the construction background. And when there is a claim against an owner from a subcontractor, for example, for delay -- this was the very first one I was involved in was back in, Christ, 1977 -- we will enter into a liquidating or sometimes called a litigation agreement with the subcontractor that says, you know, I owe you for this delay claim, but your recovery -- and we are going to pursue it together. And your recovery from me will be limited to what I recover on behalf of your claim from the owner. Because there isn't a direct line between a subcontractor and an owner.

And that's the same type of thing that we operated under here. I mean, KBC doesn't have a direct claim against the government here. They were the contractor for KDC. So even though we incurred these costs, and say, yeah, we owe it

to you, but we are not going to pay you -- your recovery, your payment, is going to be limited to what we get from an owner.

BY MR. GROAT:

Q. Do you recall specifically what the contract provisions provided in this case?

A. No. I haven't looked at it.

Q. Let me turn to the consultant, Mr. Godfrey. What, if any, inquiry have you made regarding Mr. Godfrey's employment by either Keating Development Company or Keating Building Corporation relative to the Pensacola project?

A. We had, and still do, David Godfrey on a retainer where he looks for either construction or development opportunities both government and private for both companies. So that started in about 1992.

Q. What are the terms of this retainer agreement?

A. Started in 1992 around $2,000 a month. It's moved up through the years plus expenses. And then it would be commission or in the event that we were at a job and a job was profitable.

Q. Have you made any inquiry concerning

Mr. Godfrey's involvement with the Pensacola Courthouse Project?

A. I recall really from reading things, but he was at the pre-bid conference. And then after that he was involved when we attempted to restructure the rent. And then subsequent to that I thought Mike Sencindiver talked to him about a FOIA request. And then David and I met with the GSA in Atlanta. This was before the claim was filed and at a settlement conference.

Q. Have you ever discussed with Mr. Godfrey his attendance at the pre-proposal meeting?

A. Yes.

Q. Do you know whether Mr. Godfrey heard a discussion of the -- a discussion regarding the donation agreement at the pre-proposal meeting?

MR. JACOBY: Object to the form of the question. You can answer.

THE WITNESS: I don't know whether he heard it or not.

BY MR. GROAT:

Q. What is the basis in Palafox's claim to the contracting officer for the allegation that

the question of a donation agreement was discussed at the pre-proposal conference?

MR. JACOBY: I'm going to object to the form. And also raise the objection, and possibly direct him not to testify, since this was limited to two topics, one, Mr. Godfrey and, number two, the obligation of KDC to KBC for costs. I think you're going beyond the scope of those, and I believe that was the subject of Mr. Martin's prior deposition. And unless you can explain to me how that question relates to one of those two subjects, I'm going to request him not to answer.

MR. GROAT: I'm trying to get to the question of whether Mr. Godfrey witnessed the statements regarding the donation agreement at the pre-proposal conference.

MR. JACOBY: I think his testimony to your prior question was he just doesn't know. And, in fact, I think if you read the minutes it's not clear that that was even discussed at the meeting.

MR. GROAT: My understanding is the complaint alleges that it was discussed at the meeting as does the claim. What I'm trying to do

is determine whether that information was obtained from Mr. Godfrey.

MR. JACOBY: Okay. I think his answer is he doesn't know.

THE WITNESS: Yeah, I don't know.

BY MR. GROAT:

Q. Did Mr. Godfrey's retainer agreement extend to reporting matters of significance to Keating officials that occurred at the pre-proposal meeting?

MR. JACOBY: Could you repeat that question, please?

(Pertinent portion of the record is read as follows:

"QUESTION: Did Mr. Godfrey's retainer agreement extend to reporting matters of significance to Keating officials that occurred at the pre-proposal meeting?")

MR. JACOBY: Object to the form of the question. Do you understand the question? If you do, you can answer it.

THE WITNESS: No. It -- his retainer agreement is to find projects for us. That's -- it's a business development function.

BY MR. GROAT:

Q. So as I understand your testimony, is that assuming Mr. Godfrey heard discussion of the existence of a donation agreement at the pre-proposal conference that he wouldn't have had -- he wouldn't have been expected to report to Keating officials at that discussion; is that correct?

