# *In the United States Court of Federal Claims*

| | | |
|---|---|---|
| **Palafox Street Associates, LP, et. al.**<br>**Plaintiffs,**<br><br>**v.**<br><br>**The United States,**<br>**Defendant** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No. 99-898C**<br>**Judge C. Miller** |

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION IN LIMINE

The government has filed a "Motion in Limine to Exclude Plaintiffs' Claim Summaries as Evidence Pursuant to Rule 1006," and Plaintiffs, through undersigned counsel, now respond.

## BACKGROUND

As the Court knows, this case has been scheduled for trial twice previously. The April 2006 trial date was moved to September 2006 in order accommodate the calendar of the government's lead counsel, and the September 2006 trial was rescheduled to accommodate the needs of Plaintiffs' lead counsel for medical care.[1] Now, three business days before the commencement of the rescheduled trial, when Defendant knows that Plaintiffs is and must be preparing witnesses and exhbits, the government has filed a "motion in limine" to exclude all or parts of Plaintiffs' certified claim submission, notwithstanding counsel for the government's repeated opportunities at the depositions of Plaintiffs' witnesses to obtain any clarification or explanations, or to identify any additional documents, that he now claims that he is entitled to. These claim materials were first submitted to the government in 1998 and were identified as trial exhibits in the summer of 2006. Their proposed use at trial was discussed in correspondence and

[1] Plaintiffs' attorney Fred Jacoby has now recovered from his surgery, which took place in September. Herman Braude is currently undergoing chemotherapy and may miss all or part of the upcoming trial.

pre-trial conferences previously. The assertions that Plaintiffs have raised anything "new" regarding these exhibits "for the first time" this week, or "on the eve of trial," are therefore inaccurate. The government's eleventh-hour submission of this of a formal motion can really only be explained as, at best, inexcusable neglect, or, at worst, a transparent effort to disrupt Plaintiffs' trial preparation. In any event, many of the issues raised by the motion were discussed in Plaintiffs' supplemental memorandum filed earlier this week.

## DISCUSSION

### A. The Documentation Supporting Plaintiff's Claim Summaries Was Produced to Defendants

Only portions of the claim submissions in question constitute "summaries" within the meaning of FRE 1006. Those portions include pages that summarize additional costs incurred by Plaintiffs and their construction subconractors in performing extra work above and beyond the agreed scope of what Plaintiffs were required to do under their contract in order to furnish the government with a substantially complete courthouse. This extra work included changes to interior finishes, lighting, and minor structural work ordered by the government and for which Plaintiffs would be required to recover additional compensation under the "Changes" clause of the contract. Plaintiffs' claim submissions include summaries of the costs incurred by Plaintiff (and original contractor) Keating Development Company ("KDC") and its subcontractors in performing and administering this extra work. [2]

As explained in Plaintiffs' February 5, 2007 filing, the supporting documentation for those construction and administration costs upon which those summaries are based has been

---

[2] As explained in the Complaint, at the conclusion of the construction phase of performance, the lease contract was assigned with the government's consent to Palafox Street Associates, LP, the entity currently performing the contract. An affiliate of KDC performed the actual construction work pursuant to a contract with Palafox Street Associates, L.P.

produced and otherwise made available to the government on two occasions during the course of this litigation, first in formal document production in 2001 and later that same year pursuant to and in conjunction with an audit conducted by the General Services Administration Office of Inspector General, at the request of the Contracting Officer. The government had four years following that production to request additional documents, but the government chose not to do so. The government did take a 30(b)(6) deposition of KDC at the end of 2005 for the purpose of determining whether any relevant non-privileged documents had been withheld, and the government was advised at that time that no non-privileged documents were withheld from the aforementioned production, as Dennis Martin testified in his December 30, 2005 deposition (attached here as Exhibit A).

**B. Plaintiffs Have Complied with the Court's Orders of October 31 and December 19, 2005,, and the Government Has Taken Significant Discovery Since That Time**

Much of the government's present motion is premised on what Plaintiffs believe is a mischaracterization of earlier proceedings that took place in 2005 concerning discovery matters, specifically mischaracterizing Plaintiffs' response to the Court's October 31, 2005 Order. In late 2005, four years after discovery had been concluded between the parties, the government's third counsel-of-record filed a motion to compel the Plaintiffs to supplement their interrogatory answers, which this Court granted in its October 31, 2005 Order. After two rounds of supplementation by Plaintiffs, the government claimed to still be dissatisfied and renewed its motion to compel, whereupon the Court allowed the aforementioned 30(b)(6) deposition and further ruled, in its December 19, 2005 Order, that "defendant can move to exclude any evidence that plaintiff's offer that should have been made available to defendant as a supplement to a discovery response or a more complete discovery response."