MR. JACOBY: Object to the form of the question.

THE WITNESS: Could you rephrase it?

MR. GROAT: Could you repeat the question, perhaps and....

(Pertinent portion of the record is read as follows:

"QUESTION: So as I understand your testimony, is that assuming Mr. Godfrey heard discussion of the existence of a donation agreement at the pre-proposal conference that he wouldn't have had -- he wouldn't have been expected to report to Keating officials at that discussion; is that correct?")

MR. JACOBY: Object to the form of the question. I also think your question misrepresents the facts in the testimony. It's not clear if there was a discussion at the

conference, there certainly was in the Q&A provided afterwards a reference to it, but I believe at the time the GSA denied the existence of a donation agreement. So your question really has no foundation.

MR. GROAT: Can you answer the question?

THE WITNESS: If -- it's assuming -- and this is where I have a problem -- that there was or should have been significance put on -- if there was a discussion of the donation agreement, that there should have been significance put on that. And that's -- for all those reasons I have the problem with it.

If the government had said something that David felt was very significant, he would have reported it, yes. And that's where I have trouble with your --

BY MR. GROAT:

Q. Perhaps, then, I can address it.

Would the discussion of the possibility that the City of Pensacola would execute a donation agreement have been a matter that you would have expected Mr. Godfrey to report to Keating officials?

MR. JACOBY: Objection as to the form of the question. You can answer.

THE WITNESS: No. Again, because it was stated in the -- at least from the pre-bid meeting minutes, that the government represented that it wasn't signed, didn't exist. And if it ever did, that they would give it to us. So that why would anybody put significance on what they said.

MR. GROAT: I have no further questions.

(9:31 a.m.)

JURAT

I, DENNIS MARTIN, do hereby certify that I have read the foregoing transcript of my testimony taken on Friday, August 18, 2006 and have signed it subject to the following changes:

PAGE LINE CORRECTION

[signature]

DENNIS MARTIN

DATE 9/19/06

Sworn and subscribed to before me this

19th day of Sept., 2006.

Marcia S. Kelly

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Marcia S. Kelly, Notary Public
City Of Philadelphia, Philadelphia County
My Commission Expires Nov. 27, 2007
Member, Pennsylvania Association Of Notaries

CERTIFICATION

I, Tracey L. Pinsky, Registered Professional Reporter, do hereby certify that I reported the deposition in the above-captioned matter; that the witness was duly sworn by me; that the foregoing is a true and correct transcript of the stenographic notes of testimony taken by me in the above-captioned matter.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel in connection with the action, nor financially interested in the action.

Tracey L. Pinsky,

Registered Professional Reporter

Tracey L. Pinsky

Page 1 of 1

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: 09/01/2006
Case Name: Palafox Street Assoc. v. United States
Case Number: 99-898C
Dep. Date: 08/18/2006
Deponent: Dennis Martin
Place: Philadelphia PA
Ref. No.: 8312-6

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
| --- | --- | --- | --- | --- |
| 12 | 4 | but | that | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

9/19/06
Date of Signature

COZEN
O'CONNOR
ATTORNEYS

A PROFESSIONAL CORPORATION

1900 MARKET STREET PHILADELPHIA, PA 19103-3508 215.665.2000 800.523.2900 215.665.2013 FAX www.cozen.com

September 26, 2006

**VIA FEDEX**

John S. Groat, Jr., Esquire
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 11050
Washington, DC 20530

Re: **Palafox Street Associates, LLP., et al. v. The United States**
**Deposition Transcript and Errata of Dennis Martin**

Dear Mr. Groat:

On behalf of F. Warren Jacoby, and per the Notice Regarding Signing Deposition Transcript, enclosed please find the original transcript of Dennis Martin from his deposition of August 18, 2006 in the above-referenced matter, along with Mr. Martin's executed signature page and signed errata sheet.

In the interest of time, I will also be sending copies of Mr. Martin's signature page and errata sheet to your attention via facsimile.

Please let me know if you have any questions or need additional information.

Sincerely,

COZEN O'CONNOR

Kate Bailey

By: Kate Bailey
Paralegal

Enclosures

cc: F. Warren Jacoby, Esquire

PHILADELPHIA\2786538\1 066645.000