The government's present motion goes well beyond the motion that was contemplated by the Court's December 19, 2005 Order. The present motion seeks to exclude materials that have been in the government's possession or otherwise available to the government in one form or another for nearly a decade, and is not attempting to exclude information on the grounds that it was not previously made available to the government in discovery.

To be sure, the government attempts to rationalize the requested exclusion by alleging nonconformance by Plaintiffs with FRE 1006, citingnumerous cases discussing and applying that rule, however the government's motion fails to explain why the government should be entitled to any exclusionary relief in this particular case, or to identify any actual nonconformance or resulting actual prejudice

For example, the government questions whether the cost records underlying the summaries in Plaintiffs' claim submissions are, in fact, voluminous, but this objection is spurious, since the government has no reason to doubt that fact, having already reviewed the documents twice (in the context of discovery and then in the context of an audit). The documents in question have been in storage in Plaintiffs' facilities since the completion of the audit, and the government has not, since that time, made any effort to further re-examine them, not even in the two months that elapsed between the time the government first raised this concern in July 2006 and the last scheduled trial date, nor at any time since then.

The government similarly challenges whether the underlying documents would be admissible, suggesting they are not "business records" merely because Plaintiff's counsel reasonably advised his client in April 1998 – after the government finally accepted the building and reinstated rental payments – to be cautious in creating future correspondence because of anticipated litigation. Again, this objection is spurious because all of the documentation that the

government is now seeking to exclude was compiled over the course of performance prior to April 1998, and was included in the certified claim submission that was made in June 1998.

### C. The Government's Motion Is Erroneously Relying on FRE 1006 to Exclude Non-Summary Evidence

The government's reliance on the exclusionary effect of FRE 1006 misses the mark because much of the information that the government is seeking to exclude by this Rule is not the subject of any FRE 1006-type summary. For example, the government asserts that "Palafox fails to suggest any possible basis for the Court to conclude that documentary evidence of the insurance costs Palafox projects as a basis for its calculation of what it alleges to be the net present value of the lease renewal. . . ." The computation of Plaintiffs' lease option/superior knowledge claim is not a "summary" of "voluminous documentation" as contemplated by FRE 1006, but is instead simply a calculation of projected revenues, discounted to present value, that will not be earned because the "options" upon which Plaintiffs bid and that were awarded to Plaintiffs are never likely to be exercised, due to the factual circumstance of the pre-existing Donation Agreement between the City of Pensacola and the federal government, which was not disclosed to bidders pre-award. Plaintiffs' evidence for those damages will be primarily the testimony of the KDC employees who prepared and oversaw the submission of KDC's bid: Michael Sencindiver, Dennis Martin, and possibly Tracy Greer. All three individuals were deposed in the past year over these same issues.

Significantly, not once in the government's deposition of the witnesses who prepared KDC's bid did the government ever question any witness about the insurance costs used in preparing the bid. The closest the government ever came to that issue was when asking Tracy Greer, one of the KDC employees involved in bidding, basic generalities about what factors were considered in bid preparation, in response to which Ms. Greer mentioned insurance. The

government probed no further. See Exhibit B, attached (transcript of Tracy Greer). The government has had many years and ample opportunity to explore this and any other issue related to KDC's bid preparation, and the fact that the governmnet has failed to do so is not grounds for excluding any evidence offered by KDC.

**CONCLUSION**

As discussed in Plaintiffs' February 5, 2007 supplemental memorandum, all of the documentation relating to Plaintiffs' claims for damages for the lease option /superior knowledge claim were produced to the government in 2001, both in discovery and in an audit conducted during the course of litigation. The government has had further opportunities within the past year to conduct further discovery into the claim, deposing each of the key personnel involved in its preparation. The other documents upon which Plaintiffs intend to rely, and which have been identified as exhibits for months, are documents that were previously produced to and made available to the government over the many years that this claim has been pending before the governement. Under these circumstances, there is simply no basis, under FRE 1006 or any other rule, to exclude Plaintiffs' evidence.

Dated: February 8, 2007

Respectfully submitted,

Herman M. Braude
Attorney for Plaintiffs
Gerson B. Kramer, *of counsel*
Michael A. Lewis, *of counsel*
BRAUDE & MARGULIES, P.C.
1200 Potomac Street, N.W.
Washington, D.C. 20007
(202) 471-5400 (tel)
(202) 471-5404 (fax)

F. Warren Jacoby, Esq., *of counsel*
Cozen & O'Connor
1900 Market Street
Philadelphia, PA 19103

**CERTIFICATE OF SERVICE**

I certify that on February 8, 2007, a copy of the foregoing was served by hand delivery on the following:

John Groat, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Dept of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, DC 20530

Page 30

answer.
THE WITNESS: Yes.
BY MR. GROAT:
Q. And did the documents produced reflect that analysis?
MR. JACOBY: Objection to form. If you understand the question, you can answer it, if you can.
THE WITNESS: Their files would have included their analysis to the extent they wrote an analysis down.
BY MR. GROAT:
Q. Now, did the documents produced reflect an analysis of the cash flow that would be generated by the government's exercise of the options in this case?
MR. JACOBY: You're asking Mr. Martin to try to recall what specific documents provided. To the extent you recall, fine; if you don't recall, you don't recall.
THE WITNESS: I don't recall.
BY MR. GROAT:
Q. Are you aware of any documents that reflect a cash flow analysis of -- resulting as the exercise of the options?

Page 31

A. Yeah. In preparation for the claim, yes.
Q. Now, let me invite your attention to page two of the appendix, again, response number three.
MR. JACOBY: Jack, that's the one that says all documents relating to design of the project?
MR. GROAT: That's correct.
BY MR. GROAT:
Q. Now, are you aware of any documents that were withheld in response to this request for production?
A. No.
Q. And are you aware of any documents that were deemed privileged and withheld based upon this request for production?
A. No.
Q. Let me invite your attention to request number four and ask the same question, are you aware of any documents that were withheld in response to this question?
A. No.
Q. And question number five?
MR. JACOBY: Are you asking the same question about privilege for four, too, or should he just assume that each time?

Page 32

BY MR. GROAT:
Q. Let me ask you the same question as to whether any documents have been withheld regarding question number four, and as we go down, I just ask you to review the questions and respond to the same question for each paragraph without my repeating it?
MR. JACOBY: Just say paragraph number and your response, just so the record is clear.
MR. GROAT: Thank you.
THE WITNESS: Five is no.
BY MR. GROAT:
Q. Okay, thank you.
A. Six is no.
Seven is no.
Eight is no.
Nine, I don't believe we provided canceled checks because that would be ridiculous to try to find those.
We don't file canceled checks by jobs. And I don't know from, I mean, 2001, I can't recall seeing a canceled check in the last ten to fifteen years. I think it's all done electronically.
Q. Are ledgers maintained that would reflect

Page 33

the payment?
A. Sure.
Q. Were these included in the production?
A. Yeah. The subcontractor folders were all produced which have, in their folders, the subcontracts, the payment -- the applications for payment, when were the payments made, the final release by each subcontractor.
MR. JACOBY: He's asking a different question.
BY MR. GROAT:
Q. One way of proving actual payment would be a canceled check?
A. Uh-huh.
Q. What, in the documents produced, stands in place of a canceled check as proof of payment?
MR. JACOBY: I'll object to form. You can answer.
BY MR. GROAT:
Q. To the best of your ability, please?
A. You really have to ask accounting. I mean, I look at --
MR. JACOBY: Let me see if I can help you. Does the subcontract file contain a





EXHIBIT
A

time, it was a matter of is this a project we should move forward with?
Q. Do you recall any specific meetings or conversations with Mr. Martin?
MR. JACOBY: At what point in time, Jack? I'm sorry.
BY MR. GROAT:
Q. In the course of the preparation of the best and final offer.
A. I can't recall any specific meetings.
Q. Do you recall any conversations you've had with Mr. Martin?
A. I can't.
Q. I'd ask the same questions; do you recall any specific conversations or meetings where Mr. Bertino was present?
A. I had several meetings with Mike Bertino to discuss the construction costs of the project, as I said before.
Q. Now, I'd like to specifically reference the preparation of the best and final offer in this regard.
A. Okay.



Q. Do you recall any specific meetings or discussions with Mr. Bertino in connection with the best and final offer?
A. The one specific meeting I recall is the one I referenced where we were all sitting around the table deciding whether we could go forward with the offer. I can't recall any other specific meetings.
Q. And this would not be in connection with the best and final offer, but the meeting you recall was in connection with preparation of the offer, is that correct?
MR. JACOBY: Object to the form of the question.
THE WITNESS: No.
BY MR. GROAT:
Q. Clarified to the extent that you could, what --
A. That meeting that I mentioned, Mr. Sencindiver, Martin, Keating and Bertino, that meeting was with regard to preparation of the best and final, and submission of the best and final offer.
Q. Where and when did the meeting



occur?
A. I couldn't tell you when. It was before the submission of the best and final offer. It was, I believe, on the fifth floor of Keating's offices at 1 Bala Avenue in Bala-Cynwyd.
Q. Who would have attended the meeting?
A. I answered that.
MR. JACOBY: Humor him and do it again.
MR. GROAT: If you could.
THE WITNESS: For the third time, it was me, Mike Sencindiver, Dennis Martin, Mike Bertino and Dan Keating. Those are the people I remember being there. There may have been others.
BY MR. GROAT:
Q. Do you recall any specific analysis or presentation being presented at this meeting?
A. It was a matter of do we think our construction costs are accurate, and can we do the building?
Q. Can you explain to me what's involved in the calculation of "Can we do the building"?
A. Yeah. I mean, assuming a



construction cost is firm, you know, you have a good number there, you take that number that you are provided from your contractor, you add -- and then you add in any other kinds of development costs that are not hard construction costs; that would include architectural and engineering, those kinds of -- any kinds of fees that had to be paid, but -- soft costs we call them. And then based on that capital cost, you know what you need to finance.
On top of that, then that determines your debt service. And on top of that, you have to add in your ownership costs such as taxes, insurance, things like that, management of the building, and that gives you a number. And if your lease amount that you are receiving from a tenant can cover those costs on an annual basis, then you know you have a project that works. If they can't, you don't.
Q. Did you perform such an analysis in this case?
A. Yes.
Q. And to whom did you present the analysis?

EXHIBIT
B

Page 50

A. Mike Sencindiver and I worked on it together and presented it. It was part of the discussion, I'm sure, at that meeting.
Q. What were your conclusions regarding the analysis that you performed on construction costs, development costs, capital cost, debt service and ownership costs?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: That we could do the project.
BY MR. GROAT:
Q. By "do the project," do you recall what conclusions you reached regarding the profitability of the project?
A. Well, what I remember is that if -- that we could -- that we could make -- that we could make the numbers work, and the project would work and pay for itself with the lease term. And then we had some renewal options which were important to us at the end of the day, because that was where we could -- there was an upside to the project for us.

Page 51

Q. Now, had you previously been involved in evaluating the potential profitability of government contract cases -- of government contracts?
MR. JACOBY: Object to the form of the question.
THE WITNESS: Do you mean other government leases?
BY MR. GROAT:
Q. Yes.
A. Yes.
Q. Can you explain to me generally what factor is made -- or how the possibility that the government would exercise options is evaluated in such cases?
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: In general, I think that's -- you know, that's a business decision that we make, and we factor into it what kind of a facility we are dealing with.
In this case, this was a one-of-a-kind building. Courthouses are very

Page 52

difficult for the government to finance and pay for. That's why they lease them, because they have no other way of getting them built. And the likelihood that they'd walk away from what was a 20-year old building is pretty remote. And that was a business decision that we made.
BY MR. GROAT:
Q. Who made that decision?
A. Well, I assume Dan Keating.
Q. Now at the meeting you've referenced, who was the individual that ultimately made the decision regarding the submission of the best and final offer?
MR. JACOBY: At that meeting?
MR. GROAT: At that meeting.
THE WITNESS: At that meeting, Dan Keating.
BY MR. GROAT:
Q. Do you recall if Mr. Keating was involved in the substance of the discussions regarding whether to submit a best and final offer?
MR. JACOBY: Could you read that question back, please?

Page 53

(Pertinent portion of the record is read.)
MR. JACOBY: Object to the form of the question. You are saying at that meeting?
MR. GROAT: At the meeting.
MR. JACOBY: Object to the form of the question.
You can answer.
THE WITNESS: Yes, he was there, yes.
BY MR. GROAT:
Q. What I'm interested in getting at is whether he was actually involved in discussions at the meeting in a personal capacity. Did he make comments, ask questions and, you know, raise issues at the meeting?
A. Yes.
Q. What, if any, discussion do you recall at the meeting regarding the potential for the government's exercise of the options on the Pensacola Courthouse Project?
A. That they were critical in our decision for moving forward with the best and final offer.